**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| | ) | Case No. 26-16423-MER |
| MAVERIX, LLC | ) | |
| | ) | Chapter 11 |

**DEBTOR'S AMENDED RESPONSE AND OBJECTION TO MOTION TO EXCUSE RECEIVER'S TURNOVER PURSUANT TO 11 U.S.C. § 543(d)(1)**

Maverix, LLC, the debtor and debtor-in-possession ("Debtor"), by and through its undersigned counsel objects to the Motion Excuse Receiver's Turnover Pursuant to 11 U.S.C. § 543(d)(1) filed by CooperReilly Investment Fund, LLC ("CR") for the following reasons:

**DECLARATION OF DAVID LINDAUER INCORPORATED HEREIN**

1. The facts set forth in the Declaration of David Lindauer In Support of Debtor's Response and Objection to Motion To Excuse Receiver's Turnover Pursuant to 11 U.S.C. § 543(d)(1) filed herewith are incorporated herein.

**MOVANT HAS NOT SHOWN A NEED FOR RELIEF**

2. The motion is self-contradictory. CR states that all assets have already been turned over by the receiver. If so, the relief sought is moot. By their own statements, relief is unnecessary and therefore should be denied.

**TURNOVER IS IN BEST INTEREST OF OTHER CREDITORS**

3. 11 U.S.C. § 543(d)(1) requires an examination of the effect on other creditors, not just CR.

4. Continued possession by the receiver is not in the best interest of other creditors because the receiver has not attempted to receive a fair market value or reasonably equivalent value for the sale of the assets.

5. The assets purported to be sold to CR via the Asset Purchase Agreement ("APA") are worth substantially more than the amount to be received. The APA purports to accept CR's bid in the amount $7,025,000, of which only $25,000 is cash and the remainder is credit.

6. During the receivership, there were offers from Intrepid for $10,000,000 and $11,000,000; from BAM / Future Standard for $12,200,000; and from Xtream/Sharplinefor $13,236,500. Each of the foregoing offers did not include the Indefensible Right of Use ("IRU"). The APA includes the IRU, which by itself is worth at least several million more dollars, and could be worth tens of millions.

7. The IRU (Exhibit C) grants CR a "perpetual, irrevocable, royalty-free" right over every Covered Asset, a term that reaches Excluded Assets and any other property of the Sellers not conveyed at closing that is "reasonably essential, necessary or useful" to CR, and it cannot be terminated "for any reason, including any breach or default by the Grantee." IRU §§ 1, 2, 7. It also deems all fiber conveyed to CR unless a Seller produces "contemporaneous written documentation" of grant funding, leaving the Seller holding "bare legal title . . . in trust" for CR, and it provides that no "fee, royalty, rent . . . or other consideration of any kind" is payable because the entire consideration is "included in the Purchase Price," a price that, as Mr. Lindauer testified without contradiction, "changed exactly $0" when the IRU was added. IRU §§ 1, 11, 15(b); Aug. 27, 2026 Hr'g Tr. 60:02-03. Every asset left in the estate, and anything the Debtor could sell under a plan, is

therefore permanently burdened for CR's sole benefit at no cost to CR, a right Mr. Lindauer valued under CDOT's published calculator at $19.7 million for just two strands and more than $225 million at full build. Id. at 59:07-09, 59:17-20.

8. The receiver used technical bid procedures and other impediments to dissuade and otherwise obstruct the far higher bids, without actually and properly investigating their feasibility.
9. The Debtor will likely propose a plan to sell the assets and will likely receive far more than CR’s current (largely credit) bid.
10. Any of the foregoing offers would fully satisfy CR’s claim and leave substantial more distribution to other creditors.

**CR HAS NOT DEMONSTRATED A PLAN OF REORGANIZATION IS UNLIKELY**

11. CR makes conclusory allegations about the Debtor’s motives for filing bankruptcy without any evidentiary support. Debtor filed the bankruptcy for the proper purpose of reorganizing.
12. The assets are worth far more than CR’s claim and their credit bid. Multiple offers were received for far greater amounts. A sale through Chapter 11 for a larger amount than what is to be received by the APA is not only possible, but highly likely.
13. CR argues that APA was closed prior to the time bankruptcy was filed. Accordingly, they argue that the debtor has “just one asset” - a piece of real property - which makes reorganization impossible.
14. It is doubtful the APA closed, in paragraph 99, Movant claims three separate events (payment of money, execution of a certain “Bill of Sale,” and an “IRU“) occurred “. . . [f]following the entry of the Consummation Order, on August 28, 2026, . . .” The

wording of this paragraph is ambiguous and leaves open two possibilities: (1) August 28, 2026 was merely the date of the Consummation Order and then the documents were signed at some later unspecified time or (2) documents were signed and payment made on August 28, 2026. The two exhibits cited do not answer the question. Exhibit B, the Bill of Sale states that it is "effective as of August 28, 2026" but contains no date when it was actually executed. The fact that it does not contain a date of actual execution, while apparently being predated by its terms, suggests it was signed at a later date. LIkewise, Exhibit C, the IRU, states it is effective" as of" the "Effective Date" and the "Closing Date" but also does not contain a date it was actually executed. Again, this suggests that the document was signed after August 28, 2026. Neither CR or the receiver has ever produced the docusign envelopes which would answer the question of when the documents were signed.

15. Even if the APA has closed, the APA can likely be "undone" by operation of 11 U.S.C. §548 because the receiver received less than "reasonably equivalent value" and the Debtor was rendered insolvent.

16. In either the event that APA did not close or the transaction is set aside under 11 U.S.C. §548, the Debtor will have revenue of approximately $180,000 per month while attempting to sell the assets or otherwise reorganize.

**RECEIVER UNABLE TO OPERATE NETWORK WITHOUT ASSISTANCE OF DEBTOR**

17. The receiver has been unable to operate the Debtor without the unpaid help of Mr. Lindauer. <u>See</u>, Exhibit 1 (Declaration of David Lindauer In Support Of Debtor's Response And Objection To Motion To Excuse Receiver's Turnover Pursuant To 11 U.S.C. § 543(d)(1).

18. The Receiver's principal, Bryan Perkinson, swore on September 18, 2026 that the Receiver "cannot operate the network without continued reliance on Lindauer," and "has not obtained complete, independent control over network operations . . ."

19. The Receiver's Third Report, filed August 17, 2026, says "the estate does not have all of the expertise that certain tasks require"; the outages "often require an immediate response by estate personnel"; and "Mr. Lindauer historically handled much of that work."

**PRELIMINARY REPORT DOES NOT ESTABLISH ANY WRONGDOING BY THE DEBTOR**

20. The report (ECF 60-1) submitted by Movant as a supplement (ECF 60) concerns the Debtor's parent, not the Debtor and does not establish or accuse the Debtor of wrongdoing.

21. The report is not final and the Debtor's parent has submitted a detailed response within the time period given. See, p.11 (Debtor's parent given 15 days to respond); see also, Exhibit 2 (Debtor's parent response).

22. Without a chance for the investigator to evaluate the Debtor's parent company's or Mr. Lindauer's submitted response, the preliminary findings set out in the report do not show trustworthiness or finality. Accordingly, the preliminary findings are most likely tentative and inconclusive and thus not admissible under CRE 803(8). See, *Coleman v. Home Depot Inc.*, 306 F.3d 1333, 1342 n. 4 (3d Cir. 2002) (the finality of factual findings in a public record or report is also relevant to the trustworthiness inquiry).

23. The press-release (ECF 60-2) is clearly not admissible.

**CR AND THE RECEIVER ARE NOT SUFFICIENTLY INDEPENDENT AS THE RECEIVER HAS WORKED AT THE DIRECTION OF AND FOR THE BENEFIT OF CR**

24. The Receiver stopped the Debtor's ongoing construction for the benefit CR, and its own words say so. On March 31, 2026, it instructed the Maverix team: "All work being done at Maverix, whether grant related or otherwise, needs to remain stopped until the sale with Cooper Reilly has been completed." See, Docket No. 49-6 at 7 (email quotation).

25. It then told the state court that it had "directed that work on these projects be suspended." Docket No. 49-5, p. 10. Its Third Report gives the reason: the Receivership Order "requires CooperReilly's approval for transactions over $10,000, which these projects would require. CooperReilly has stated that it does not want the estate to perform additional grant work." Docket No. 49-12, p. 5. The State rescinded the grants on September 21, 2026. CR now offers that rescission as a reason to leave the Receiver in place. Docket No. 60. CR was motivated to stop work in the grants because it benefited CR. By stopping the work, and delaying it until after CR purchased the assets under the APA, the income from that work benefited solely CR and any successor entity, not the Debtor.

Respectfully submitted this 25th day of September, 2026.

By: /s/ Matthew C Campbell

Matthew C. Campbell, attorney for Debtor
Co. Reg. No. 42713
LAW OFFICES OF MATTHEW C. CAMPBELL LLC
Durango, CO 81301
(970) 422-4270 phone
(970) 478-0178 fax
matthew@cswlegal.com

CERTIFICATE OF SERVICE

I certify that on this 25th day of September, 2026, I served the foregoing document (and all attached documents, if any) upon the following:

ALAN MOTES (Attorney for US Trustee) - ECF system
Patrick R. Akers for Creditor CooperReilly Investment Fund, LLC - ECF System
Matthew T. Faga for Creditor CooperReilly Investment Fund, LLC - ECF System
John Goutell on behalf of Debtor Maverix LLC - ECF System
David A. Laird on behalf of Interested Party Sonoran Capital Advisors - ECF System
Benjamin Wieck on behalf of Creditor CooperReilly Investment Fund, LLC - ECF System

/s/ Matthew C. Campbell