**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MAVERIX, LLC, | ) | Case No. 26-16423-MER |
| | ) | |
| Debtor. | ) | Chapter 11 |

**DECLARATION OF DAVID LINDAUER IN SUPPORT OF THE DEBTOR'S RESPONSE AND OBJECTION TO MOTION TO EXCUSE RECEIVER'S TURNOVER PURSUANT TO 11 U.S.C. § 543(d)(1)**

I, David Lindauer, declare under penalty of perjury under 28 U.S.C. § 1746:

## I. BACKGROUND

1. I am the sole manager of Maverix LLC, the Debtor. For more than 20 years I have founded and operated technology companies, working in network engineering, software development, and the administration of high-performance, high-availability server systems. I founded Maverix in 2020, personally designed and built its fiber network, including the core routing, cabinets and monitoring, and have directed its network engineering since. I make this declaration on personal knowledge and on the company's records, monitoring systems, communication portals and customer-support systems, and my own correspondence.

2. This declaration shows four things:

(a) since the Receiver's appointment on January 22, 2026, only my team and I have kept this network running, often at the request of the Receiver's own staff;

(b) the Receiver has said in its own filings that it cannot operate the network;

(c) customers have been left offline for days and weeks while the Receiver declined to authorize or pay for the work; my team usually fixed the problem anyway, often unpaid, and the Receiver's reports then blamed the problems on us; and

(d) CooperReilly's path pays no creditor but CooperReilly, and turnover to the Debtor is the only path on which the other creditors can be paid.

3. "My team" means the engineers and field staff of the Debtor's affiliates that support the network: Viath, Inc.; Maverix Enterprise Holdings, Inc.; EngiNuity Works LLC (network engineering, including engineer Ben Coffey); End to End Construction, LLC (construction and locating); and Splice Techs, LLC. Brad Billman, chief technology officer, supports billing and customer systems. Those companies, not the Receiver, pay these people except where I say otherwise.

4. Customers are identified by initials and area only. Times are Mountain time. Customer-offline counts are what I or the customer service staff read from the network-management system at the time, unless I say otherwise.

## II. THE RECEIVER HAS SAID, UNDER OATH AND IN ITS OWN REPORTS, THAT IT CANNOT RUN THIS NETWORK

5. The Receiver's principal, Bryan Perkinson, swore on September 18, 2026 that the Receiver "cannot operate the network without continued reliance on Lindauer," and "has not obtained the complete, independent control over network operations contemplated by the Receivership Order." Docket No. 49-3 ¶¶ 10, 12.

6. The only network engineer the Receiver identifies is Derek Anderson of IP ArchiTechs, engaged on August 24, 2026: seven months after the Receiver's appointment, and three days before the August 27 hearing at which the Receiver asked the state court to approve and close the

sale to CooperReilly. Docket No. 49-3 ¶ 30. He was engaged to "identify, document, and secure" the network's systems and "obtain or restore administrative control over them." Id. The Receiver says the credentials he was engaged to obtain "are necessary before CooperReilly's personnel can operate the network." Docket No. 49-2 at 4-5. Under the purchase agreement, each party "shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions." Docket No. 51-2 § 9.1. The Receiver engaged him without consulting us, and no one from his firm has contacted me (¶ 48). As of September 18, the Receiver says its engineers "cannot do so independently," it "cannot yet confirm that all necessary systems have been identified," and the transition "cannot be completed." Docket No. 49-3 ¶¶ 34, 35.

7. A receiver that cannot yet say what systems its network has could not have known what qualifications to require of an engineer, let alone tested whether one had them. It is like hiring an electrician to run a power plant without its schematics: no one on the hiring side knows what to ask for, and even a qualified electrician would need the schematics and months of training before running the plant. I told the Receiver this in writing on July 21, 2026, three days after it proposed an outside firm: "the documentation and training required to step in cold does not exist and cannot be conjured on demand. Nobody the receivership currently employs is qualified to perform even the entry-level portions of this." Ex. 7-A. In the same email I estimated that any outside team would need two to three months, and paid time from my team, to come up to speed (¶ 47).

8. The Receiver's Third Report, filed August 17, 2026, says "the estate does not have all of the expertise that certain tasks require"; the outages "often require an immediate response by estate personnel"; and "Mr. Lindauer historically handled much of that work." Docket No. 49-12

at 6, 7, 10. Its September 8 report says "CooperReilly is still assembling the personnel needed to operate the network independently." Docket No. 49-2 at 4-5.

9. CooperReilly's own consultant reported in June that it had "No Access to Network Engineering - No physical access to the network," and that its report "is not a comprehensive engineering audit." Docket No. 49-13. On August 27, 2026, the Receiver's counsel told the state court: "The system is breaking down routinely." Transcript of Aug. 27, 2026 hearing at 39:9-16. Like any utility, this network needs constant monitoring and maintenance by people who know it; when that work is done, customers rarely see the problems it prevents. From January the Receiver declined to engage or pay for that work, then described what followed as a network breaking down.

10. On August 17, 2026, the Receiver's counsel sent me a seven-day demand listing what the Receiver still did not have, including credentials for the core Juniper routing equipment, the Calix servers, the monitoring platforms, the carrier portals, the fiber-mapping system, the 811 account and the colocation facility. The Receiver's September 4 contempt motion repeated it. Docket No. 49-29. As I stated under oath in the state court on September 11, 2026, much of that list is access the Receiver already holds, access it removed from me, or systems it created.

11. On June 17, 2026, Tegan Christianson of the Receiver wrote that the business "should continue to function in the ordinary course, as it has during the Receivership period, with employees and affiliated entities performing necessary technical and operational work to maintain network stability and customer service." Ex. 1-C. That is how the network has been run: by my team, from outside the receivership.

12. That is ordinary for an internet provider of this size. In my experience, providers of this size contract out most of their network engineering, construction, locating and splicing rather

than carry that expensive, specialized staff on their own payroll. When the Receiver was appointed, the Borrowers' only employees were customer service representatives; there were no field staff and no network engineers. Our contractors happen to be affiliated companies, which do the work faster, at lower cost and on payment terms an outside vendor would not give. The Receiver's principal says Maverix LLC has no employees other than me and no operation "capable of maintaining the network." Docket No. 49-3 ¶ 5. The network has been maintained by contract, before and throughout the receivership. At the end of June 2026 the Receiver moved several of the affiliated companies' employees, including field staff, onto the receivership payroll. That changed who paid them, not the work they did, and it brought no network engineer into the receivership.

## III. JANUARY TO JUNE: MY TEAM KEPT THE NETWORK UP AND THE RECEIVER ASKED US TO

13. From the first week, the Receiver asked us how the network works and who fixes it. On January 28, Mr. Christianson set as an agenda item "Failure Points - What are the pitfalls Maverix faces on a day-to-day basis, who is responsible for fixing them when things to go wrong." (sic) Ex. 1-A. On February 9 I sent him the list of systems that run the network "while I'm in between putting out fires." He replied: "This is just what we're looking for to get started." Ex. 1-B.

14. Between January and June my team:

(a) resolved a network-wide core routing fault in late January and early February, with written investigation reports and an action plan for each class of core equipment;

(b) normalized BGP routing preferences (February 1), redesigned DHCP relay and fixed a management-network loop (February 9), and checked customer-router storage health (February 12);

(c) diagnosed and fixed individual customer faults at the core;

(d) migrated the core switching onto newer switches (completed March 4);

(e) handled three air-conditioning failures in the network operations center, on February 19 (91 degrees), April 6 (85 degrees) and April 24, and added temperature monitoring;

(f) reported in April that a prospective buyer's locating contractor had damaged one of the two backbone cables feeding the network operations center. It was never repaired;

(g) drove the carrier ticket when a Hurricane Electric transit circuit failed on May 16, until the carrier replaced its equipment on May 18;

(h) ran a security review of every core configuration and took full backups (June 10);

(i) answered the customer service staff's escalations daily: customer faults they could not resolve, static IP addresses, and custom configurations for business customers;

(j) assisted with technical troubleshooting when field technicians could not isolate and resolve a problem; and

(k) ran optical time-domain reflectometer (OTDR) tests on fiber faults to locate cable damage.

15. On June 17, 2026, I reported several emergencies in one day to the Receiver's counsel, copying Mr. Christianson and Mr. Perkinson, including "A cabinet is showing a heat alarm,

multiple customers are down ... our primary outbound carrier says you haven't sent them payment in 90 days and they're about to disconnect services on Friday," a second cabinet overheating, and an 811 damage ticket. Docket No. 49-24 (CooperReilly's exhibit). The monitoring record, January 22 to September 16, 2026, is Ex. 2.

16. On June 19, the customer service manager told me of an emergency locate. I sent End to End's locator that day although End to End was not being paid, and Mr. Christianson thanked me. End to End's 41 completed locates, $13,102.50, invoiced June 17 and re-sent three times, were never disputed and never paid. The Third Report: "The Receiver declined to pay the additional invoices." Docket No. 49-12 at 12.

## IV. JULY 2: THE KIOWA BACKBONE WAS CUT THE MORNING AFTER THE RECEIVER TOOK OVER LOCATES, AND THE SAME MORNING I WARNED IT WOULD BE

17. On June 30, 2026, Mr. Christianson wrote that the 811 locating function "should reside with the Receiver" and requested all access "for the Receiver to directly administer the 811 system." On July 1 the Receiver's counsel wrote that the Receiver "is assuming control over utility locates." Ex. 3-A. The Receiver says an 811 representative attributed the removal of employees from a notification list to an email from me. Docket No. 49-12 at 9, 12; Docket No. 49 ¶ 75. As I stated under oath on September 11, 2026, I never asked Colorado 811 to remove anyone. My one email to Colorado 811 on the subject, June 22, 2026, said: "I need to be clear that NO ONE can be added without my express authorization." Ex. 3-B. It removed no one, and I never answered 811's reply asking whether an existing contact should remain. Id. Each locate response is tied to a certified individual personally answerable for it. I have not heard the recording CooperReilly describes. I hold no 811 login, as I told the Receiver in writing on June

30. My written requests on August 3 and 5 for read-only 811 visibility for our personnel were never granted.

18. At 8:32 a.m. on July 2, 2026, I sent the Receiver's counsel a letter warning that unpaid and unanswered locates would lead to line strikes. That morning a third-party crew cut the 288-fiber backbone serving the Kiowa grant-funded network near Highway 86, at a crossing that had not been located. The monitoring system records the outage beginning at 8:07 a.m. Ex. 2.

19. At 9:44 a.m. the Receiver's operations lead, Angie Stearns, posted: "There is likely a cut n ear CJ17 cabinet due to ignored locate." When I asked that requests to our staff come through the company channel, she posted: "No need ... Do what you do. I got this one." When I asked what was being done about the damage: "Feel free to call my attorney." Ex. 3-C.

20. That morning I told the Receiver's counsel I had people ready to repair it, including a Prodigy Excavating crew available within 30 minutes on authorization. None of those offers was accepted. At 12:51 p.m. our counsel wrote to the Receiver's counsel that the Receiver was "actively preventing my client's personnel from documenting the damage in the public right-of-way." Ex. 3-D. That afternoon I watched the Receiver's personnel handle the roughly 1,000-pound reel of replacement cable by pulling on the cable itself, then strike the reel with a truck. I wrote to the Receiver's counsel at 2:33 and 2:42 p.m. that the cable could not go in the ground without "full OTDR test results," and asked them to "stop damaging the fiber" and not install it. Id. On July 7, Steve Smith of Prodigy, whose company built most of this network, reviewed video of the handling and wrote: "you will have to assume that whole spool is compromised, I would not install that fiber knowing that it had been handle[d] this way." Id. The Receiver used one splicer to splice in a short length of that cable as a temporary repair and, as far as any record shows, produced no optical test traces. I asked in writing for a proper repair, with the cable

replaced and all 288 fibers tested end to end, on July 3, July 19, August 3 and August 5 (¶ 45(b)). At 9:06 p.m., after more than thirteen hours, I sent the outage notice the grant agreement requires to the Colorado Broadband Office and the Attorney General's office.

21. The Third Report says the estate "restored the affected customers within 48 hours." Docket No. 49-12 at 9, 12. The monitoring system shows the ports serving the Elizabeth Stampede Rodeo grounds down from July 2 until August 19, 48 days. Ex. 2. End to End's charges for July 2 have not been paid.

## V. JULY 14 TO 23: CUSTOMERS WERE OFFLINE FOR UP TO EIGHT DAYS WHILE THE RECEIVER DECLINED THE FIX

22. On July 14, 2026, more than eight utility power fluctuations in a few hours set off an address-resolution fault in the customer network. At 3:16 p.m. the customer service manager reported about 500 customers offline. The Receiver's operations lead posted: "Good. Let us know where the problem is and we'll get it checked out." No one on the Receiver's side did any network work. I restored service that evening; by 6:36 p.m. about 15 customers remained offline. Ex. 4-A.

23. The fault recurred daily on the parts of the network not yet upgraded, knocking customers off one by one. My team fixed them individually as the customer service staff reported them. Throughout the receivership, the customer service staff have told my team directly about the most urgent cases, where a customer's safety or job depended on getting service back. They knew the Receiver would not pay for our time on those cases. My team restored those customers anyway, without pay. The outages were not the fault of the customers, the customer service staff or my team, and we would not leave those customers without service. On July 17 I sent Mr. Christianson two invoices: $4,700 for 13 hours of emergency work already done, and a $15,000 flat fee for the upgrade that would end the fault.

24. On July 18 the customer service staff reported about 31 outages since the prior evening. That night Mr. Christianson replied that the Receiver "is currently engaging an independent third-party network engineering firm," and would "wait for their evaluation before authorizing upgrades that have reportedly been under consideration for approximately a year but, until recently, did not appear to be operationally necessary." Ex. 4-B. He did not say who had reported that. The Receiver had not yet engaged any engineer, and so far as I know no one on its side had network experience or access to the core equipment (¶ 46). He would pay only ten of the thirteen hours invoiced, and wrote: "If these outages are being intentionally created or manipulated, we intend to determine that through an independent forensic review conducted by qualified professionals." Id.

25. I told him that night more than 40 customers were offline. By July 21 nearly 50 were, many for more than four days; his own email that day refers to "the ~50 customers." Ex. 4-C. They included people who work from home, an elderly customer with medical conditions relying on the company's phone service, and a customer with no cell coverage whose only phone line was down. Several said they would switch providers.

26. On July 21 Mr. Christianson offered to pay the $4,700 "pending the resolution of the outage for the ~50 customers," reserving "the right to pursue this money via a clawback," refused the upgrade, and threatened to install "our own personnel." Ex. 4-C.

27. That evening, a week into the outage and three days after announcing a "network engineering firm," the Receiver introduced Forensic Discovery, LLC as "the firm that is helping us to get our arms around the network," "authorized to perform this investigation on behalf of the receivership." Ex. 4-D. Its principal, Trent Walton, signs as a "Certified Computer Forensic Examiner," "Certified Cyber Crime Examiner," "Certified Economic Crime Forensic Examiner"

and licensed private investigator. Id. The firm's website describes an "eDiscovery & Digital Forensics" practice and says nothing of network engineering. Id. When I spoke with Mr. Walton that evening, he told me that the Receiver had first contacted him that day; that he had worked with someone in the Receiver's group on a case a few months earlier; that "we don't have network certs"; that his employees are computer-science majors; and that their network work was "definitely not to ... ISP type level stuff." He said his task was to confirm for Mr. Christianson whether my proposed fix was valid, because Mr. Christianson had told him he was "not a technical guy" and did not know whether the upgrade was needed. The Receiver had known of the outage since its first afternoon (¶ 22). What it engaged a week later was the "forensic review" its July 18 email had tied to whether the outages were "intentionally created or manipulated." Ex. 4-B.

28. I gave Mr. Walton that evening everything he asked for: an outage evidence report, device, event and power logs, the list of 51 offline devices, and read-only access. The next morning we reviewed the electric utility's own records of the July 14 power events together. After his review, Mr. Walton called me and told me he had told Mr. Christianson, in substance, that there was no conspiracy against him, that I had not caused the problems, and that they needed to be fixed. On July 22 Mr. Christianson wrote: "That conversation helped clarify the issues and gave us better visibility into the situation. Our understanding has shifted." That night Mr. Walton wrote that he was "working on getting a hold of Tegan" to put my scope of work "in front of him." Ex. 4-D. The Receiver approved the upgrade the next morning (¶ 29).

29. On July 23 at 10:05 a.m. Mr. Christianson approved the spend and sent $12,200, covering the $4,700 and half the upgrade. At 10:13 a.m. the operations lead posted: "Please begin work on all offline customers immediately." Ex. 4-E. Ben Coffey and I restored the affected customers

within about two and a half hours; at 12:33 p.m. the customer service manager posted that all were back online. Ex. 4-A. Over the next three weeks we completed the upgrade (backbone switching, redundant transit, DHCP relay, central logging, firewall and address translation, and EVPN-VXLAN fabric fixes), and the recurring outages stopped. Mr. Christianson wrote on July 31: “We have heard indication from the CSR team that the recurring outages have slowed.” Ex. 4-F. The second $7,500 was paid the week of August 10.

30. The upgrade was the fix I proposed on July 16 and 17, refused on July 18 as not “operationally necessary,” and approved on July 23. From July 14 to 22 alone, 205 different customers contacted support about the outage, and the support line logged 812 calls, about a third of them answered. Ex. 4-G.

## VI. AUGUST 2 AND 3: A POWER EMERGENCY AND A FIBER CUT, AND THE INVOICE WAS REFUSED

31. On Sunday, August 2, 2026, a commercial power outage hit the network operations center. The air conditioning would not run on the generator, the server room reached about 90 degrees, the battery backups sent low-battery alarms, and about 200 customers went offline. I was on site from about 2:30 to 6:30 p.m., kept the generator and equipment running, and bought more propane when the first tank ran out. The Receiver’s employees had asked us to handle it, and I reported each step as it happened in the company channel, where the Receiver’s customer service manager and operations lead were posting with me: the room was “starting to get warm bc the AC won’t run on the generator”; I had “Already burned through 1 tank” and the server room was “Almost 90”; and at 6:04 p.m. I was back with propane and power was restored. Ex. 5-A. The operations lead answered those reports by asking what kind of generator it was. Id. No one told me to stop, and no one from the Receiver came to the site. Afterward, at my own expense, I replaced the generator’s propane supply with a larger permanent tank and tubing and

upgraded the generator setup so the center would keep running through an outage. The Receiver was not involved and has not reimbursed any of it, although it knew of the August 2 emergency and the generator is critical to keeping the network running.

32. EngiNuity invoiced $3,201.73 for the August 2 power emergency, which the Receiver's employees had asked us to handle and had followed in the company channel as it was done, and for the next day's Zayo response described below. The invoice included $201.73 for the propane and supplies, with the store receipt attached. On August 18 Mr. Christianson refused it: "Unless you can point me to some documentation where a member of the receivership team approved this work prior to it being started, we are unable to pay any amounts toward that invoice." Ex. 5-D. The Receiver has not paid any of it, including the fuel that kept the network operations center running.

33. On August 3 a third-party boring crew struck the leased Zayo fiber between Parker and Denver. The core failed over to the Elizabeth route as designed, keeping the rest of the network up. The Douglas County cabinet has no switching that can use that route, so about 150 customers there lost service for 22 hours and 34 minutes. Ex. 2. My team detected the break before customers called in, located it by optical testing, sent Ben Coffey to the site, and offered to install a switch we had on hand at the cabinet that night, which would have restored those customers without waiting on the carrier. Ex. 5-A. That switch is what the cabinet needs to use the redundant route. It had been planned and never installed.

34. Neither that offer nor our offer to handle the carrier was accepted. My team knows this Zayo route and has direct contacts with Zayo's supervisors and splicing crews. We had already located the break, and in my August 3 letter to the Receiver's counsel I asked for authorization that night for our personnel to contact Zayo directly, give it the fault location, and supply the

circuit identifier. Instead, the Receiver had its customer service staff call Zayo; its counsel later wrote that the Receiver "has been in contact with Zayo through Maverix Broadband's customer service team." Ex. 5-C. The customer service staff spent hours on the phone to open a repair case. It was opened about nine and a half hours after the damage, with the circuit identifier blank, because the staff had not been given the circuit and contract details that identify our fiber and had never before dealt with, or been asked to deal with, one of our carriers. Ex. 5-B. The repair then moved through Zayo's general channels, with Zayo searching for a break we had already found, rather than through the direct contacts my team had offered. The 811 damage ticket for the strike was still unanswered 48 hours later. Customers came back when Zayo finished its splice on August 4.

35. On August 5 the Receiver's counsel wrote that "the matters you raised were non-issues and, in any event, have been resolved," and asked me to "immediately provide the login information" for the Zayo portal to the customer service team. Ex. 5-C. The switch has still not been installed, and the Douglas County cabinet has dropped again since, including on September 9. Ex. 2. Installing it during the August 3 outage would have restored those customers sooner and closed the gap for the next one.

## VII. AUGUST 25: THE RECEIVER'S TECHNICIANS CALLED A FIBER BREAK A "BACKEND ISSUE," AND THE FIBER MAP WAS SHUT OFF

36. On August 25, 2026, about 20 customers near Park Line Estates lost service at once. That morning the Vetro fiber-mapping system holding the network's routes and splice diagrams had been shut off, for my team and the customer service staff alike, and the customer service manager reported: "No reason was given." Ex. 6-A. I was told that the customer service staff informed the Receiver, asked that it be restored, and received no response. It is still offline. It holds the only copies of the network's splice diagrams and per-customer fiber paths, built up

over years, and I do not know whether that data has been preserved. The purchase agreement lists the "network maps of Sellers" among the assets CooperReilly was to receive, and the Receiver's bill of sale lists "network/customer maps." Docket No. 51-2 § 2.1(f); Docket No. 51-4 at 5. The system holding them was shut off three days before the claimed closing and has not been restored.

37. At 7:02 p.m. the customer service manager posted: "This does not appear to be a physical problem with the fiber lines according to the technicians. Suspect issues with the Warsaw OLT/splitter or some other backend issue." I was not asked for help. By then, I was told, at least two field technicians had spent more than five hours looking for the source and had concluded it was not a field problem. Once I had the list of affected customers, I could see within minutes that they spanned three cabinets and five network segments, which pointed to a physical fiber fault, and I posted that. Ex. 6-B. From my desk, within about five minutes, I narrowed the break to a section of cable about 1,000 feet long. It was a fiber break there. Before the receivership, my team would have been part of that search from the start. Here, as in July and August, the Receiver's field staff worked the problem without us, and our help was not sought. The last splice was completed on August 27, about 48 hours after the outage began. Ex. 6-B.

## VIII. THE CALIX SUBSCRIBER-MANAGEMENT SERVER HAS BEEN DOWN SINCE AUGUST 2

38. The Calix subscriber-management server, SMx, is how the company looks up, provisions and changes service for customers on its Calix fiber equipment. Without it, the customer service staff and field technicians cannot troubleshoot a customer's connection, replace faulty customer equipment, or provision or upgrade service. The Receiver knew that from the start: SMx was on the list of systems I sent Mr. Christianson on February 9, 2026. Ex. 1-B. SMx went down in the

August 2 power event and has been down for almost two months. I restarted it without pay on August 4, 5, 6, 11 and 13; it now boots but needs further work. Ex. 6-C.

39. The customer service staff asked repeatedly when SMx would be back. As I stated under oath in the state court on September 11, 2026, customer service representatives asked the Receiver to engage my colleagues and me to investigate and to pay for that work, and the Receiver declined, including after the matter was raised with it directly. On August 13 a customer service supervisor wrote to me: "Get me whats needed to get SMX back. Ill push to make that a priority." On August 17: "since we are unable to get into SMx it is telling us that the customer isn't created ... What do we need to do to onboard this new customer?" Ex. 6-C.

40. With SMx down, a Brittanie Ridge customer stayed offline for more than 34 days because the fault could not be looked up, and a new customer in The Pines who could not be set up on August 17 was still asking for service on September 10. Ex. 6-C. The Receiver never engaged or paid my team to repair SMx. Its September 4 contempt motion instead demanded Calix access from me. Docket No. 49-29. As I stated under oath on September 11, I cannot deliver access I no longer have: the Receiver had already taken over my Calix access, and no one can be given working access to an SMx server that is down.

## IX. SEPTEMBER: THE NETWORK STILL DEPENDS ON US

41. On September 9, 2026, customers across Sun Country, Parker and Elizabeth began losing service; about 46 wrote in that day and 22 the next. That afternoon's customer alert told customers to update their home routers. At 9:37 the next morning the customer service staff updated the website alert to point to an upstream disruption at the Denver exchange. That exchange is several hops outside our network. I then investigated and quickly found the actual fault at the edge of our own network: on the link between one of our core routers and Amazon's

peering, an upstream device was dropping about 90 percent of traffic. I routed the network around it, and the alert was marked resolved at 12:04 p.m. Ex. 6-D. Looking at the exchange would not have found it, and fixing it required changing the routing on our own core routers. Before the receivership, the customer service staff told our network staff about complaints as soon as they came in, and a fault like this would have been investigated and fixed quickly. That changed during the receivership. In the middle of the July outage, the customer service staff's posts in the company channel stopped from July 20 at 11:38 a.m. until the morning of July 23, the day the Receiver approved the fix.

42. On September 7 a Viath system administrator, who has handled much of the network's operations and security and whom the Receiver does not pay, flagged a newly published security flaw in the software running the five core MikroTik routers, CVE-2026-67276, which "enables unauthenticated takeover of a RouterOS device when SSH is exposed." Ex. 6-D. An outside party exploiting it could take control of the core routers, and with them the network's routing, without a password. I upgraded all five overnight on September 10. Ex. 6-D. No one on the Receiver's side raised the flaw, then or since, and the Receiver had no part in the fix.

## X. CUSTOMERS LEFT OFFLINE AND WORK THAT DID NOT GET DONE

43. From January 22 to September 23, 2026, my team and I catalogued 77 separate outages and service failures from the monitoring system, company channels, support system and correspondence. Where the record gives both a customer count and a duration, they total roughly 685 to 745 customer-days of lost service, not counting outages with no recorded count.

44. Individual customers left offline for long periods include:

(a) the Elizabeth Stampede Rodeo grounds, 48 days (July 2 to August 19);

(b) C.M., Brittanie Ridge, more than 34 days;

(c) M., Rodeo area, more than 15 days from September 1;

(d) H.W. and K.L., northeast Douglas County, more than 7 days after construction damaged their drop fibers;

(e) C.J., more than 7 days waiting for a splice because the estate's one outside splicer was unavailable;

(f) D.M., Saddlewood, more than 7 days without the phone service he relies on, with no cell coverage at home.

45. Work that needed doing and was not done includes:

(a) repair of the backbone cable damaged by the buyer's locating contractor;

(b) a proper repair of the Kiowa backbone, re-spliced and tested end to end, which I asked for on July 3, July 19, August 3 and August 5;

(c) the planned switch at the Douglas County cabinet so it can use the redundant route, offered August 3 and 5 and still not installed;

(d) recabling of the overheating CR13, CJ and Ptarmigan cabinets, offered in writing July 19, August 3 and August 5; every cabinet switch has logged hardware alarms since March 22;

(e) restoration of SMx;

(f) static IP service for customers who paid for or requested it;

(g) new activations and installations, including customers waiting months;

(h) payment of the 811 locate program, whose late fees, by the Receiver's own report, "now exceed $20,000." Docket No. 49-12 at 12.

46. The Receiver's account of these events. The Third Report says the Receiver "kept the core network serving approximately 2,000 homes and businesses" and "responded to outages and other network issues." Docket No. 49-12 at 16. It blames "Maverix's dated and unorthodox infrastructure" and me. Id. at 9, 11. It does not mention the July 14 to 23 outage, the upgrade that ended it, or the payment the Receiver approved for it. My companies appear in it only as unpaid creditors. Id. at 20. It does not say who on its side did the network work, and by its own sworn account no one could have: it could not operate the network without me, held no core credentials, and engaged the only network engineer it identifies after the period the report covers. ¶¶ 5, 6, 7, 10. So far as I know, no one on the Receiver's staff or among its contractors has held core credentials to this network or operated one like it. The only outside review in the record, CooperReilly's consultant's, had "No Access to Network Engineering" and "is not a comprehensive engineering audit." ¶ 9. The network is carrier grade, the class an internet service provider runs, far more complex than a business network, and qualified engineers for it are scarce and expensive. Its core runs an EVPN-VXLAN fabric and connects to the internet over four 10-gigabit upstream links with more than a dozen BGP profiles, through redundant switching and dual core routers, so no single device can take the network down and failover is almost instant. Its redundant 100-gigabit DWDM route carried the network when the Zayo fiber was cut on August 3 (¶ 33).

## XI. I TOLD THE RECEIVER IT WOULD TAKE TWO TO THREE MONTHS AND A COSTLY TEAM TO REPLACE US, AND IT NEVER ENGAGED

47. On July 21, 2026, I wrote to Mr. Christianson, copying Mr. Perkinson and both sides' counsel: "Any outside team, however qualified, has to climb a steep and fully billable learning curve before they can safely touch a live EVPN fabric they did not build ... Realistically that is two to three months for a new engineer to come up to speed, at higher rates than ours, and a

handoff would itself consume substantial paid hours from our non-receivership staff to bring them current." Ex. 7-A.

48. The Receiver did not respond to that estimate. It proposed that a customer service supervisor "shadow you or Ben" and "learn the processes necessary over the course of the week," then an $8,000-a-month arrangement under which I would remain responsible for troubleshooting and serve as a "technical resource" to a third-party team that could begin "as early as next week." Ex. 7-B. No such team was ever introduced to me, Ben Coffey or Brad Billman, and no one asked us to help find one. The engineer the Receiver retained on August 24 has never contacted me. Docket No. 49-3 ¶ 30.

## XII. PAYMENT CAME LATE, IN PART AND ON CONDITIONS, AND SOME WORK WAS REFUSED

49. The Receiver has paid some of the affiliated companies' staff costs, including payroll in April and June and, for network work, the $12,200 on July 23 and the $7,500 in August. But it paid late and on conditions: it tied payment for completed work to future work, reserved a "clawback," required pre-approval for emergencies at night and on weekends, and refused invoices outright. My team's network engineering before July 17 was never billed or paid.

50. Unpaid today are, among other things, the 41 locate invoices ($13,102.50), End to End's July 2 response, EngiNuity's August 2 and 3 invoice ($3,201.73), and the $17,522.09 payroll audit balance identified in my companies' July 7 letter. The Receiver's own payables aging carries balances owed to EngiNuity, End to End, Maverix Enterprise Holdings, Splice Techs and Viath. Docket No. 49-12 at 20.

## XIII. THE MISMANAGEMENT CHARGES IN COOPERREILLY'S MOTION

51. CooperReilly's motion charges me and the Debtor with mismanagement. Docket No. 49 ¶¶ 76-82, 135-149. I answer each charge in turn.

52. The June 17 email. CooperReilly says I sent "a barrage of profane-laced messages," and quotes one, my June 17, 2026 email. Docket No. 49 ¶ 81. The word it objects to is in this sentence: "FUCK - and as I was about to hit send, we just got a second notification of a cabinet overheating." Docket No. 49-24 at 1. It was an exclamation as the second alarm came in, directed at no one. The emergency was real. The monitoring system recorded both alarms: the Ptarmigan cabinet at 8:39 a.m., and the CJ cabinet at 1:18:58 p.m., seven minutes before I sent the email. Ex. 2 at 1 (events 6158219 and 6159982). Zayo's default notice arrived the next morning, stating balances past due up to 360 days and that service would be interrupted if not paid by July 3. Ex. 1-D. As I testified in the state court on June 25, 2026, the email "wasn't a threat. This was letting your client know the actual repercussions." Transcript of June 25, 2026 hearing at 59:19-24.

CooperReilly and the Receiver say I "concocted emergencies." Docket No. 49 ¶¶ 81, 149. I have not reported an emergency that was not real. No one from the Receiver has ever asked me for the data behind one, although its staff read the same monitoring systems daily. E.g., Ex. 4-A. The sequence has been the same throughout: a problem is reported; no one on the Receiver's side fixes it; my team does, often unpaid; and the Receiver later calls the problem exaggerated or caused by me. ¶¶ 22-30, 31-35, 46.

53. Shared staff. CooperReilly calls the affiliates' support of the network "commingling." Docket No. 49 ¶¶ 82, 146. The Receiver relied on that support in writing: the business runs "with employees and affiliated entities performing necessary technical and operational work" (Ex. 1-C), and the "Receiver recognizes that employees of certain affiliated entities may perform work that benefits Borrowers and the Receivership Estate" (Ex. 1-E). Each company has its own employer identification number and payroll, and each Maverix entity its own contracts, titles and

registrations. The affiliates bill Maverix at standard rates slightly below market; while investment is sought, Maverix pays at least the costs it actually consumes, chiefly payroll.

54. Vendor arrears. CooperReilly says the Debtor failed to pay Zayo "while paying off insider debts." Docket No. 49 ¶ 147. It identifies no insider payment. Maverix LLC had no bank account of its own on January 22, 2026; its former account had been closed and not yet reopened at the new bank. From January 22 the Receiver controlled the companies' accounts, and the Zayo balance grew under that control. Ex. 1-D; Docket No. 49-12 at 20. My affiliates and I put outside money in to cover costs, including about $50,000 paid to Zayo during the receivership by the controller while employed by Maverix Enterprise Holdings, Inc.; she now works for the Receiver. The Receiver has not produced the bank statements or ledgers, so I cannot yet reconcile its figures.

55. The Parker property. CooperReilly says the Debtor let the Parker mortgage fall into arrears. Docket No. 49 ¶ 145. The Receiver collected the rents from January 22 until September 3, 2026, and returned the property "~60 days in default." Docket No. 49-2 at 81-82.

56. The other charges mostly concern Maverix Broadband, Inc., the affiliates or me, not Maverix LLC.

(a) The April 2026 financing (Docket No. 49 ¶¶ 76, 78, 148). As I testified on June 25, 2026, I first learned Maverix Broadband, Inc. was included in the documents when the Receiver's counsel raised it; I personally guaranteed the obligation; and the large portion of the proceeds went directly to Maverix Broadband's bills. Transcript of June 25, 2026 hearing at 60:8-10, 60:21-61:4. That matter is pending in the state court. The documents do not name Maverix LLC.

(b) The storage container (¶ 79). As I wrote to the Receiver's counsel on August 4, 2026, it sits on my family's property, our cameras recorded people attempting to tamper with it, and I locked it to secure the contents, stored at no cost to the estate. Access has not been refused; on July 20 I offered in writing staged pickup or access on one business day's notice.

(c) Terminated employees (¶¶ 73-74, 149). Ms. St. Pierre and Ms. Stenhaug were employed by Maverix Enterprise Holdings, Inc., which ended their employment on May 22, 2026, for reasons it documented at the time. No Maverix LLC employee was terminated. On system access, see my sworn Schedule A filed in the state court on September 11, 2026.

57. None of these charges concerns how the network has been operated since January 22, the subject of Parts II to XII.

## XIV. THE OTHER CREDITORS: COOPERREILLY'S PATH PAYS ONLY COOPERREILLY

58. CooperReilly's motion states that the companies had "more than $10.2 million in liabilities (excluding amounts owed to CR)." Docket No. 49 ¶ 135. The Debtor's twenty largest unsecured creditors total about $6.68 million, led by Prodigy Excavating, which built most of the network and has told the state court it is owed $1,300,000 on the assets identified for sale and $2,400,000 on the rest.

59. CooperReilly's credit bid is $7,025,000: $7,000,000 of its own claim and $25,000 cash. Docket No. 49-2 at 2. That is less than the $7,933,446.57 principal it says it lent. Docket No. 49 ¶ 24. Every dollar goes to CooperReilly, and the approval order leaves it free to pursue a

deficiency against the Borrowers and Viath. Docket No. 49-30 ¶ 7. On that path no other creditor receives anything.

60. The market valued these assets well above CooperReilly's bid, and CooperReilly knew it:

(a) In our broker's 2025 sale process, written offers included BAM Broadband and Post Road at $9,800,000 cash; Intrepid Fiber at $9,750,000 in a signed letter of intent; PhireLink at $12,000,000; Ideatek at up to $17,616,000, with $12,500,000 at closing; Heritage Holding at a price repaying CooperReilly in full; Visionary Communications in a signed letter of intent at $13,100,000; and Xtream's final all-cash offer on November 12, 2025 of $15,500,000 for the existing and Kiowa networks, backed by its sponsor's equity letter. Ex. 8-A; see Exhibits 4 to 25 to Viath, Inc.'s August 28, 2026 objection in Case No. 2026CV30150. None of those buyers asked for, or was offered, anything like the "Perpetual, Irrevocable, Royalty-Free License and Indefeasible Right to Use Agreement" (the "IRU") that the Receiver signed in CooperReilly's favor at the claimed closing, for no additional consideration: the credit bid stayed at $7,025,000. Docket No. 51-5; Docket No. 49-2 at 2. In late April 2026, CooperReilly's counsel proposed increasing its credit bid if the assets also included the Kiowa grant network and a parcel of real property, with a separate note from the Borrowers. The agreement that was signed kept the credit bid at $7,025,000 and gave CooperReilly rights in the Kiowa network through the IRU, for nothing.

(b) On December 8, 2025, CooperReilly's adviser sent its credit-bid purchase agreement and wrote that if it was not agreed that week, its counsel "will have no choice but to pursue a receiver." On December 11 its manager wrote: "It is this APA or the courts....it's truly that simple. It's time for pens down on anything related to Visionary."

Ex. 8-B. By then the Borrowers held Visionary's signed letter of intent at $13,100,000 (subparagraph (a)). CooperReilly's agreement was a $7 million credit bid without a release of the rest of its claim.

(c) On January 7, 2026, our then counsel wrote to CooperReilly's counsel that the Borrowers could not sign CooperReilly's agreement because the assets were worth "materially higher than the $7 million purchase price" and it lacked "a full and final release of all loan obligations," and that the Borrowers remained "committed to closing the Visionary transaction as the most viable path to making your client whole." Ex. 8-C. He proposed two alternatives: a binding valuation by a mutually selected neutral, or a stipulated receiver to run a 45- to 60-day market process for "the highest and best transaction reasonably available," with a sale to CooperReilly at the neutral's value if none closed. CooperReilly accepted neither. Its counsel had written on January 5 that he was "being instructed to prepare the receivership paperwork"; it filed on January 13 and obtained the ex parte appointment on January 22. Ex. 8-C. Either the Visionary transaction or either of those alternatives would have repaid CooperReilly and left real money for the other creditors. CooperReilly chose the receivership instead, and its claimed balance has grown since with default-rate interest and fees (¶ 62).

(d) In the Receiver's own February 2026 round, every written bid again exceeded CooperReilly's: Xtream, through Sharpline Capital, at $13,236,500, revised to $12,752,881; BAM Broadband and Future Standard at $12,200,000 in a signed term sheet; and Intrepid Fiber at $10,000,000, raised to $11,000,000. Docket No. 41-1 ¶ 13.

(e) On March 9, 2026, Mr. Christianson circulated CooperReilly's waterfall on the selected $12.2 million deal. Our proposal allotted $1,650,000 to accounts payable and

$750,000 to working capital; CooperReilly cut those to $833,324.24 and $40,275.67 and took $10,910,000. Ex. 8-D.

(f) On June 25, 2026, Mr. Perkinson testified that the $12.2 million sale "would pay off Cooperreilly, it would result in potentially some excess capital going back to Maverix." Transcript of June 25, 2026 hearing at 78:12-15.

(g) In the May 13, 2026 partial settlement, CooperReilly agreed that $12,000,000 paid by June 29 would "finally resolve all issues in the Action." Docket No. 49-18 § 4.

61. Every one of those numbers would have paid CooperReilly and left money for other creditors. The $7,025,000 credit bid pays only CooperReilly.

62. CooperReilly's claimed balance has kept growing while each of those paths went unused. It stated a payoff of about $10.3 million in November 2025. Each of the following would have paid that in full and left money for other creditors:

(a) Xtream's $15,500,000 all-cash offer and Visionary's signed $13,100,000 letter of intent, both November 12, 2025 (¶ 60(a));

(b) the neutral valuation or the stipulated market process our counsel proposed on January 7, 2026 (¶ 60(c));

(c) the February 2026 bids of $12,200,000 and more, and CooperReilly's own March 9 waterfall, which gave it $10,910,000 (¶ 60(d), (e));

(d) the $12,000,000 CooperReilly agreed on May 13, 2026 would "finally resolve all issues in the Action" (¶ 60(g)).

CooperReilly now asserts about $10.85 million, including default-rate interest and fees that accrued over those same months. In this case the Debtor can object to that claim and to the

Receiver's asserted charges of $677,609.42 (Docket No. 49 ¶ 156) before anyone is paid. Outside it, no one will.

## XV. THE SALE HAS NOT BEEN COMPLETED

63. No closing document was provided to the Debtor or me before 3:37 p.m. on September 8, 2026, when the Receiver's counsel served its supplemental report with the closing papers. As far as I know, no vehicle title has been reissued, no lessor, licensor or carrier has consented to an assignment, and the registration of the Debtor's internet number resources is unchanged. The Receiver still holds the assets it has held throughout the receivership, and CooperReilly is "still assembling the personnel needed to operate the network independently." Docket No. 49-2 at 4-5.

## XVI. THE DEBTOR CAN REORGANIZE, AND WILL USE THE PROPERTY TO PAY ITS CREDITORS

64. The Debtor's plant bills about $159,507.38 a month from about 1,801 accounts; the whole network about $179,853 a month from about 2,000. My team's payroll and operating costs for the network are about $100,000 a month.

65. The offers in Part XIV were real, written and above CooperReilly's bid. Maverix has several interested parties today, whom I do not name in this public filing. When the Receiver learned of an earlier financing source, it wrote that "we are contacting this lender immediately." Ex. 8-E. I will identify the current parties under seal or in camera if the Court wishes.

66. If the property is turned over, the Debtor will keep operating the network through my team, keep customers online, and run a sale or refinancing process at market value with notice to every creditor, so that creditors other than CooperReilly are paid. It will also object in this Court to claims and charges that should be reduced or disallowed.

## XVII. PROPERTY AND TRANSFERS ONLY A DEBTOR CAN RECOVER

67. The Receiver cannot recover transfers for all creditors. Transfers calling for review include:

(a) post-petition transfers of the Debtor's property, including the change of the Slack workspace's Primary Owner on September 18, 2026, the removal of the Debtor's vehicles, trailers and plows from the storage yard between about September 1 and 20, and any delivery of credentials, systems or records to CooperReilly;

(b) the Receiver's certificates funding CooperReilly-directed consultants and retention bonuses, made liens in CooperReilly's favor, including $30,000.00 and $33,947.31 for the network assessment and $17,500 for bonuses "through the expected closing of the APA," Docket No. 49-5 at 15; Docket No. 49-12 at 6;

(c) the Receiver's asserted $677,609.42 in charges, Docket No. 49 ¶ 156, against $475,576.10 in professional fees disclosed through July 31, 2026, Docket No. 49-12 at 21;

(d) any payment during the receivership for CooperReilly's benefit, including its planned transition.

## XVIII. SINCE THE PETITION

68. CooperReilly says the Debtor's "baseless statements" stalled the state-court neutral. Docket No. 49 ¶ 141. Its own exhibit shows the neutral vacated her September 18 hearing "pursuant to the Request of the Receiver," to be reset only "after adjudication by the United States Bankruptcy Court of all disputes regarding ownership of the property." Docket No. 49-36. The Receiver has nonetheless kept acting on the Debtor's property, as set out in the Debtor's emergency motion to enforce the stay.

## XIX. WHY THE PROPERTY MUST COME BACK TO THE DEBTOR

69. The Receiver cannot run the network; its principal has sworn so. CooperReilly, a Georgia company, is by the Receiver's own report "still assembling the personnel needed to operate the network independently." Docket No. 49-2 at 4-5. My team has run it throughout, at the Receiver's staff's request, often unpaid.

70. If the property is returned, my team will keep operating the network as we have since 2020, without pre-approval delays for emergencies. The Debtor can then pursue a sale or refinancing at market value with every creditor at the table, object to inflated claims and charges, and propose a plan that pays creditors other than CooperReilly. It is the only path on which Prodigy, the other contractors and vendors, the carriers and the rest of the creditors receive anything.

71. I prepared this declaration on a short schedule, from the records available to me. The Receiver holds the companies' bank records, ledgers and much of their correspondence and has not produced them to me. Dates, times, amounts and customer counts are taken from the records cited. If I learn that any statement here is inaccurate or incomplete, I will promptly correct it by supplemental declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 25, 2026, at Parker, Colorado.

______________________________

David Lindauer

**EXHIBITS**

- **Exhibit 1:** The Receiver asks my team to run the network, and the carrier goes unpaid (1-A to 1-E).

- **Exhibit 2:** Network monitoring record (Zabbix), January 22 to September 16, 2026.

- **Exhibit 3:** The Receiver takes over 811 locates, and the July 2 backbone cut and repair (3-A to 3-D).

- **Exhibit 4:** July 14 to 31, 2026: the recurring outage, the refusal, the forensic firm, the approval and the fix (4-A to 4-G).

- **Exhibit 5:** August 2 to 18, 2026: the power emergency, the Zayo cut, the Receiver's response and the refused invoice (5-A to 5-D).

- **Exhibit 6:** August 25 to September 10, 2026: the fiber map, the Park Line break, SMx and the September routing fault (6-A to 6-D).

- **Exhibit 7:** The two-to-three-month replacement estimate and the Receiver's response (7-A and 7-B).

- **Exhibit 8:** The offers CooperReilly would not let the Borrowers finish, the valuation it declined, and the lender the Receiver contacted (8-A to 8-E).

Documents already in this Court's record are cited by docket number and are not attached again.