# PERPETUAL, IRREVOCABLE, ROYALTY-FREE LICENSE AND INDEFEASIBLE RIGHT TO USE AGREEMENT
## (Network Assets)

**THIS PERPETUAL, IRREVOCABLE, ROYALTY-FREE LICENSE AND INDEFEASIBLE RIGHT TO USE AGREEMENT** (this "Agreement") is made and entered into as of the Closing Date (the "Effective Date") by and among **MAVERIX LLC**, a Colorado limited liability company ("Maverix"), and **MAVERIX BROADBAND, INC.**, a Colorado corporation ("Maverix Broadband", and together with Maverix, and together with their respective successors, assigns, transferees, receivers, and trustees, the "Sellers" or the "Grantor"), each acting by and through Sonoran Capital Advisors, in its capacity as the Court-appointed receiver over all of the Sellers' assets (the "Receiver"), and **COOPERREILLY INVESTMENT FUND, LLC**, a Georgia limited liability company (together with its successors, assigns, and nominees, the "Buyer" or the "Grantee"). The Grantor and the Grantee are collectively referred to herein as the "Parties" and each individually as a "Party."

## RECITALS

A. The Sellers and the Buyer are parties to that certain Asset Purchase Agreement, together with the exhibits and schedules attached thereto, as amended, restated, supplemented, or otherwise modified from time to time (the "Purchase Agreement"), filed with the District Court for the City and County of Denver, Colorado (the "Court") on May 8, 2026 in the case styled CooperReilly Investment Fund, LLC v. Maverix LLC, et al., No. 2026CV30150, pursuant to which the Buyer is acquiring the Acquired Assets from the Sellers.

B. By its Order Granting Verified Motion for Ex Parte Appointment of Receiver entered January 22, 2026, the Court appointed the Receiver over all of the Sellers' assets, and the Sellers act hereunder by and through the Receiver.

C. As recited in the Purchase Agreement, the Sellers operate the Business, which includes (i) the Non-Grant Network and (ii) the Grant Network. The Buyer is acquiring substantially all of the assets related to the Non-Grant Network.

D. The Non-Grant Network and the Grant Network were designed, constructed, deployed, operated, monitored, and maintained by the Sellers as a single, physically and operationally integrated system, without regard to the source of the funding used to construct or acquire any particular component thereof. As a consequence, the Grantee cannot own, operate, maintain, repair, restore, expand, or interconnect with the Non-Grant Network, or conduct the Business, without continuing physical and logical access to, and the right to use, components of that system that the Sellers are retaining.

E. The definition of "Fiber Assets" in the Purchase Agreement provides that any Fiber Assets that are part of the Grant Network and that are essential, useful, or necessary for the continued operation of the Non-Grant Network are included in the Acquired Assets, and further provides that, in the event an ownership transfer of a specific asset is not possible or requires regulatory consent, the Buyer may elect to have the applicable Seller retain such asset subject to this Agreement, with the Parties working in good faith to ensure that there is no interruption of service to the Non-Grant Network.



EXHIBIT 5

F. The definition of "Acquired Assets" in the Purchase Agreement further provides that, unless disclosed by a Seller with contemporaneous written documentation evidencing the grant funding of an asset, interest, or right, all Fiber Assets shall conclusively be deemed not to be a Grant-Funded Asset and shall constitute an Acquired Asset.

G. Neither Party is able as of the Effective Date to identify with certainty and completeness every asset retained by the Sellers to which the Grantee requires access. The Parties therefore intend that this Agreement be construed as broadly as possible in favor of the Grantee's access and use rights, that it cover every category of asset described in Section 2.2 whether or not any particular asset has been identified as of the Effective Date, and that the Parties work together on a continuing and cooperative basis, through the process set forth in Section 4, to identify, describe, schedule, and confirm the specific assets to which the Grantee requires access, with any such identification being confirmatory of, and not a condition to, the rights granted hereunder.

H. This Agreement is being executed and delivered as a closing deliverable under Section 3.1(b)(iv) of the Purchase Agreement, is a Transaction Document for purposes of the Purchase Agreement, and is in form and substance reasonably acceptable to the Buyer.

**NOW, THEREFORE**, in consideration of the Purchase Price paid and to be paid by the Buyer under Section 3.2 of the Purchase Agreement, the mutual covenants hereinafter set forth, the covenants and agreements set forth in the Purchase Agreement, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

**1. Definitions.** Capitalized terms used but not defined in this Agreement have the meanings given to them in the Purchase Agreement, including "Acquired Assets," "Affiliate," "Business," "Business Day," "Closing," "Closing Date," "Communications Laws," "Excluded Assets," "Fiber Assets," "Fiber Medium," "Financial Assistance Programs," "Governmental Authority," "Grant Network," "Leases," "Non-Grant Network," "Permits," "Person," "Systems," "Tower," and "Tower Lease." As used in this Agreement, the following terms have the following meanings:

(a) "Covered Assets" means, collectively and in the broadest sense, all of the following, wherever located and whether or not identified on Exhibit A hereto: (i) each Grant-Funded Asset; (ii) each Retained Fiber Asset; (iii) each asset within any category described in Section 2.2 that is not conveyed to the Grantee at the Closing; (iv) each asset identified, added, or deemed added pursuant to Section 4; and (v) any other property, asset, interest, or right of any Seller of any kind or nature, tangible or intangible, real, personal, or mixed, that is not conveyed to the Grantee at the Closing and that is at any time reasonably essential, necessary or useful for any Permitted Use, including any Excluded Asset and any asset that is at any time determined to be a Grant-Funded Asset. No asset otherwise within this definition is excluded from it, and no right of the Grantee under this Agreement is limited, by reason of such asset not being listed on Exhibit A or otherwise not having been specifically identified.

(b) "Emergency" means any event, condition, or occurrence that has caused, or is reasonably likely to cause within seven (7) days, an interruption or degradation of service on the Non-Grant Network, or a threat to the safety of persons or property.

(c) "Grantee Parties" means the Grantee and its Affiliates, successors, assigns, nominees, transferees, lenders, employees, agents, contractors, subcontractors, and permittees, and their respective designees.

(d) "Grant-Funded Asset" has the meaning given to that term in the definition of "Acquired Assets" in the Purchase Agreement, being an asset, interest, or right funded by grant funding, and is subject to the conclusive presumption set forth in that definition that, unless disclosed by a Seller with contemporaneous written documentation evidencing the grant funding thereof, all Fiber Assets shall conclusively be deemed not to be Grant-Funded Assets and shall constitute Acquired Assets.

(e) "Identification Process" has the meaning set forth in Section 4.1.

(f) "Permitted Uses" has the meaning set forth in Section 3.

(g) "Retained Fiber Asset" means any Fiber Asset that is part of the Grant Network and that is essential, useful, or necessary for the continued operation of the Non-Grant Network, and that accordingly constitutes an Acquired Asset under the definition of "Fiber Assets" in the Purchase Agreement, but as to which an ownership transfer to the Grantee is not possible or requires regulatory consent and the Grantee has elected, or hereafter elects, to have the applicable Seller retain such asset subject to this Agreement.

**2. Grant of License and Indefeasible Right to Use.** Effective as of the Effective Date, the Grantor hereby grants, bargains, sells, conveys, and confirms to the Grantee and the other Grantee Parties, and their respective successors, assigns, and nominees, a perpetual, irrevocable, royalty-free, non-exclusive license and indefeasible right to use, in, to, through, over, under, upon, along, and across each and every Covered Asset, together with the right of vehicular and pedestrian ingress and egress to, from, and over the real property, facilities, and premises on, in, or under which any Covered Asset is located, in each case to the full extent of the Grantor's right, title, and interest therein and to the extent reasonably essential, necessary, or useful for any Permitted Use, for the useful life of each such Covered Asset (the "License"). For the avoidance of doubt, the rights of the Grantee granted hereunder are present, fully-vested property rights in the Covered Assets, granted for value, and effective without further performance by the Grantor, and the obligations of the Grantor hereunder are covenants in aid of such property rights, and not conditions precedent to the effectiveness or enforceability of the License.

**2.1 Automatic Effectiveness.** The License is effective, and attaches to each Covered Asset, automatically and without any further action, instrument, consent, payment, or deliverable of either Party, including as to (a) any asset that becomes a Covered Asset after the Effective Date, (b) any asset first identified through the Identification Process, (c) any asset as to which the Grantee makes an election under the definition of "Fiber Assets" in the Purchase Agreement, and (d) any replacement of, addition to, relocation of, or successor to any Covered Asset. The Parties' failure to identify, schedule, describe, or list any asset shall not defeat, limit, delay, or condition the License as to that asset.

**2.2 Categories of Covered Assets.** Without limiting the generality of Section 2 or the definition of Covered Assets, and by way of description rather than limitation, the Covered Assets include all of the following, to the extent not conveyed to the Grantee at the Closing, whether now existing or hereafter constructed, acquired, installed, replaced, upgraded, relocated, or otherwise brought into service, and

whether owned, leased, licensed, subscribed, held under an indefeasible right of use, or otherwise controlled by the Grantor:

(a) **Network, Systems, and Outside Plant.** The Systems and all outside plant, including all Fiber Medium and Fiber Assets, all fiber optic cable (aerial, buried, direct-buried, and underground), dark fiber and lit fiber, individual fiber strands, ribbons, buffer tubes and sheaths, backbone, middle-mile, metro, distribution, feeder, lateral, and drop segments, drop cable and conduit from easement to customer location, service drops, copper and coaxial cable, wireless and fixed wireless facilities, and all associated network segments, routes, and rings.

(b) **Conduit and Underground Structures.** All conduit, innerduct, microduct, ductbank, spare and unoccupied duct, bore paths, casings, trenches, direct-bury routes, manholes, handholes, vaults, mini-vaults, flowerpots, pull boxes, pedestals, splice cases, splice closures, splice and quick-attach terminals, slack loops, slack storage devices (including snowshoes), markers, locate wire, tracer wire, and warning tape.

(c) **Cabinets, Huts, Shelters, and Structures.** All cabinets and enclosures placed in a public or private right of way or easement, and all huts, shelters, buildings, remote terminals, node sites, equipment pads, racks, bays, cages, frames, distribution frames, optical distribution frames, main distribution frames, cross-connect panels, patch panels, splitter cabinets, terminals, and terminal blocks, together with the associated land, pads, fencing, gates, access drives, and parking.

(d) **Network Operations Center and Monitoring Systems.** The network operations center ("NOC") and any backup or alternate NOC, and all network operations, monitoring, surveillance, alarming, ticketing, dispatch, provisioning, element management, network management, inventory, mapping, and support systems, including OSS, BSS, NMS, EMS, DNS, DHCP, RADIUS, CRM, and billing and mediation systems, together with remote access to each of the foregoing and all associated dashboards, account information, usernames, passwords, credentials, and administrative rights necessary to monitor and operate the Non-Grant Network. For the avoidance of doubt, this clause (d) does not limit or qualify the Grantee's rights in the lease for the NOC cabinet at 910 15th Street, Denver, Colorado, or the license to the CRM, each of which is an Assumed Lease or Assumed Contract listed on Schedule 2 to the Purchase Agreement and is to be assigned to the Grantee at the Closing, to the extent assignable, in accordance with Section 2.5 of the Purchase Agreement. For the avoidance of doubt, this also includes SXM, Maestro and UCIS.

(e) **Central Offices, Headends, Hubs, and Colocation.** All central offices, headends, hubs, points of presence, data centers, meet-me rooms, carrier hotels, colocation and interconnection space, cage and rack space, cable vaults, entrance facilities, riser and conduit space within buildings, storage yards, and all cross-connects, interconnection points, and demarcation facilities.

(f) **Aerial Infrastructure and Towers.** All utility poles, pole attachments, pole standoffs, Towers, monopoles, anchors, guys, strand, messenger wire, lashings, hangers, cable clamps,

cable support, suspension and tension devices and clamping, aerial attachments, and all rights of attachment and occupancy relating thereto, including under any Tower Lease.

(g) **Electronics and Active Equipment.** All Optical Line Terminals, Optical Network Terminals, Service Network Interfaces, patch cables, switches, routers, aggregation and access equipment, DWDM/CWDM equipment, transponders, amplifiers, regenerators, repeaters, optical splitters, media converters, servers, storage, firewalls, and all associated modules, optics, cards, and firmware, including any such equipment located at Customer locations. For the avoidance of doubt, this includes all fixed wireless and point-to-point radios, antennas, backhaul, and customer premises equipment, and all other wireless devices, equipment, and radios, including equipment manufactured by Ubiquiti, Inc. For the purposes of clarification, this also includes all credentials, passwords, access controls and information necessary to access all systems, including the network operations center(s).

(h) **Power, Environmental, and Site Systems.** All commercial power service, meters, service drops and entrances, panels, transfer switches, generators, fuel systems and fuel supply, uninterruptible power supplies, batteries, rectifiers, inverters, DC plant, grounding and bonding systems, HVAC and environmental control, fire detection and suppression, lighting, physical security, cameras, locks, keys, key codes, badges, and access control systems, in each case serving any Covered Asset or any facility housing any Covered Asset.

(i) **Real Property Interests, Permits, and Third-Party Rights.** All Leases (as defined in the Purchase Agreement, including leases, subleases, licenses, concessions, options, easements, rights of way, rights of use, reciprocal easements, pole attachment and conduit access agreements, and recorded memoranda of any of the foregoing), all Permits, and all franchises, approvals, encroachment and crossing agreements (including railroad, highway, waterway, and utility crossings), joint trench and joint build agreements, master license agreements, site and ground leases, building access and rooftop agreements, colocation agreements, and indefeasible rights of use held by the Grantor, in each case to the fullest extent the Grantor may grant, sublicense, or permit use thereof.

(j) **Records, Data, and Documentation.** All as-built drawings, construction records, route maps, network maps, GIS and mapping data and layers, fiber records, strand and splice assignments, splice diagrams, circuit and path records, OTDR traces and test results, acceptance testing documentation, network diagrams, Internet Protocol space and Autonomous System Number documentation, equipment records, files, receipts, and assignment documentation, inventory and asset databases, maintenance and outage histories, locate records, permit files, FCC Broadband Data Collection and Colorado Broadband Office/PUC mapping submissions, warranties, manufacturer documentation, and all account information, usernames, passwords, keys, and credentials necessary to access any of the foregoing.

(k) **Software, Intellectual Property, and Contracts.** All computers, servers, systems, software, firmware, licenses, subscriptions, maintenance and support agreements, service contracts, locate and 811 services, and vendor and contractor arrangements, in each case relating to or

necessary for the operation, monitoring, maintenance, repair, or expansion of any Covered Asset, to the extent the Grantor may grant, sublicense, assign, or permit the use thereof.

(l) **Spares, Materials, and Construction Equipment.** All spare fiber, cable, conduit, hardware, electronics, optics, cards, components, consumables, maintenance materials, tools, and test equipment held or maintained by the Grantor for the network, and any equipment of the type described on Schedule 3 to the Purchase Agreement that is not conveyed to the Grantee at the Closing.

(m) **Miscellaneous.** Any other asset, right, facility, system, interest, or item of any kind or nature, tangible or intangible, real, personal, or mixed, that is at any time reasonably essential, necessary or useful for any Permitted Use, including anything that is functionally related to, interconnected with, physically co-located with, or serves any asset described in clauses (a) through (l) above.

**2.3 Rule of Construction.** This Agreement shall be construed broadly in favor of the Grantee's access to and use of the Covered Assets and in favor of the continuity of service on the Non-Grant Network, consistent with the Parties' agreement in the definition of "Fiber Assets" in the Purchase Agreement to work in good faith to ensure that there is no interruption of service to the Non-Grant Network. Each enumeration in this Agreement is illustrative and not exhaustive, the words "including," "includes," and "such as" mean "including without limitation," no rule of construction requiring interpretation against the drafting Party shall apply, and terms defined in the singular include the plural and terms defined in the plural include the singular (including "Financial Assistance Programs"). Any ambiguity as to whether an asset is a Covered Asset, or whether a use is a Permitted Use, shall be resolved in favor of coverage.

**2.4 Access to the Grant Network.** The Parties acknowledge that the Grant Network and the Non-Grant Network are physically and operationally integrated. The License extends to the Grant Network and to every component, facility, system, and record comprising or serving it, to the extent reasonably essential, necessary, or useful for any Permitted Use. No characterization of any asset as part of the Grant Network, as a Grant-Funded Asset, or as an Excluded Asset limits the Grantee's access to or use of that asset under this Agreement.

**3. Permitted Uses.** Consistent with Section 3.1(b)(iv) of the Purchase Agreement, the Grantee Parties may exercise the License for any and all of the following purposes, and for any purpose reasonably incidental thereto, in each case to the extent reasonably essential, necessary, or useful for the operation, maintenance, repair, restoration, migration, or expansion of the Non-Grant Network or the Business (collectively, the "Permitted Uses"):

(a) accessing, entering upon, occupying, traversing, and remaining upon any Covered Asset and any premises or real property on, in, under, or over which a Covered Asset is located, at any time, twenty-four (24) hours per day, seven (7) days per week;

(b) using, operating, monitoring, testing, inspecting, surveying, locating, and auditing any Covered Asset;

(c) maintaining, migrating, repairing, restoring, replacing, upgrading, expanding, augmenting, rearranging, re-routing, relocating, splicing, re-splicing, terminating, grooming, and lighting

any Covered Asset, and placing additional cable, fiber, conduit, equipment, or facilities in, on, or through any Covered Asset;

(d) separating the Grant and Non-Grant networks, interconnecting and cross-connecting the Non-Grant Network with, and transporting traffic over and through, any Covered Asset, and interconnecting with third-party networks at, through, or by means of any Covered Asset;

(e) operating, maintaining, expanding, and conducting the Business and the Non-Grant Network, including providing any service to any Customer over or by means of any Covered Asset;

(f) obtaining, reviewing, copying, and using the records, data, systems access, and credentials described in Sections 2.2(d), 2.2(j), and 2.2(k), and in Section 6; and

(g) permitting any Grantee Party, and any contractor, subcontractor, vendor, or designee of any Grantee Party, to do any of the foregoing on the Grantee's behalf.

**4. Identification of Covered Assets.** The Parties acknowledge that a complete inventory of the Covered Assets does not exist as of the Effective Date and that the identification of Covered Assets is an ongoing undertaking. The Grantee may, on a continuing basis and without regard to any deadline or cut-off, identify, describe, locate, and schedule the assets to which it requires access. Nothing in this Section 4 requires any act by the Grantor.

**4.1 Identification Process.** The Grantee shall maintain the master list of Covered Assets (the "Identification Process"). The Grantee may at any time, in its sole discretion and without the consent, approval, participation, or cooperation of the Grantor, review records, conduct field surveys, site visits, and walk-downs, and identify any asset as a Covered Asset. The Identification Process requires no act by the Grantor, and the Grantor's failure or refusal to participate does not limit, delay, or condition the Grantee's rights under this Agreement

4.2 Supplements to Exhibit A; Deemed Acceptance. The Grantee may at any time, and from time to time, deliver to the Grantor a written supplement identifying one or more assets as Covered Assets. Upon delivery, each asset so identified is conclusively deemed a Covered Asset for all purposes of this Agreement, without any consent, countersignature, or other act of the Grantor, and Exhibit A is deemed amended accordingly. If the Grantor disputes any such identification, it shall deliver written notice within ten (10) Business Days after delivery of the supplement stating the specific basis for the dispute; no such dispute suspends, limits, or conditions the Grantee's access to or use of the asset, or its status as a Covered Asset, pending resolution

**4.3 Exhibit A Not Limiting.** Exhibit A is descriptive and confirmatory only. The omission of any asset from Exhibit A, the incompleteness or inaccuracy of any description on Exhibit A, and the Grantee's failure to conduct or complete the Identification Process shall not (a) limit the definition of Covered Assets, (b) limit, suspend, or condition the License or any Permitted Use, (c) constitute a waiver of any right of the Grantee, or (d) give rise to any presumption that an omitted asset is not a Covered Asset. Exhibit A may be blank as of the Effective Date without affecting the validity or scope of this Agreement.

4.4 Access to Information; Consent. The Grantor consents to, and authorizes, the Grantee's access to and use of the Grantor's books, records, systems, data, personnel, contractors, and premises for purposes of the Identification Process, the Permitted Uses, the separation of the Covered Assets from the Acquired Assets, and the Grantee's separation, operation, access, use, and support of the Acquired Assets. The Grantor shall not withhold, obscure, destroy, or delay the production of any information reasonably requested by the Grantee. The Grantee shall bear its own costs of the Identification Process.

**5. No Transfer of Ownership; No Waiver of the Grantee's Claims.** Nothing in this Agreement transfers, or shall be construed to transfer, to the Grantee any right, title, or ownership interest in any Covered Asset, or any residual value, disposition right, revenue, or economic benefit associated with any Covered Asset other than the Permitted Uses. Ownership of the Covered Assets remains with the Grantor.

**5.1 No Admission or Waiver.** The grant of the License as to any asset, the listing of any asset on Exhibit A, and the Grantee's exercise of any right hereunder do not constitute an admission or agreement by the Grantee that such asset is a Grant-Funded Asset or an Excluded Asset, or that such asset is not an Acquired Asset. The Grantee expressly reserves all of its rights under the Purchase Agreement, including under the definitions of "Acquired Assets" and "Fiber Assets" and under Section 2.4 (Wrong Pockets) of the Purchase Agreement, to establish that any asset is an Acquired Asset and to require its transfer.

**6. Records, Data, and Systems Access.** Promptly following the Effective Date, and from time to time thereafter upon request, the Grantor shall provide the Grantee with copies of, and continuing access to, all records, data, drawings, maps, files, systems, account information, usernames, passwords, credentials, keys, key codes, badges, lock combinations, and access codes reasonably necessary for the Grantee to identify, locate, access, monitor, operate, maintain, repair, expand, and interconnect with the Covered Assets. This Section 6 supplements, and does not limit, the Grantor's delivery obligations under Section 3.1(b)(iii) of the Purchase Agreement. The Grantor shall not destroy, alter, or dispose of any such record or data without first offering it to the Grantee. Where a Covered Asset is secured, the Grantor shall provide the Grantee with independent means of access and shall not change any lock, code, or credential without providing the replacement to the Grantee concurrently. To the extent any item described in this Section 6 is not delivered, the Grantor consents to the Grantee obtaining it directly from any third party holding it, and this Agreement authorizes any such third party to deliver it to the Grantee.

**6.1 Delivery Deadline; Authorization.** The Grantor shall deliver all items described in Section 6 at the Closing. The Grantor acknowledges and agrees that this Agreement constitutes a standing letter of authorization to each landlord, utility, pole owner, colocation provider, carrier, vendor, and other third-party controlling access to any Covered Asset or any premises housing a Covered Asset, authorizing the Grantee Parties to access the same and to communicate and transact directly with such third-party. The Grantee may present this Agreement to any such third party as evidence of that authorization, may cause its designated personnel to be added to any access list, badge roster, or authorized-caller list maintained by any such third party, and may execute any further authorization such third party requires, in its own name or in the name of the Grantor, and the Grantor appoints the Grantee its attorney-in-fact for that purpose on the terms set forth in Section 9.2.

**6.2 Access Self-Help.** If the Grantor fails to provide access to any Covered Asset as required by this Agreement, the Grantee may, without prejudice to any other remedy after two (2) Business Days'

written notice, or such shorter period as is reasonable under the circumstances (and without notice in an Emergency), take reasonable measures to obtain access, including engaging a locksmith and replacing or bypassing any lock, seal, or credential, and entering any enclosure, cabinet, hut, or facility housing a Covered Asset. Such measures shall be at the Grantee's cost and shall not constitute trespass, conversion, or a default by the Grantee.

**6.3 Personnel.** The Grantor shall not restrict, and waives any restriction on, the Grantee's solicitation, contact, or hiring of any employee, contractor, or consultant of the Grantor with knowledge of the Covered Assets, and consents to the Grantee communicating with any such person directly.

**7. Term; Irrevocability.** The term of this Agreement is perpetual and runs for the useful life of each Covered Asset. This Agreement and the License shall not be terminated, revoked, cancelled, forfeited, suspended, extinguished, or impaired for any reason, including any breach or default by the Grantee, except by a written instrument executed by both Parties (or their respective successors or assigns) or as expressly provided in Section 15(b). The Parties acknowledge and intend that the License constitutes an indefeasible right to use. The Grantor's sole remedy for any breach by the Grantee is an action for damages or specific performance, and in no event termination or suspension of the License.

**8. Successors and Assigns.** In satisfaction of Section 3.1(b)(iv) of the Purchase Agreement, the License runs with each Covered Asset and survives any transfer of any Covered Asset to any successor grantee. The License is appurtenant to the Covered Assets, touches and concerns the Covered Assets and any real property interest therein, and shall run with such assets and interests. Each and every one of the benefits and burdens of this Agreement shall inure to and be binding upon the Parties and their respective legal representatives, heirs, administrators, receivers (including the Receiver), trustees, successors, transferees, and assigns, and upon any subsequent owner, lienholder, foreclosing party, purchaser at any foreclosure, receivership, or judicial sale, successor grantee under any Financial Assistance Program, and any Governmental Authority taking title to or control of any Covered Asset, and shall survive any conveyance, transfer, foreclosure, forfeiture, abandonment, reversion, receivership, insolvency, bankruptcy, or winding up affecting the Covered Assets or the Sellers. The Grantor shall not transfer, assign, convey, encumber, abandon, or dispose of any Covered Asset except expressly subject to this Agreement, shall include an express reference to this Agreement in each instrument of transfer, and shall give the Grantee not less than ten (10) Business Days' prior written notice of any such transfer.

**9. Reserved Rights; No Interference.** The Grantor reserves the right to use the Covered Assets and to grant further interests in the Covered Assets to other Persons, so long as such uses and interests do not materially or unreasonably interfere with, and are expressly subordinate to, the rights of the Grantee Parties under this Agreement. The Grantor shall not take any action, or fail to take any action, that unreasonably impairs the Grantee's exercise of the rights granted hereunder, and shall not deny, condition, delay, or charge for access to any Covered Asset. The Grantee shall use commercially reasonable efforts to avoid interference with the Grantor's operation of the Grant Network and shall not take any action, or fail to take any action, that unreasonably impairs the safety, integrity, or performance of the Covered Assets or the Grant Network.

**9.1 Preservation of Covered Assets.** The Grantor shall not remove, relocate, decommission, disable, power down, disconnect, modify, degrade, or dispose of any Covered Asset, and shall not

discontinue any system, service, or utility serving any Covered Asset, without the Grantee's prior written consent. The Grantor shall not terminate, surrender, amend, reject, or permit the lapse of any Lease, Permit, easement, license, pole attachment agreement, conduit occupancy agreement, colocation agreement, or other instrument under which any Covered Asset is held or accessed, without the Grantee's prior written consent. The Grantor consents to the Grantee obtaining directly from any counterparty the status of, and any notice of default, non-renewal, or termination under, any such instrument, and this Agreement authorizes any such counterparty to communicate with and accept payment from the Grantee.

**9.2 Cure and Step-In Rights.** If the Grantor fails to perform any obligation under Section 9.1 or fails to maintain any Covered Asset, or fails to pursue or obtain any consent or approval in accordance with Section 15, the Grantee, and any officer or manager acting on behalf of the Grantee, may (but is not obligated to), upon notice to the Grantor, whether in the Grantor's name or its own.

(i) perform such obligation, pay any amount due, cure any default, assume any account, and deal directly with any counterparty;

(ii) incidental to the actions in the foregoing Clause (i), execute, deliver, file, record, or transmit any notices to utilities, notices to vendors, cure notices, other notices, consents, consent requests, access requests, estoppels, certificates, assignments, sublicenses, subleases, memorandums, transfer documents, permit applications, regulatory filings, utility or service-provider authorizations, account-assumption documents, payment instructions, and other similar operational instruments; and

(iii) take any other action reasonably essential, necessary, or useful for exercising, effectuating, protecting, preserving, confirming, continuing, or enforcing the rights of the Grantee hereunder to make any Permitted Use of any Covered Asset, as determined in the Grantee's reasonable discretion.

The Grantor appoints the Grantee its attorney-in-fact, with full power of substitution, for such purposes, which appointment is a power coupled with an interest, is irrevocable, and survives the discharge of the Receiver and the dissolution, winding up, termination of existence, insolvency, bankruptcy, or future receivership as to any Seller; and binds the Grantor and each of its successors, assigns, receivers, liquidators, trustees, owners, and all persons or entities acting through or under any of them.

The Grantor waives (1) any and all objections to any action taken by the Grantee, or any officer or manager of the Grantee, within the scope of this power of attorney, and (2) any and all claims against any counterparty or other third party for acts of such counterparty or other third party in connection with any act of the Grantee taken within the scope of this power of attorney.

Any third party may rely conclusively on a signed copy of this Agreement as sufficient evidence of the Grantee's authority, or the authority of any officer or manager of the Grantee, without inquiry and without joinder, consent, or further action by the Grantor.

**10. Standard of Work; Notice; Emergencies.** The Grantee shall perform all work on the Covered Assets in a good and workmanlike manner, in accordance with prevailing industry standards for the construction, operation, and maintenance of fiber optic networks, and in compliance with all applicable law, including the Communications Laws, and with all Permits and rights-of-way requirements.

(a) Emergency Work. In the case of an Emergency, the Grantee may perform work immediately and without prior notice, provided that the Grantee shall (i) use commercially reasonable efforts to notify the Grantor as promptly as possible, and in any event within twenty-four (24) hours after commencing such work, and (ii) restore the affected Covered Asset to its pre-Emergency condition as promptly as reasonably practicable.

**11. Costs; No Fee.** The Grantee shall bear its own costs of exercising the rights granted to it under this Agreement, including the costs of accessing, using, maintaining, repairing, replacing, expanding, and interconnecting with the Covered Assets. Consistent with Section 3.1(b)(iv) of the Purchase Agreement, the License is royalty-free, and no fee, royalty, rent, recurring charge, access charge, colocation charge, or other consideration of any kind shall be payable by the Grantee to the Grantor for the License or any Permitted Use, the entire consideration therefor being included in the Purchase Price.

**12. Damages; Preservation of Acquired Assets.** Except as may be prohibited or limited by applicable law:

(a) the Grantee shall be responsible for, and shall bear the risk of, all damage, loss, injury, or liability arising from or in connection with its own work on any Covered Asset, including (i) damage to the Covered Asset itself, (ii) damage to any other property, whether or not owned by the Grantor, and (iii) any interruption, degradation, or loss of service on the Grant Network to the extent caused by the Grantee's work; and

(b) the Grantor shall not damage, destroy, remove, relocate, disable, or interfere with any Acquired Asset. To the extent any Acquired Asset remains in the Grantor's possession or upon premises controlled by the Grantor, the Grantor holds it in trust for the Grantee as bailee, consistent with Section 2.4 (Wrong Pockets) of the Purchase Agreement, owes the Grantee a duty of reasonable care, and shall deliver it to the Grantee upon demand.

**13. No Warranty.** THE GRANTOR PROVIDES THE COVERED ASSETS "AS IS" FOR PURPOSES OF THE GRANTEE'S EXERCISE OF RIGHTS UNDER THIS AGREEMENT. THE GRANTOR MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE COVERED ASSETS, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. NOTHING IN THIS SECTION 13 LIMITS ANY COVENANT OR AGREEMENT GIVEN UNDER THE PURCHASE AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, OR ANY REPRESENTATION OR WARRANTY TO THE EXTENT IT SURVIVES THE CLOSING.

**14. Title; Authority; Quiet Enjoyment.** The Grantor covenants that it has full legal right and lawful authority, including under the Court's order appointing the Receiver and the Court's order approving the Purchase Agreement, to make the grant herein contained, and further covenants that it will warrant and forever defend the License in the quiet and peaceable possession of the Grantee and its successors, assigns, and nominees. The foregoing covenants are given by each Seller as to the assets in which such Seller holds an interest. To the extent the Grantor's interest in any Covered Asset is a leasehold, license, easement, or

other non-fee interest, the Grantor grants the maximum sublicense, sublease, or permission to use that its interest and the governing instrument permit, and consents to the Grantee seeking and obtaining, in its own name or in the name of the Grantor, any consent required to give the Grantee the full benefit of this Agreement.

**15. Regulatory Matters; Reclassification.** The Parties acknowledge that certain Covered Assets may be subject to notice, consent, non-objection, or approval requirements of a Governmental Authority, the FCC, a PUC, or a grantor agency under a Financial Assistance Program.

(a) Consents. Where required, the Grantor shall use its best efforts, consistent with Section 2.5(b) of the Purchase Agreement, to obtain any such required consent or approval as promptly as possible following the Effective Date, at the Grantor's cost, and shall provide the Grantee with reasonable updates on the status of such efforts. Pending receipt of any such consent, this Agreement remains effective as to each Covered Asset in accordance with its terms, and each Party shall exercise its rights hereunder in a manner consistent with any applicable regulatory constraint of which such Party has actual knowledge. The Grantee may pursue, apply for, and obtain any such consent or approval directly, at any time and in its sole discretion, in its own name or in the name of the Grantor, and may communicate directly with any Governmental Authority or grantor agency for that purpose. The Grantor appoints the Grantee its attorney-in-fact for such purposes on the terms set forth in Section 9.2, and no act of the Grantor is required.

(b) Assets Determined Not to Be Grant-Funded. Any Covered Asset at any time determined not to be a Grant-Funded Asset, including by operation of the conclusive presumption in the definition of "Acquired Assets" in the Purchase Agreement, is, and at all times from and after the Closing has been, an Acquired Asset conveyed to the Grantee under Section 2.1 of the Purchase Agreement. The applicable Seller holds bare legal title to such asset in trust for the Grantee under Section 2.4 (Wrong Pockets) of the Purchase Agreement, and the Grantee may execute, deliver, file, and record such instruments as it deems necessary to evidence and perfect its ownership, in its own name or in the name of the Grantor, without any act of the Grantor. The License as to such asset continues until record title is perfected in the Grantee.

(c) Assets Determined to Be Grant-Funded. If any asset used in, serving, or necessary for the Non-Grant Network is at any time determined to be a Grant-Funded Asset, or if the Grantee makes an election under the definition of "Fiber Assets" in the Purchase Agreement as to any Retained Fiber Asset, such asset automatically becomes a Covered Asset subject to this Agreement without any further action of the Parties.

(d) No Adverse Positions. The Grantor shall not, and shall cause its Affiliates, the Receiver, and its successors and assigns not to, take any position adverse to the Grantee's rights under this Agreement in any communication with, filing with, or proceeding before the Court, the FCC, any PUC, USAC, or any other Governmental Authority or grantor agency. The Grantee may communicate directly with any Governmental Authority or grantor agency regarding any Covered Asset and its rights under this Agreement, and may request and receive from any such authority or agency any inquiry, audit, notice of violation, Proceeding, or other

communication relating to any Covered Asset. The Grantor consents to such communication and authorizes each such authority and agency to deal directly with the Grantee.

(e) For the avoidance of doubt, the Grantee has the right to communicate directly with, appear before, file with, obtain information from, and request action by any Governmental Authority, including but not limited to the FCC, NTIA, PUC, USAC, and any other agency, or any other landlord, utility, pole owner, colocation provider, carrier, vendor, or other third party with jurisdiction over, control of, or contractual rights relating to any Covered Asset; and the Grantor shall not revoke, limit, contradict, or interfere with any such acts taken by the Grantee. If any Governmental Authority, grantor agency, landlord, utility, pole owner, right-of-way authority, colocation provider, carrier, vendor, or other third party requires the Grantor's joinder, signature, confirmation, or authorization, the Grantor shall provide the same within two (2) Business Days after request, or immediately in the case of an Emergency, and if it fails to do so within such time period, the Grantee may exercise the power of attorney granted by Section 9.2.

**16. Remedies; Specific Performance.** The Parties acknowledge that the Covered Assets are unique, that the Non-Grant Network cannot be operated without the rights granted hereunder, and that money damages would be an inadequate remedy for any breach of this Agreement by the Grantor. Accordingly, the Grantee is entitled to specific performance, injunctive relief, and other equitable remedies to enforce this Agreement, without the necessity of posting a bond or proving actual damages, in addition to any other remedy available at law or in equity. The Grantor stipulates that (a) any breach of Sections 6, 9, 9.1, 9.2, or 12(b) causes immediate and irreparable harm for which money damages are inadequate; (b) the Grantee is entitled to a temporary restraining order and preliminary and permanent injunctive relief without bond, security, or proof of actual damages; and (c) the Grantor will not oppose such relief on the ground that the Grantee has an adequate remedy at law.

**17. Further Assurances.** The Grantee may execute, acknowledge, deliver, file, and record any instrument it deems necessary or appropriate to evidence, confirm, or perfect the License or any of its rights under this Agreement, including supplements to Exhibit A, consents, estoppels, and confirmations of coverage as to particular assets, in its own name or in the name of the Grantor, and the Grantor appoints the Grantee its attorney-in-fact for such limited purposes on the terms set forth in Section 9.2. The Grantee shall bear the costs thereof. No act of the Grantor is required to give effect to this Agreement.

**18. Assignment.** The Grantee may assign this Agreement, in whole or in part, without the consent of the Grantor, to any Affiliate of the Grantee, to any lender as collateral, or to any purchaser, transferee, nominee, or successor to all or any portion of the Non-Grant Network or the Business. Any such assignment is effective upon delivery to the Grantor of notice thereof. The Grantor may not assign this Agreement without the prior written consent of the Grantee, except that the Grantor may assign this Agreement to any transferee of, or successor grantee to, any Covered Asset, provided that such transferee or successor agrees in writing to be bound by this Agreement. Any purported assignment in violation of this Section 18 is void.

**19. Notice.** All notices in connection with this Agreement shall be in writing and shall be deemed properly given and delivered to the other Party: (i) on the day of delivery if delivered in person; (ii) one Business Day after deposit with a nationally recognized overnight courier; (iii) three (3) Business Days after deposit if sent by certified United States mail, postage prepaid, return receipt requested; or (iv) upon

confirmation of transmission if sent by email, to the addresses set out below, or to such other addresses as are from time to time specified by written notice delivered in accordance herewith. If the Receiver has been discharged, or if no Seller maintains a valid notice address, notice to the Grantor is effective upon transmission by email to the last known email address of the Grantor or the Receiver together with deposit by certified mail, postage prepaid, addressed to the last address of record of the applicable Seller with the Colorado Secretary of State.

**GRANTOR:** Maverix LLC and Maverix Broadband, Inc.
c/o Sonoran Capital Advisors, as Receiver
1733 North Greenfield Road
Mesa AZ, 85205
Attn: Bryan Perkinson
Email: tchristianson@sonorancap.com;
bperkinson@sonorancap.com

**GRANTEE:** CooperReilly Investment Fund, LLC
4395 Harris Trail, NW
Atlanta, Georgia 30327
Attn: Matthew Middelthon
Email: middeltho2@aol.com

**20. Attorneys' Fees.** In the event any Party seeks to enforce its rights hereunder through litigation, arbitration, or another legal proceeding, the court or panel shall award to the prevailing Party as part of its judgment or award its reasonable attorneys' fees and costs.

**21. Relationship of the Parties.** Nothing in this Agreement shall be deemed or construed by any Party, by either Seller, or by any third Person, to create the relationship of principal and agent, or of limited or general partners, or of joint venturers, or of any other association between the Parties or between the Sellers. Nothing herein shall be construed to impose any personal liability on the Receiver, and the Receiver executes this Agreement solely in its capacity as Receiver and not individually.

**22. Governing Law; Jurisdiction; Venue; Jury Waiver.** Consistent with Sections 9.5, 9.10, and 9.11 of the Purchase Agreement, this Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the laws of the State of Colorado, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

**23. Miscellaneous.** (a) Entire Agreement; Amendment. This Agreement, together with the Purchase Agreement and the other Transaction Documents, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, discussions, and understandings. This Agreement may be amended only by a written instrument executed by both Parties, except that Exhibit A may be supplemented as provided in Section 4.2.

(b) Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision. Any provision held invalid or unenforceable shall be modified to the minimum extent necessary to make it valid and enforceable. No holding of invalidity as to any Covered Asset shall affect the License as to any other Covered Asset.

(c) No Waiver. No delay or failure by either Party in exercising any right hereunder, and no course of dealing, shall operate as a waiver of that or any other right. No waiver is effective unless in writing and signed by the waiving Party.

(d) Section Headings. The section headings contained herein are included for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

(e) Counterparts; Electronic Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts may be executed via physical or electronic signature and delivered via electronic mail or other means of electronic transmission.

(f) No Third-Party Beneficiaries. Except for the Grantee Parties, the Receiver, and the express references to successor grantees and Governmental Authorities herein, this Agreement is for the sole benefit of the Parties and their permitted successors, assigns, and nominees.

(g) Interpretation. In the event of any conflict between this Agreement and the Purchase Agreement solely with respect to the License and the Grantee's access to and use of the Covered Assets, this Agreement controls. All other conflicts shall be resolved in favor of the Purchase Agreement.

(h) Survival. The License and the other rights granted to the Grantee under this Agreement are perpetual, are not subject to the survival limitations of Section 9.12 of the Purchase Agreement (which by its terms applies to representations, warranties, covenants, and agreements contained in the Purchase Agreement), and survive the Closing, any termination of the Purchase Agreement, the discharge of the Receiver, and any dissolution, winding up, receivership, or bankruptcy of either Seller. The rights granted hereunder shall not be affected by the Sellers ceasing operations or winding up their affairs following the Closing as contemplated by Section 6.3 of the Purchase Agreement.

IN WITNESS WHEREOF, the Grantor and the Grantee have executed this Agreement as of the Effective Date.

**"GRANTOR"**

**MAVERIX LLC,**
a Colorado limited liability company

By: Sonoran Capital Advisors, its Receiver

By: Signed by: E4F7691EECC843E...

Name: Bryan Perkinson

Title: Managing Member

**MAVERIX BROADBAND, INC.,**
a Colorado corporation
By: Sonoran Capital Advisors, its Receiver

By: Signed by: E4F7691EECC843E...

Name: Bryan Perkinson

Title: Managing Member

**"GRANTEE"**

**COOPERREILLY INVESTMENT FUND, LLC,**
a Georgia limited liability company

By: Signed by: Matthew Middelthon EE4872675E5741A...

Name: Matthew Middelthon

Title: Manager

## Exhibit A: Covered Assets

This Exhibit A is descriptive and confirmatory only. Pursuant to Section 4.3, the omission of any asset from this Exhibit A does not limit the definition of Covered Assets or the scope of the License, and this Exhibit A may be blank as of the Effective Date. This Exhibit A is supplemented from time to time in accordance with Section 4.2. Without limiting Section 4.3, and pending completion of the Parties' investigation of the Covered Assets, the assumption and assignment of third-party Contracts and Leases, and any migration of systems or services, the Covered Assets include all of the following. Completion of any such investigation, assumption, assignment, or migration shall not remove any asset from the Covered Assets, and shall not terminate, limit, or suspend the License as to any asset, except as expressly provided in Section 15(b).

### Identified Covered Assets:

1. All Fiber Medium, Fiber Assets, fiber routes, segments, strands, laterals, drops, conduit, innerduct, ductbank, bore paths, manholes, handholes, vaults, splice cases, terminals and all other underground structures.
2. All cabinets, enclosures, huts, shelters, node sites, racks, frames, NOC, monitoring and management systems, CRM systems and devices, data centers, storage yards, colocation/interconnection spaces, central offices, headends, hubs, points of presence, switches, routers, optics, OLTs, ONTs, service network interfaces, and associated credentials and access.
3. All Leases, easements, rights-of-way, Permits, franchises, pole attachment and conduit access agreements, and crossing agreements, power, environmental and site systems.
4. All records, as-builts, GIS data, fiber and splice records, engineering plans, network maps, test results, and associated credentials and access.
5. All software, licenses, service contracts, and associated credentials and access.
6. All spares, inventory, materials, tools, test equipment, vehicles and access codes to locations where housed.
7. All Retained Fiber Assets as to which the Grantee has made an election under the definition of "Fiber Assets" in the Purchase Agreement and other assets identified through the Identification Process.