# STATE OF COLORADO GRANT AGREEMENT FOR CAPITAL PROJECTS FUND (CPF)

**COVER PAGE**

| | |
|---|---|
| **State Agency**<br>Governor's Office of Information Technology | **Agreement Number/CORE Encumbrance Number**<br>191465<br>CTGG1 2024-4106 |
| **Grantee**<br>Maverix Broadband, Inc.<br>**Project Name**<br>Kiowa FTTH<br>**UEI**<br>X3G2NJ6QE223 | **Agreement Performance Beginning Date**<br>The Effective Date<br>**Initial Agreement Expiration Date**<br>December 31, 2026 |
| **Agreement Maximum Amount**<br>Initial Term*<br>State Fiscal Year 2024 $1,861,407.00<br>State Fiscal Year 2025<br>State Fiscal Year 2026<br>State Fiscal Year 2027<br>*The amount for each remaining State Fiscal Year in the Initial Term is minus any funds expended in the previous State Fiscal Year(s).<br>Extension Terms<br>State Fiscal Year 20__<br>State Fiscal Year 20__<br>**Total for All State Fiscal Years** $1,861,407.00 | **Fund Expenditure End Date**<br>December 31, 2026<br>**Agreement Authority**<br>Authority to enter into this grant Agreement exists in section 604 of the Social Security Act (the CPF Statute), as added by section 9901 of the American Rescue Plan Act of 2021. This grant Agreement is issued as a Fixed Amount Subaward per 2 C.F.R. § 200.201 pursuant to the "SLFRF and CPF Supplementary Broadband Guidance." |
| **Matching Funds Amount** $620,500.00<br>**Grant Funds Maximum Amount** $1,861,407.00 | **Matching Funds Percentage Required:** 25% |

**Agreement Purpose**

The purpose of this Agreement is to facilitate timely completion by Grantee of the broadband Project described in Exhibit A while complying with all requirements found in the laws, regulations, and official guidance implementing the broadband awards made from the Capital Projects Fund (CPF). This grant Agreement is issued as a Fixed Amount Subaward per 2 C.F.R. § 200.201 subject to additional State rules, regulations, and requirements.

**Exhibits and Order of Precedence**

The following Exhibits and attachments are included with this Agreement:

1. Exhibit A, Statement of Work.
2. Exhibit B, Sample Option Letter.
3. Exhibit C, Budget.
4. Exhibit D, Performance Bond.
5. Exhibit E, Labor and Material Payment Bond.
6. Exhibit F, Grant Federal Provisions.
7. Exhibit G, Agreement with Subrecipient of Federal Recovery Funds and Terms and Conditions.
8. Exhibit H, PII Certification.
9. Exhibit I, [RESERVED].

10. Exhibit J, Certification of Broadband Speeds.
11. Exhibit K, Assurances of Compliance with 2 C.F.R. § 200.216 Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.
12. Exhibit L, Certification of Last Mile.
13. Exhibit M, Acknowledgement of Reporting Requirements.
14. Exhibit N, Notice to Proceed.
15. Exhibit O, Certification of Need.
16. Exhibit P, Certification of Affordability.

In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment, such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

1. Exhibit F, Grant Federal Provisions.
2. Exhibit G, Agreement with Subrecipient of Federal Recovery Funds and Terms and Conditions.
3. Colorado Special Provisions in §18 of the main body of this Agreement.
4. The provisions of the other sections of the main body of this Agreement.
5. Exhibit A, Statement of Work.
6. Exhibit H, PII Certification.
7. Exhibit B, Sample Option Letter.
8. Exhibit N, Notice to Proceed.
9. Exhibit C, Budget.
10. Exhibit J, Certification of Broadband Speeds.
11. Exhibit K, Assurances of Compliance with 2 C.F.R. § 200.216 Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.
12. Exhibit L, Certification of Last Mile.
13. Exhibit M, Acknowledgement of Reporting Requirements.
14. Exhibit O, Certification of Need.
15. Exhibit P, Certification of Affordability.
16. Exhibit E, Labor and Material Payment Bond.
17. Exhibit D, Performance Bond.

**Principal Representatives**

| For the State: | For Grantee: |
|---|---|
| Jonas Durham<br>Colorado Broadband Office<br>Governor's Office of Information Technology<br>1575 Sherman St.<br>Denver, Colorado 80203<br>jonas.durham@state.co.us | Maverix Broadband, Inc.<br>10940 S Parker Rd, Suite 418, Parker, CO 80134 US<br>david@maverixbroadband.com |

## FEDERAL AWARD(S) APPLICABLE TO THIS GRANT AWARD

| | |
|---|---|
| Federal Awarding Agency | U.S. Department of the Treasury |
| Grant Program | Coronavirus Capital Projects Fund |
| Assistance Listing Number | 21.029 |
| Federal Award Number | CPFFN0142 |
| Federal Award Date | February 4, 2022 |
| Federal Award End Date * | December 31, 2026 |
| Federal Statutory Authority | Title VI of the Social Security Act, Section 604 |
| Total Amount of Federal Award (this is not the amount of this grant Agreement) | $170,751,674.00 |

* Funds may not be available through the Federal Award End Date subject to the provisions in §2 and §5 below of this Agreement.

## SIGNATURE PAGE

**THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT**

Each person signing this Agreement represents and warrants that the signer is duly authorized to execute this Agreement and to bind the Party authorizing such signature.

| GRANTEE | STATE OF COLORADO |
|---|---|
| Maverix Broadband, Inc. | Jared S. Polis, Governor<br>Governor's Office of Information Technology<br>David Edinger, Chief Information Officer and Executive Director |
| By: DocuSigned by: David Lindauer 5A71151C09CC45C... | By: DocuSigned by: Alex Monts 4235987998F1488... |
| Title: CEO | Title: CFO |
| Date: 5/30/2024 | Date: 5/30/2024 |

In accordance with §24-30-202, C.R.S., this Agreement is not valid until signed and dated below by the State Controller or an authorized delegate.

**STATE CONTROLLER**
**Robert Jaros, CPA, MBA, JD**

By: DocuSigned by: Andi Hardy A911981DBBD3466...

Title: Controller

**Effective Date:** 6/3/2024

## TABLE OF CONTENTS


COVER PAGE 1-3
SIGNATURE PAGE 4
1. PARTIES 5
2. TERM AND EFFECTIVE DATE 5
3. DEFINITIONS 6
4. STATEMENT OF WORK 9
5. PAYMENTS TO GRANTEE 9
6. REPORTING - NOTIFICATION 11
7. GRANTEE RECORDS 12
8. CONFIDENTIAL INFORMATION - STATE RECORDS 13
9. CONFLICTS OF INTEREST 14
10. INSURANCE 14
11. BREACH OF AGREEMENT 16
12. REMEDIES 16
13. DISPUTE RESOLUTION 18
14. NOTICES AND REPRESENTATIVES 19
15. RIGHTS IN WORK PRODUCT AND OTHER INFORMATION 19
16. CERTIFICATIONS AND COMPLIANCE 19
17. GENERAL PROVISIONS 21
18. COLORADO SPECIAL PROVISIONS (COLORADO FISCAL RULE 3-3) 24


## 1. PARTIES

This Agreement ("Agreement") is entered into by and between Grantee named on the Cover Page for this Agreement ("Grantee"), and the STATE OF COLORADO acting by and through the State agency named on the Cover Page for this Agreement (the "State"). Grantee and the State agree to the terms and conditions in this Agreement.

## 2. TERM AND EFFECTIVE DATE

A. Effective Date

This Agreement shall not be valid or enforceable until the Effective Date shown on the Signature Page, and the Agreement Funds shall be expended by the Agreement Fund Expenditure End Date shown on the Cover Page for this Agreement. The State shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay Grantee for any Work performed or expense incurred before the Effective Date, except as described in **§5.D**, or after the Agreement Fund Expenditure End Date. If the Work will be performed in multiple phases, the period of performance start and end date of each phase is detailed under the Project schedule in Exhibit A, Statement of Work.

B. Initial Term

The Parties' respective performances under this Agreement shall commence on the Agreement Performance Beginning Date shown on the Cover Page for this Agreement and shall terminate on the Initial Agreement Expiration Date shown on the Cover Page for this Agreement (the "Initial Term") unless sooner terminated or further extended in accordance with the terms of this Agreement.

The Term of this Agreement shall commence on the Effective Date and shall continue until the State remits a Project Closeout Letter (as detailed in Exhibit A) evidencing completion of all Work in accordance with Exhibit A of this Agreement, unless sooner terminated in accordance with the terms of this Agreement.

C. Extension Terms

i. State's Option

The State, at its discretion, shall have the option to extend the performance under this Agreement beyond the Initial Term for successive periods of one year or less at the same rates and under the same terms specified in this Agreement (each such period an "Extension Term"). In order to exercise this option, the State shall provide

written notice to Grantee in a form equivalent to the Sample Option Letter attached to this Agreement. The Term of this Agreement, including any Extension Term(s), may not extend beyond December 31, 2026.

ii. Grantee Request

If Grantee anticipates that the Project cannot be completed by the Fund Expenditure End Date and/or that funds will be remaining at the end of the Fund Expenditure End Date, Grantee must request, in writing, a grant extension, at least sixty (60) days before the Fund Expenditure End Date. The request must contain a narrative explaining the need for the extension. Approval of the request is contingent upon federal/state limitations and at the discretion of the State.

D. End of Term Extension

If this Agreement approaches the end of its Initial Term, or any Extension Term then in place, the State, at its discretion, upon written notice to Grantee as provided in **§14**, may unilaterally extend such Initial Term or Extension Term for a period not to exceed two months (an "End of Term Extension"), regardless of whether additional Extension Terms are available or not. The provisions of this Agreement in effect when such notice is given shall remain in effect during the End of Term Extension. The End of Term Extension shall automatically terminate upon execution of a replacement agreement or modification extending the total term of this Agreement. The Term of this Agreement, including any End of Term Extension(s), may not extend beyond December 31, 2026.

E. Early Termination in the Public Interest

The State is entering into this Agreement to serve the public interest of the State of Colorado as determined by its Governor, General Assembly, or Courts. If this Agreement ceases to further the public interest of the State, the State, in its discretion, may terminate this Agreement in whole or in part. A determination that this Agreement should be terminated in the public interest shall not be equivalent to a State right to terminate for convenience. This subsection shall not apply to a termination of this Agreement by the State for Breach of Agreement by Grantee, which shall be governed by **§12.A.i.**

i. Method and Content

The State shall notify Grantee of such termination in accordance with **§14.** The notice shall specify the effective date of the termination and whether it affects all or a portion of this Agreement, and shall include, to the extent practicable, the public interest justification for the termination.

ii. Obligations and Rights

Upon receipt of a termination notice for termination in the public interest, Grantee shall be subject to the rights and obligations set forth in **§12.A.i.a**.

iii. Payments

If the State terminates this Agreement in the public interest, the State shall pay Grantee an amount equal to the percentage of the total reimbursement payable under this Agreement that corresponds to the percentage of Work satisfactorily completed and accepted, as determined by the State, less payments previously made. Additionally, if this Agreement is less than 60% completed, as determined by the State, the State may reimburse Grantee for a portion of allowable actual out-of-pocket expenses, not otherwise reimbursed under this Agreement, incurred by Grantee which are directly attributable to the uncompleted portion of Grantee's obligations, provided that the sum of any and all reimbursement shall not exceed the maximum amount payable to Grantee hereunder.

F. Grantee's Termination Under Federal Requirements

Grantee may request termination of this Agreement by sending notice to the State that includes the reasons for the termination and the effective date of the termination. If this Agreement is terminated in this manner, then Grantee shall return any advanced payments made for work that will not be performed prior to the effective date of the termination. Approval of termination shall be at the sole discretion of the State, which may condition approval upon return of some, or all, of any previously reimbursed expenses.

## 3. DEFINITIONS

The following terms shall be construed and interpreted as follows:

A. "**Agreement**" means this agreement, including all attached Exhibits, all documents incorporated by reference, all referenced statutes, rules and cited authorities, and any future modifications thereto.

B. "**Agreement Funds**" means the total of all of the funds contemplated by this Agreement including **Grant Funds** and **Matching Funds**.

C. "**Award**" means an award by a Recipient to a Subrecipient funded in whole or in part by a Federal Award. The terms and conditions of the Federal Award flow down to the Award unless the terms and conditions of the Federal Award specifically indicate otherwise.

D. "**Breach of Agreement**" means the failure of a Party to perform any of its obligations in accordance with this Agreement, in whole or in part or in a timely or satisfactory manner. The institution of proceedings under any bankruptcy, insolvency, reorganization or similar law, by or against Grantee, or the appointment of a receiver or similar officer for Grantee or any of its property, which is not vacated or fully stayed within 30 days after the institution of such proceeding, shall also constitute a Breach of Agreement. If Grantee is debarred or suspended under §24-109-105, C.R.S. at any time during the Term of this Agreement, then such debarment or suspension shall constitute a Breach of Agreement.

E. "**Budget**" means the budget detailed in Exhibit C for the Work described in Exhibit A.

F. "**Business Day**" means any day in which the State is open and conducting business, but shall not include Saturday, Sunday or any day on which the State observes one of the holidays listed in §24-11-101(1), C.R.S. Any other reference to "day" means calendar day.

G. "**CORA**" means the Colorado Open Records Act, §§24-72-200.1, *et seq.*, C.R.S.

H. "**Effective Date**" means the date on which this Agreement is approved and signed by the Colorado State Controller or designee, as shown on the Signature Page for this Agreement.

I. "**End of Term Extension**" means the time period defined in **§2.D**.

J. "**Exhibits**" means the exhibits and attachments included with this Agreement as shown on the Cover Page for this Agreement.

K. "**Extension Term**" means the time period defined in **§2.C.**

L. "**Federal Award**" means an award of Federal financial assistance or a cost-reimbursement agreement, under the Federal Acquisition Regulations or by a formula or block grant, by a Federal Awarding Agency to a Recipient. "Federal Award" also means an agreement setting forth the terms and conditions of the Federal Award. The term does not include payments to a contractor, an Entity, as defined in Exhibit F, or an individual that is a beneficiary of a Federal program.

M. "**Federal Awarding Agency**" means a Federal agency providing a Federal Award to a Recipient. The U.S. Department of the Treasury is the Federal Awarding Agency for the Federal Award that is the subject of this Agreement.

N. "**Fixed Amount Subaward**" means a type of grant under which the Federal Awarding Agency or pass-through entity provides a specific level of support. Accountability is based primarily on performance and results. (For additional information on Fixed Amount Subawards, see 2 C.F.R. § 200.201 and the "SLFRF and CPF Supplementary Broadband Guidance").

O. "**Goods**" means any movable material acquired, produced, or delivered by Grantee as set forth in this Agreement and shall include any movable material acquired, produced, or delivered by Grantee in connection with the Services.

P. "**Grant Funds**" means the funds that have been appropriated, designated, encumbered, or otherwise made available for payment by the State under this Agreement.

Q. "**Incident**" means any accidental or deliberate event that results in or constitutes an imminent threat of the unauthorized access, loss, disclosure, modification, disruption, or destruction of any communications or information resources of the State, which are included as part of the Work, as described in §§24-37.5-401, *et seq*., C.R.S. Incidents include, without limitation, (i) successful attempts to gain unauthorized access to a State system or State Records regardless of where such information is located; (ii) unwanted disruption or denial of service; (iii) the unauthorized use of a State system for the processing or storage of data; or (iv) changes to State system hardware, firmware, or software characteristics without the State's knowledge, instruction, or consent.

R. "**Initial Term**" means the time period defined in **§2.B**.

S. "**Matching Funds**" means the funds provided by Grantee as a match required to receive the Grant Funds.

T. "**Party**" means the State or Grantee, and **"Parties"** means both the State and Grantee.

U. "**PCI**" means payment card information including any data related to credit card holders' names, credit card numbers, or other credit card information as may be protected by state or federal law.

V. "**PII**" means personally identifiable information including, without limitation, any information maintained by the State about an individual that can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, or biometric records; and any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information. PII includes, but is not limited to, all information defined as personally identifiable information in §§24-72-501 and 24-73-101, C.R.S.

W. "**Project**" means the broadband infrastructure project to be completed by Grantee pursuant to this Agreement, as further described in Exhibit A.

X. "**Recipient**" means the State agency shown on the Cover Page of this Agreement, for the purposes of this Federal Award.

Y. "**Services**" means the services to be performed by Grantee as set forth in this Agreement, and shall include any services to be rendered by Grantee in connection with the Goods.

Z. "**State Confidential Information**" means any and all State Records not subject to disclosure under CORA. State Confidential Information shall include, but is not limited to, PII, PCI, Tax Information, and State personnel records not subject to disclosure under CORA. State Confidential Information shall not include information or data concerning individuals that is not deemed confidential but nevertheless belongs to the State, which has been communicated, furnished, or disclosed by the State to Grantee which (i) is subject to disclosure pursuant to CORA; (ii) is already known to Grantee without restrictions at the time of its disclosure to Grantee; (iii) is or subsequently becomes publicly available without breach of any obligation owed by Grantee to the State; (iv) is disclosed to Grantee, without confidentiality obligations, by a third party who has the right to disclose such information; or (v) was independently developed without reliance on any State Confidential Information.

AA. "**State Fiscal Rules**" means the fiscal rules promulgated by the Colorado State Controller pursuant to §24-30-202(13)(a), C.R.S.

BB. "**State Fiscal Year**" means a 12-month period beginning on July 1 of each calendar year and ending on June 30 of the following calendar year. If a single calendar year follows the term, then it means the State Fiscal Year ending in that calendar year.

CC. "**State Records**" means any and all State data, information, and records, regardless of physical form, including, but not limited to, information subject to disclosure under CORA.

DD. "**Subcontractor**" means third parties, if any, engaged by Grantee to aid in performance of the Work. For purposes of this Agreement, "Subcontractor" also includes any other recipient of Award funds.

EE. "**Subrecipient**" means an Entity, as defined in Exhibit F, that receives a subaward from a Recipient to carry out part of a Federal program. A Subrecipient may also be a recipient of other Federal Awards directly from a Federal Awarding Agency. A Subrecipient is subject to the terms and conditions of the Federal Award to the Recipient, including program compliance requirements. The term does not include an individual who is a beneficiary of a Federal program. For the purposes of this Agreement, Grantee is a Subrecipient.

FF. "**Tax Information**" means federal and State of Colorado tax information including, without limitation, federal and State tax returns, return information, and such other tax-related information as may be protected by federal and State law and regulation. Tax Information includes, but is not limited to all information defined as federal tax information in Internal Revenue Service Publication 1075.

GG. "**Term**" means the Initial Term, any Extension Term(s), and any End of Term Extension(s), collectively. The Term of this Agreement shall not extend beyond December 31, 2026.

HH. "**Uniform Guidance**" means the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards.

II. "**Work**" means the Goods delivered and Services performed pursuant to this Agreement.

JJ. "**Work Product**" means the tangible and intangible results of the Work, whether finished or unfinished, including drafts. Work Product includes, but is not limited to, documents, text, software (including source code), research, reports, proposals, specifications, plans, notes, studies, data, images, photographs, negatives, pictures, drawings, designs, models, surveys, maps, materials, ideas, concepts, know-how, information, and any other results of the Work. "Work Product" does not include any material that was developed prior to the Effective Date that is used, without modification, in the performance of the Work.

Any other term used in this Agreement that is defined in an Exhibit shall be construed and interpreted as defined in that Exhibit.

**4. STATEMENT OF WORK**

Grantee shall complete the Work as described in this Agreement and in accordance with the provisions of Exhibit A. The State shall have no liability to compensate Grantee for the delivery of any goods or the performance of any services that are not specifically set forth in this Agreement.

**5. PAYMENTS TO GRANTEE**

A. Maximum Amount

Payments to Grantee are limited to the unpaid, obligated balance of the Grant Funds. The State shall have no obligation to pay Grantee any amount under this Agreement that exceeds the Grant Funds Maximum Amount for each State Fiscal Year shown on the Cover Page of this Agreement.

B. Payment Procedures

i. Invoices and Payment

a. The State shall pay Grantee in the amounts and in accordance with the schedule and other conditions set forth in Exhibit A.

b. Grantee shall initiate payment requests by invoice to the State, in a form and manner approved by the State. Grantee warrants that it will not attempt to invoice the State for any Work, materials, or supplies which are not Reimbursable Expenditures, as defined in Exhibit A.

c. The State shall pay each invoice within forty-five (45) days following the State's receipt of that invoice, so long as the amount invoiced contains sufficient detail for the State to understand the Work Grantee claims to have completed and any reimbursable materials or supplies utilized in the completion of that Work for which reimbursement is sought during the period that the invoice covers. If the State determines that the amount of any invoice is not correct, then Grantee shall make all changes necessary to correct that invoice.

d. The acceptance of an invoice shall not constitute acceptance of any Work performed or deliverables provided under this Agreement. Grantee agrees that, while reimbursement by the State will occur as Work is properly invoiced pursuant and subject to the other terms of this Agreement, ultimate acceptance by the State of all Work will need to be verified pursuant to the Project Closeout process detailed in Exhibit A.

ii. Interest

Amounts not paid by the State within forty-five (45) days of the State's acceptance of the invoice shall bear interest on the unpaid balance beginning on the 46th day at the rate of 1% per month, as required by §24-30-202(24)(a), C.R.S., until paid in full; provided, however, that interest shall not accrue on unpaid amounts that the State disputes in writing or for which the State is exercising its right to deny or withhold payment, as further detailed in **§12**. Grantee shall invoice the State separately for accrued interest on delinquent amounts, and the invoice shall reference the delinquent payment, the number of day's interest to be paid and the interest rate.

iii. Payment Disputes

If Grantee disputes any calculation, determination or amount of any payment, Grantee shall notify the State in writing of its dispute within thirty (30) days following the earlier to occur of Grantee's receipt of the payment or notification of the determination or calculation of the payment by the State. The State

will review the information presented by Grantee and may make changes to its determination based on this review. The calculation, determination or payment amount that results from the State's review shall not be subject to additional dispute under this subsection. No payment subject to a dispute under this subsection shall be due until after the State has concluded its review, and the State shall not pay any interest on any amount during the period the payment is subject to dispute under this subsection.

iv. Available Funds-Contingency-Termination

The State is prohibited by law from making commitments beyond the term of the current State Fiscal Year. Payment to Grantee beyond the current State Fiscal Year is contingent on the appropriation and continuing availability of Grant Funds in any subsequent year (as provided in the Colorado Special Provisions). If federal funds or funds from any other non-State funds constitute all or some of the Grant Funds, the State's obligation to pay Grantee is contingent upon the federal funds or non-State funds continuing to be made available for payment. Payments to be made pursuant to this Agreement shall be made only from Grant Funds, and the State's liability for such payments shall be limited to the amount remaining of such Grant Funds. If federal funds are not appropriated, or otherwise become unavailable to fund this Agreement, for any reason, the State may, upon written notice, terminate this Agreement, in whole or in part, without incurring further liability. The State shall, however, remain obligated to pay for Work that is delivered and accepted prior to the effective date of notice of termination, and this termination shall otherwise be treated as if this Agreement were terminated in the public interest as described in **§2.E**.

v. Federal Recovery

The closeout of a Federal Award does not affect the right of the Federal Awarding Agency or the State to disallow costs and recover funds on the basis of a later audit or other review. Any cost disallowance recovery is to be made within the Record Retention Period, as defined below.

C. Matching Funds

Grantee shall provide Matching Funds as shown on the Cover Page of this Agreement, and in Exhibit A and Exhibit C. Grantee shall have raised the full amount of Matching Funds prior to the Effective Date and shall report to the State regarding the status of such funds upon request. Grantee's obligation to pay all or any part of any Matching Funds, whether direct or contingent, only extend to matching those funds which are duly and lawfully appropriated for the purposes of this Agreement by the authorized representatives of Grantee. Grantee represents to the State that the amount designated as Matching Funds has been legally appropriated for the purposes of this Agreement by its authorized representatives, is set-aside solely to be used as Matching Funds for Grantee's Work under this Agreement, and is not subject to conditions restrictions, or encumbrances which could prevent Grantee's use of the Matching Funds. Grantee does not by this Agreement irrevocably pledge present cash reserves for payments in future fiscal years, and this Agreement is not intended to create a multiple-fiscal year debt of Grantee.

D. Reimbursement of Grantee Costs

The State shall reimburse Grantee's allowable actual costs, as further detailed in Exhibit A and Exhibit C, not exceeding the Grant Funds Maximum Amount on the Cover Page, except that Grantee may change the amounts between each line item of the Budget without formal modification to this Agreement, as long as Grantee obtains prior written approval from the State. The change shall not modify the Agreement Maximum Amount, the maximum amount for any State Fiscal Year, or any requirements of the Work. The State shall reimburse Grantee for the federal share of properly documented allowable costs related to the Work after review and approval thereof, subject to the provisions of this Agreement and its Exhibit A. However, any costs incurred by Grantee prior to the Effective Date shall not be reimbursed absent specific allowance of pre-award costs and indication that the Federal Award funding is retroactive. Grantee's costs for Work performed after the Fund Expenditure End Date shown on the Cover Page for this Agreement, or after any phase performance period end date for a respective phase of the Work, shall not be reimbursable. The State shall only reimburse allowable costs described in this Agreement and shown in the Budget if those costs are actually incurred in performance of the Work, and:

i. Permitted to be reimbursed under the terms of Exhibit A;

ii. Reasonable and necessary to accomplish the Work and for the Goods and Services provided; and

iii. Equal to the actual net cost to Grantee (i.e. the price paid minus any items of value received by Grantee that reduce the cost actually incurred).

E. Closeout

Grantee shall close out this Award within forty-five (45) days after the Fund Expenditure End Date shown on the Cover Page for this Agreement. To complete closeout, Grantee shall submit to the State all deliverables (including documentation) as defined in this Agreement and the closeout procedures in Exhibit A, and Grantee's final reimbursement request or invoice. The State will withhold up to five percent (5%) of allowable costs until all final documentation has been submitted and accepted by the State. If the Federal Awarding Agency has not closed this Federal Award within one year and ninety (90) days after the Fund Expenditure End Date shown on the Cover Page for this Agreement due to Grantee's failure to submit required documentation or Grantee's failure to complete the Work, then Grantee may be prohibited from applying for new Federal Awards through the State until such documentation is submitted and accepted.

F. Option Letters/Notice to Proceed

i. The State, at its discretion, shall have the option to increase or decrease the quantity of Goods and Services and/or Service Area (as defined in Exhibit A) based upon the rates established in this Agreement, and increase the maximum amount payable accordingly. In order to exercise this option, the State shall provide written notice to Grantee in a form substantially equivalent to Exhibit B. Delivery of Goods and performance of Services shall continue at the same rates and terms as described in this Agreement.

ii. The rates shown in Exhibit A are determined by cost per location served. The State, at its discretion, shall have the option to increase or decrease the rates shown in Exhibit A, as the State determines is necessary to account for Project expense changes. In order to exercise this option, the State shall provide written notice to Grantee in a form substantially equivalent to Exhibit B. Any new rates table or exhibit shall be effective as of the effective date of that written notice unless the notice provides for a different date.

iii. The State, at its discretion, shall have the option to direct Grantee to begin performance of any of the Agreement phases described in Exhibit A. In order to exercise this option, the State shall provide written notice to Grantee in a form substantially equivalent to Exhibit B and/or Exhibit N. Grantee shall begin Work on each phase as of the effective date of the written notice requiring Grantee to complete that phase, or a later date if one is contained in the notice, and shall complete all Work described in Exhibit A of this Agreement for that phase.

## 6. REPORTING - NOTIFICATION

A. Quarterly Progress and Financial Reports

In addition to any reports required elsewhere in the main body of this Agreement or pursuant to any Exhibit, for any agreement having a term longer than three months, Grantee shall submit, on a quarterly basis, written reports ("Quarterly Reports") specifying: (i) progress made for performance measures; and (ii) financial expenditures. Such progress report shall be in accordance with the procedures developed and prescribed by the State. Progress reports shall be submitted to the State not later than fifteen (15) days following the end of each calendar quarter or at such time as otherwise specified by the State. Acceptance of any reports, including the reports required under this Agreement, does not constitute acceptance of any Work performed or deliverables provided under this Agreement. Further, no report shall be construed to modify the terms of this Agreement or operate as a waiver of any terms of this Agreement.

B. Annual Reports

Grantee shall submit, on an annual basis, a written report ("Annual Report"), as outlined in Exhibit A.

C. Litigation Reporting

If Grantee is served with a pleading or other document in connection with an action before a court or other administrative decision making body, and such pleading or document relates to this Agreement or may affect Grantee's ability to perform its obligations under this Agreement, Grantee shall, within ten (10) days after being served, notify the State of such action and deliver copies of such pleading or document to the State's Principal Representative identified on the Cover Page for this Agreement.

D. Performance and Final Status

Grantee shall submit all financial, performance and other reports to the State no later than forty-five (45) days after the end of the Initial Term if no Extension Terms are exercised, or the final Extension Term exercised by the State, containing an evaluation and review of Grantee's performance and the final status of Grantee's obligations hereunder.

E. Violations Reporting

Grantee shall disclose, in a timely manner, in writing to the State and the Federal Awarding Agency, all violations of federal or State criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal Award. The State or the Federal Awarding Agency may impose any penalties for noncompliance allowed under 2 C.F.R. Part 180 and 31 U.S.C. § 3321, which may include, without limitation, suspension or debarment.

F. Network Outage Notification

During a period of five (5) years following the date of closeout of the Project by the State, Grantee must provide written notification to the CBO (as defined in Exhibit A) of any network outage affecting more than twenty-five (25) percent of service addresses located in the Project area and lasting longer than eight (8) hours. The notification must be made within fifteen (15) days of the outage beginning.

G. Open Internet/Network Management Notification

Grantee must provide written notification to the CBO within fifteen (15) days of a federal agency issuing a final order or entering into a statement or consent decree, or a court of competent jurisdiction issuing a final judgment against Grantee, that determines that Grantee has: (i) blocked lawful internet content, applications, services, or devices unless such blocking is conducted in a manner consistent with reasonable network management practices and disclosed in the Grant Application (as defined in Exhibit A); (ii) engaged in paid prioritization of internet content; (iii) regulated network traffic by throttling bandwidth or otherwise impaired or degraded lawful internet traffic on the basis of internet content, application, service or use of a non-harmful device, unless such impairment or degradation is conducted in a manner consistent with reasonable network management practices; or (iv) failed or refused to disclose its network management practices, subject to reasonable conditions necessary to protect proprietary information.

## 7. GRANTEE RECORDS

A. Maintenance

Grantee shall make, keep, maintain, and allow inspection and monitoring by the State of a complete file of all records, documents, notes and other written materials, electronic media files, and communications (including e-mails) pertaining in any manner to the Work or the delivery of Services (including, but not limited to the operation of programs) or Goods hereunder ("Grantee Records"). Grantee shall maintain such Grantee Records for a period (the "Record Retention Period") of five (5) years following the date of submission to the State of the final Quarterly Report or Annual Report, or if this Award is renewed quarterly or annually, from the date of the submission of each Quarterly Report or Annual Report, respectively. If any litigation, claim, or audit related to this Award starts before expiration of the Record Retention Period, the Record Retention Period shall extend until all litigation, claims, or audit findings have been resolved and final action taken by the State or Federal Awarding Agency. The Federal Awarding Agency, a cognizant agency for audit, oversight or indirect costs, and the State, may notify Grantee in writing that the Record Retention Period shall be extended. For records for real property and equipment, the Record Retention Period shall extend three (3) years following final disposition of such property.

B. Inspection

Grantee shall permit the State, the federal government, and any other duly authorized agent of a governmental agency to audit, inspect, examine, excerpt, copy and transcribe Grantee Records during the Record Retention Period. Grantee shall make Grantee Records available during normal business hours at Grantee's office or place of business, or at other mutually agreed upon times or locations, upon no fewer than two (2) Business Days' notice from the State, unless the State determines that a shorter period of notice, or no notice, is necessary to protect the interests of the State. If requested by the State in writing, Grantee shall provide an electronic copy of Grantee Records in the form of a memory drive, secure file transfer, or other form of electronic transfer.

C. Monitoring

The State will monitor Grantee's performance of its obligations under this Agreement using procedures as determined by the State or as required by applicable federal law. The federal government and any other duly authorized agent of a governmental agency, in its discretion, may monitor Grantee's performance of its obligations under this Agreement using procedures as determined by that governmental entity. Grantee shall allow the State to perform all monitoring required by the Uniform Guidance, based on the State's risk analysis of Grantee and this Agreement. The State shall have the right, in its sole discretion, to change its monitoring procedures and requirements at any time during the Term of this Agreement. The State shall monitor Grantee's performance in a manner that does not unduly interfere with Grantee's performance of the Work.

D. Final Audit Report

Grantee shall promptly submit to the State a copy of any final audit report of an audit performed on Grantee Records that relates to or affects this Agreement or the Work, whether the audit is conducted by Grantee or a third party. Additionally, if Grantee is required to perform a single audit under 2 C.F.R. § 200.501, *et seq.*, then Grantee shall submit a copy of the results of that audit to the State within the same timelines as the submission to the federal government.

**8. CONFIDENTIAL INFORMATION - STATE RECORDS**

A. Confidentiality

Grantee shall keep confidential, and cause all Subcontractors to keep confidential, all State Records, unless those State Records are publicly available. Grantee shall not, without prior written approval of the State, use, publish, copy, disclose to any third party, or permit the use by any third party of any State Records, except as otherwise stated in this Agreement, permitted by law or approved in writing by the State. Grantee shall provide for the security of all State Confidential Information in accordance with all policies promulgated by the Colorado Office of Information Security and all applicable laws, rules, policies, publications, and guidelines. If Grantee or any of its Subcontractors will or may receive the following types of data, Grantee or its Subcontractors shall provide for the security of such data according to the following: **(i)** the most recently promulgated IRS Publication 1075 for all Tax Information and in accordance with the Safeguarding Requirements for Federal Tax Information, if applicable; **(ii)** the most recently updated PCI Data Security Standard from the PCI Security Standards Council for all PCI; and **(iii)** the most recently issued version of the U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Security Policy for all CJI, if applicable. Grantee shall immediately forward any request or demand for State Records to the State's Principal Representative.

B. Other Entity Access and Nondisclosure Agreements

Grantee may provide State Records to its agents, employees, assigns and Subcontractors as necessary to perform the Work, but shall restrict access to State Confidential Information to those agents, employees, assigns and Subcontractors who require access to perform their obligations under this Agreement. Grantee shall ensure all such agents, employees, assigns, and Subcontractors sign agreements containing nondisclosure provisions at least as protective as those in this Agreement, and that the nondisclosure provisions are in force at all times the agent, employee, assign or Subcontractor has access to any State Confidential Information. Grantee shall provide copies of those signed nondisclosure provisions to the State upon execution of the nondisclosure provisions.

C. Use, Security, and Retention

Grantee shall use, hold and maintain State Confidential Information in compliance with any and all applicable laws and regulations in facilities located within the United States, and shall maintain a secure environment that ensures confidentiality of all State Confidential Information wherever located. Grantee shall provide the State with access, subject to Grantee's reasonable security requirements, for purposes of inspecting and monitoring access and use of State Confidential Information and evaluating security control effectiveness. Upon the expiration or termination of this Agreement, Grantee shall return State Records provided to Grantee or destroy such State Records and certify to the State that it has done so, as directed by the State. If Grantee is prevented by law or regulation from returning or destroying State Confidential Information, Grantee warrants it will guarantee the confidentiality of, and cease to use, such State Confidential Information.

D. Incident Notice and Remediation

If Grantee becomes aware of any Incident, it shall notify the State immediately and cooperate with the State regarding recovery, remediation, and the necessity to involve law enforcement, as determined by the State. Unless Grantee can establish that none of Grantee or any of its agents, employees, assigns or Subcontractors are the cause or source of the Incident, Grantee shall be responsible for the cost of notifying each person who may have been impacted by the Incident. After an Incident, Grantee shall take steps to reduce the risk of incurring a similar type of Incident in the future as directed by the State, which may include, but is not limited to, developing and implementing a remediation plan that is approved by the State at no additional cost to the State. The State may adjust or direct modifications to this plan, in its sole discretion and Grantee shall make all modifications as directed by the State. If Grantee cannot produce its analysis and plan within the allotted time, the State, in its sole discretion, may perform such analysis and produce a remediation plan, and Grantee shall reimburse the State for the reasonable costs thereof.

E. Safeguarding PII

If Grantee or any of its Subcontractors will or may receive PII under this Agreement, Grantee shall provide for the security of such PII, in a manner and form acceptable to the State, including, without limitation, State non-disclosure requirements, use of appropriate technology, security practices, computer access security, data access security, data storage encryption, data transmission encryption, security inspections, and audits. Grantee shall be a "Third-Party Service Provider" as defined in §24-73-103(1)(i), C.R.S. and shall maintain security procedures and practices consistent with §§24-73-101 *et seq.*, C.R.S. In addition, as set forth in §24-74-102, *et seq.*, C.R.S., Grantee, including, but not limited to, Grantee's employees, agents and Subcontractors, agrees not to share any PII with any third parties for the purpose of investigating for, participating in, cooperating with, or assisting with Federal immigration enforcement. If Grantee is given direct access to any State databases containing PII, Grantee shall execute, on behalf of itself and its employees, a certification on an annual basis. Grantee's duty and obligation to certify shall continue as long as Grantee has direct access to any State databases containing PII. If Grantee uses any Subcontractors to perform services requiring direct access to State databases containing PII, Grantee shall require such Subcontractors to execute and deliver a certification to the State on an annual basis, so long as the Subcontractor has access to State databases containing PII.

**9. CONFLICTS OF INTEREST**

A. Actual Conflicts of Interest

Grantee shall not engage in any business or activities, or maintain any relationships that conflict in any way with the full performance of the obligations of Grantee under this Agreement. Such a conflict of interest would arise when a Grantee or Subcontractor's employee, officer or agent were to offer or provide any tangible personal benefit to an employee of the State, or any member of the employee's immediate family or the employee's partner, related to the award of, entry into or management or oversight of this Agreement.

B. Apparent Conflicts of Interest

Grantee acknowledges that, with respect to this Agreement, even the appearance of a conflict of interest shall be harmful to the State's interests. Absent the State's prior written approval, Grantee shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of Grantee's obligations under this Agreement.

C. Disclosure to the State

If a conflict or the appearance of a conflict arises, or if Grantee is uncertain whether a conflict or the appearance of a conflict has arisen, Grantee shall submit to the State a disclosure statement setting forth the relevant details for the State's consideration. Failure to promptly submit a disclosure statement or to follow the State's direction in regard to the actual or apparent conflict constitutes a Breach of Agreement.

D. Grantee acknowledges that all State employees are subject to the ethical principles described in §24-18-105, C.R.S. Grantee further acknowledges that State employees may be subject to the requirements of §24-18-105, C.R.S. with regard to this Agreement to the State.

**10. INSURANCE**

Grantee shall obtain and maintain, and ensure that each Subcontractor shall obtain and maintain, insurance reasonably appropriate to the scope of each Subcontractor's Work. All insurance policies required by this Agreement that are not provided through self-insurance shall be issued by insurance companies rated A-, VII or better by AM Best or as otherwise reasonably approved by the State.

A. Workers' Compensation

Workers' compensation insurance as required by state statute, and employers' liability insurance covering all Grantee or Subcontractor employees acting within the course and scope of their employment.

B. General Liability

Commercial general liability insurance covering premises operations, fire damage, independent contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

i. $1,000,000 each occurrence;

ii. $1,000,000 general aggregate; and

iii. $1,000,000 products and completed operations aggregate; and

iv. $50,000 any one fire.

C. Automobile Liability

Automobile liability insurance covering any auto (including owned, hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

D. Professional Liability including Cyber/Network Security and Privacy Liability, and Pollution Legal Liability Insurance

Liability insurance covering civil, regulatory, and statutory damages, contractual damages, data breach management exposure, and any loss of income or extra expense as a result of actual or alleged breach, violation, or infringement of right to privacy, consumer data protection law, confidentiality or other legal protection for personal information, as well as State Confidential Information, and unless covered under a separate policy as outlined below in §10(E), this liability insurance must cover pollution liability, with minimum limits as follows:

i. $1,000,000 each claim; and

ii. $1,000,000 general aggregate.

E. Pollution Legal Liability Insurance

If the Pollution Legal Liability policy is not a component of the Professional Liability policy, as outlined above in §10(D), Grantee must have Pollution Legal Liability Insurance, with minimum limits as follows:

i. $1,000,000 each claim; and

ii. $1,000,000 annual aggregate.

The State shall be named as an additional insured to the Pollution Legal Liability policy. If the Pollution Legal Liability insurance policy is a component of the Professional Liability policy, the additional insured requirement is waived, and the policy shall be written on a claims made form, with an extended reporting period of at least two years following final acceptance of the Work.

F. Crime Insurance

Crime insurance including employee dishonesty coverage with minimum limits as follows:

i. $1,000,000 each occurrence; and

ii. $1,000,000 general aggregate.

G. Additional Insured

The State shall be named as additional insured on all commercial general liability policies (leases and construction agreements require additional insured coverage for completed operations) required of Grantee and Subcontractors.

H. Primacy of Coverage

Coverage required of Grantee and each Subcontractor shall be primary and noncontributory over any insurance or self-insurance program carried by Grantee or the State with respect to losses for which Grantee is responsible.

I. Cancellation

All commercial insurance policies required hereunder shall include provisions preventing cancellation or non-renewal, except for cancellation based on non-payment of premiums, without at least thirty (30) days prior notice to Grantee (ten (10) days for non-payment of premium) and Grantee shall forward such notice to the State in accordance with **§14** within seven (7) days of Grantee's receipt of such notice if such cancellation or non-renewal would result in Grantee no longer complying with the requirements of this §10.

J. Subrogation Waiver

All commercial insurance policies secured or maintained by Grantee or its Subcontractors in relation to this Agreement shall include clauses stating that each carrier shall waive all rights of recovery under subrogation or otherwise against Grantee or the State, its agencies, institutions, organizations, officers, agents, employees, and volunteers.

K. Public Entities

If Grantee is a "public entity" within the meaning of the Colorado Governmental Immunity Act, §§24-10-101, *et seq.*, C.R.S. (the "GIA"), Grantee shall maintain, in lieu of the liability insurance requirements stated above, at all times during the Term of this Agreement such liability insurance, by commercial policy or self-insurance, as is necessary to meet its liabilities under the GIA. If a Subcontractor is a public entity within the meaning of the GIA, Grantee shall ensure that the Subcontractor maintain at all times during the terms of this Grantee, in lieu of the liability insurance requirements stated above, such liability insurance, by commercial policy or self-insurance, as is necessary to meet the Subcontractor's obligations under the GIA.

L. Certificates

For each commercial insurance plan provided by Grantee under this Agreement, upon the request of the State, Grantee shall provide to the State certificates evidencing Grantee's insurance coverage required in this Agreement within seven (7) Business Days following the Effective Date. Grantee shall provide to the State certificates evidencing Subcontractor insurance coverage required under this Agreement within seven (7) Business Days following the Effective Date, except that, if Grantee's subcontract is not in effect as of the Effective Date, Grantee shall provide to the State certificates showing Subcontractor insurance coverage required under this Agreement within seven (7) Business Days following Grantee's execution of the subcontract. Before the expiration date of Grantee's or any Subcontractor's coverage, Grantee shall deliver to the State certificates of insurance evidencing renewals of coverage. At any other time during the Term of this Agreement, but not more often than four (4) times per year, upon request by the State, Grantee shall, within seven (7) Business Days following the request by the State, supply to the State evidence satisfactory to the State of compliance with the provisions of this section.

## 11. BREACH OF AGREEMENT

In the event of a Breach of Agreement, the aggrieved Party shall give written notice of Breach of Agreement to the other Party. If the notified Party does not cure the breach, at its sole expense, within thirty (30) days after the delivery of written notice, the Party may exercise any of the remedies as described in **§12** for that Party. Notwithstanding any provision of this Agreement to the contrary, the State, in its discretion, need not provide notice or a cure period and may immediately terminate this Agreement in whole or in part or institute any other remedy in this Agreement in order to protect the public interest of the State; or if Grantee is debarred or suspended under §24-109-105, C.R.S., the State, in its discretion, need not provide notice or cure period and may terminate this Agreement in whole or in part or institute any other remedy in this Agreement as of the date that the debarment or suspension takes effect.

## 12. REMEDIES

A. State's Remedies

If Grantee is in Breach of Agreement under any provision of this Agreement and fails to cure such breach, the State, following the notice and cure period set forth in **§11,** shall have all of the remedies listed in this section in addition to all other remedies set forth in this Agreement or at law. The State may exercise any or all of the remedies available to it, in its discretion, concurrently or consecutively. The remedies in this **§12** are in addition to, and not in lieu of, those remedies permitted in or required by Exhibit G, Agreement of Subrecipient of Federal Recovery Funds and Terms and Conditions.

i. Termination for Breach

In the event of Grantee's uncured Breach of Agreement, the State may terminate this entire Agreement or any part of this Agreement. Additionally, if Grantee fails to comply with any terms of the Federal Award, then the State may, in its discretion or at the direction of a Federal Awarding Agency, terminate this entire Agreement or any part of this Agreement. Grantee shall continue performance of this Agreement to the extent not terminated, if any.

a. Obligations and Rights

To the extent specified in any termination notice, Grantee shall not incur further obligations or render further performance past the effective date of such notice, and shall immediately terminate outstanding orders and subcontracts with third parties. However, Grantee shall complete and deliver to the State all Work not cancelled by the termination notice, and may incur obligations as necessary to do so within this Agreement's terms. At the request of the State, Grantee shall assign to the State all of Grantee's rights, title, and interest in and to such terminated orders or subcontracts. Upon termination, Grantee shall take timely, reasonable and necessary action to protect and preserve property in the possession of Grantee but in which the State has an interest. At the State's request, Grantee shall return materials owned by the State in Grantee's possession at the time of any termination. Grantee shall deliver all completed Work Product and all Work Product that was in the process of completion to the State at the State's request.

b. Payments

Notwithstanding anything to the contrary, the State shall only pay Grantee for properly invoiced Work as of the date of termination. If, after termination by the State, the State agrees that Grantee was not in breach or that Grantee's action or inaction was excusable, such termination shall be treated as a "suspension" of this Agreement.

c. Damages and Withholding

Notwithstanding any other remedial action by the State, Grantee shall remain liable to the State for any damages sustained by the State in connection with any breach by Grantee, and the State may withhold payment to Grantee for the purpose of mitigating the State's damages until such time as the exact amount of damages due to the State from Grantee is determined. The State may withhold any amount that may be due Grantee as the State deems necessary to protect the State against loss including, without limitation, loss as a result of outstanding liens and excess costs incurred by the State in procuring from third parties replacement Work as cover.

ii. Remedies Not Involving Termination

The State, in its discretion, may exercise one or more of the following additional remedies:

a. Suspend Performance

Suspend Grantee's performance with respect to all or any portion of the Work pending corrective action as specified by the State without entitling Grantee to an adjustment in price or cost or an adjustment in the performance schedule. Grantee shall promptly cease performing Work and incurring costs in accordance with the State's directive, and the State shall not be liable for costs incurred by Grantee after the suspension of performance.

b. Withhold Payment

Withhold payment to Grantee until Grantee corrects its Work.

c. Deny Payment

Deny payment for Work not performed, or that due to Grantee's actions or inactions, cannot be performed or if they were performed are reasonably of no value to the State; provided, that any denial of payment shall be equal to the value of the obligations not performed.

d. Removal

Demand immediate removal of any of Grantee's employees, agents, or Subcontractors from the Work whom the State deems incompetent, careless, insubordinate, unsuitable, or otherwise

unacceptable or whose continued relation to this Agreement is deemed by the State to be contrary to the public interest or the State's best interest.

e. Intellectual Property

[RESERVED].

iii. Remedy – Recoupment of Grant Funds

By this Agreement, Grantee is agreeing to produce the Project defined in Exhibit A, and that, upon completion, the Project will meet the Project Completion Standards set forth in Exhibit A and to comply with the Project Closeout requirements contained in Exhibit A. Grantee agrees that the provisions detailed in the aforementioned sentence are material, that Grantee's adherence to these terms is critical to the State's ability to assess Grantee's performance of the grant conditions contained herein, and that the State needs this information to ensure taxpayer funds are utilized properly. Accordingly, in the event of Grantee's uncured Breach of Agreement, Grantee agrees the State shall be entitled to the return of all Grant Funds that Grantee received from the State by and through this Agreement, and that the State, in addition to its exercise of any of the Remedies described elsewhere in this Agreement, may pursue the return of all Grant Funds.

B. Grantee's Remedies

If the State is in breach of any provision of this Agreement and does not cure such breach, Grantee, following the notice and cure period in **§11** and the dispute resolution process in **§13** shall have the following remedies:

a. Reinstatement of Agreement

If this Agreement was wrongfully terminated or suspended, the Parties agree a court may reinstate this Agreement and, in doing so, require that the State agree to adjustment of dates and extension of the Term as needed to complete the Work and as the court deems just and proper.

b. Payment of Grant Funds

If a court finds any portion of the Grant Funds was wrongfully withheld or denied, or if suspension of this Agreement was wrongfully made by the State, Grantee shall be entitled to such portion of Grant Funds that were wrongfully withheld or denied, or such portion of the Grant Funds which were not reimbursed due to the State's wrongful suspension, plus interest on such wrongfully withheld, denied, or unreimbursed funds accruing at the rate and pursuant to the terms set forth in **§5.B.ii** above.

c. Specific Performance

Grantee may be afforded such specific performance as may be ordered by a court of competent jurisdiction, as allowed in law and equity.

d. Funding Limitation

The remedies set forth in subsections "a", "b", and "c" immediately above are subject to this subsection "d". Grantee agrees that the Grant Funds are only an award of funds out of the money allocated to the State pursuant to the Award. Grantee agrees that, as described elsewhere in this Agreement, State law limits the availability of public funds. There is a risk that (i) money that remains unused will revert to other uses, (ii) the functions, duties, or authority of the State may materially change, or its existence may cease altogether, (iii) CPF funding may cease to exist or contain no funds, and (iv) the law may change such that, for whatever reason, due to some operation of law, the money will no longer be available. Grantee accepts the risk of this occurring. The Parties agree that, in the event funding is temporarily unavailable, a court may direct the State to allocate funding during the next State Fiscal Year to address the remedies contained in sections "a" through "c" above.

This **§12(B)** sets forth the exclusive remedies for Grantee. No other remedies are permitted. Grantee is on notice that any entitlement to the Grant Funds by Grantee is subject to the limitations described in this **§12**.

**13. DISPUTE RESOLUTION**

A. Initial Resolution

Except as herein specifically provided otherwise, disputes concerning the performance of this Agreement, which cannot be resolved by the designated Agreement representatives shall be referred in writing to a senior departmental management staff member designated by the State and a senior manager designated by Grantee for resolution.

B. Resolution of Controversies

If the initial resolution described in **§13.A** fails to resolve the dispute within ten (10) Business Days, Grantee shall submit any alleged Breach of Agreement by the State to the Procurement Official of the State Agency named on the Cover Page of this Agreement as described in §24-101-301(30), C.R.S. for resolution following the same resolution of controversies process as described in §§24-106-109, and 24-109-101.1 through 24-109-505, C.R.S. (the "Resolution Statutes"), except that if Grantee wishes to challenge any decision rendered by the Procurement Official, Grantee's challenge shall be an appeal to the executive director of the Department of Personnel and Administration, or their delegate, in the same manner as described in the Resolution Statutes before Grantee pursues any further action. Except as otherwise stated in this Section, all requirements of the Resolution Statutes shall apply including, without limitation, time limitations regardless of whether the Colorado Procurement Code applies to this Agreement.

**14. NOTICES AND REPRESENTATIVES**

Each individual identified as a Principal Representative on the Cover Page for this Agreement shall be the Principal Representative of the designating Party. All notices required or permitted to be given under this Agreement shall be in writing, and shall be delivered **(A)** by hand with receipt required, **(B)** by certified or registered mail to such Party's Principal Representative at the address set forth on the Cover Page, or **(C)** as an email with read receipt requested to the Principal Representative at the email address, if any, set forth on the Cover Page for this Agreement. If a Party delivers a notice to another through email and the email is undeliverable, then, unless the Party has been provided with an alternate email contact, the Party delivering the notice shall deliver the notice by hand with receipt required or by certified or registered mail to such Party's Principal Representative at the address set forth on the Cover Page for this Agreement. Either Party may change its Principal Representative or Principal Representative contact information, or may designate specific other individuals to receive certain types of notices in addition to or in lieu of a Principal Representative, by notice submitted in accordance with this section without a formal amendment to this Agreement. Unless otherwise provided in this Agreement, notices shall be effective upon delivery of the written notice.

**15. RIGHTS IN WORK PRODUCT AND OTHER INFORMATION**

A. Exclusive Property of the State

Except to the extent specifically provided elsewhere in this Agreement, any pre-existing State Records, State software, research, reports, studies, photographs, negatives or other documents, drawings, models, materials, data and information shall be the exclusive property of the State (collectively, "State Materials"). Grantee shall not use, willingly allow, cause or permit Work Product or State Materials to be used for any purpose other than the performance of Grantee's obligations in this Agreement without the prior written consent of the State. Upon termination of this Agreement for any reason, Grantee shall provide all Work Product and State Materials to the State in a form and manner as directed by the State.

B. Exclusive Property of Grantee

Grantee retains the exclusive rights, title, and ownership to any and all pre-existing materials owned or licensed to Grantee including, but not limited to, all pre-existing software, licensed products, associated source code, machine code, text images, audio and/or video, and third-party materials, delivered by Grantee under this Agreement, whether incorporated in a deliverable or necessary to use a deliverable (collectively, "Grantee Property"). Grantee Property shall be licensed to the State as set forth in this Agreement or a State approved license agreement: (i) entered into as exhibits to this Agreement; (ii) obtained by the State from the applicable third-party vendor; or (iii) in the case of open source software, the license terms set forth in the applicable open source license agreement.

**16. CERTIFICATIONS AND COMPLIANCE**

A. Certification of Eligibility

Grantee acknowledges and agrees that criteria for eligibility to participate in the Capital Projects Fund Broadband Infrastructure Grant Program ("Grant Program") were set out in the CBO's Grant application

documents, including the "Capital Projects Fund Broadband Infrastructure Grant Program Official Guidelines," and that only persons or entities that satisfy these criteria may participate in the Grant Program or receive a contract like this Agreement. Grantee certifies that Grantee is eligible to participate in the Grant Program as of the Effective Date of this Agreement. Grantee further certifies that Grantee was eligible to participate in the Grant Program at the time Grantee submitted its Grant Application (as defined in Exhibit A). Grantee further agrees that Grantee has an affirmative obligation to immediately notify the State in writing if, at any time, it becomes aware that it is not, or may not be, eligible to participate in the Grant Program.

B. Independence of Application

i. Grantee certifies that Grantee's Grant Application, including the price(s) and/or bid amount(s) in Grantee's Grant Application, was arrived at independently without, for the purposes of restricting competition, any consultation, communication, or agreement with any other applicant or competitor. This certification includes, but is not limited to: (i) the price(s) and/or bid amount(s) in Grantee's Grant Application; (ii) the intention to submit an application; and (iii) the methods or factors used to calculate said price(s) and/or bid amount(s).

ii. Grantee further certifies that the price(s) and/or bid amount(s) in Grantee's Grant Application have not been and will not be knowingly disclosed by Grantee, directly or indirectly, to any other applicant or competitor before the Grant Program application process started or before award unless otherwise required by law; and no attempt has been made or will be made by Grantee to induce any other persons or entities to submit or not to submit an application or bid for the purpose of restricting competition.

C. Periodic Certifications

Grantee acknowledges and agrees that, in addition to the certifications Grantee makes as part of this Agreement, Grantee may make further explicit or implied certifications of compliance with provisions of this Agreement and/or applicable statutes or regulations. Grantee further acknowledges and agrees that Grantee is under an obligation to, at all times, communicate with the State with utmost candor and truthfulness including, but not limited to, alerting the State in writing as soon as Grantee becomes aware that any of its certifications or communications are, were, may be, or may have been materially inaccurate, untrue, or false.

D. Anti-kickback

i. Prohibition. Grantee agrees that Grantee, Grantee's employees, and Grantee's agents are prohibited from: (i) providing or attempting to provide or offering to provide any kickback; (ii) soliciting, accepting, or attempting to accept any kickback; or (iii) including, directly or indirectly, the amount of any kickback in the price charged by Grantee to the State or in the price charged by a Subcontractor to Grantee or to a higher tier Subcontractor.

ii. Kickback Defined.

a. Favorable Treatment. Grantee agrees that, as used in this section, "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to any employee or agent of the State or any political subdivision of the State, a contractor, a Subcontractor, or other person or entity connected with the Grant Program for the purpose of improperly obtaining or rewarding favorable treatment in connection with this Agreement or in connection with a subcontract relating this Agreement or any other grant or project.

b. Referrals, Self-dealing. Grantee also agrees that, as used in this clause, "kickback" means the referral without prior written approval from the State of any business, including any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind, in connection with this Agreement to any entity in which Grantee and/or any of Grantee's owners, officers, or employees (and/or any of those persons' immediate family members) has an ownership or investment interest. Grantee agrees that, as used in this section, "immediate family member" includes current and former spouses, birth and adoptive parents, children, siblings, stepparents, stepchildren, stepbrothers, stepsisters, cousins, aunts, uncles, fathers-in-law, mothers-in-law, sons-in-law, daughters-in-law, brothers-in-law, sisters-in-law, grandparents, grandchildren, and the spouse of a grandparent or grandchild.

iii. Notice, Certification. Grantee further agrees that Grantee has an affirmative obligation to immediately notify the State in writing if, at any time, it becomes aware that a kickback has, will, may, or may have

occur(ed). Grantee certifies that Grantee is not aware of any kickbacks that have occurred in connection with the Grant Program prior to the Effective Date of this Agreement.

iv. State's Discretion. Grantee acknowledges and agrees that the State may, in its sole discretion, authorize in writing a transaction or business relationship that may otherwise be a kickback. Grantee agrees that absent such a written authorization executed by an appropriate officer or agent of the State, Grantee cannot infer and/or rely on any other action by the State as an approval of a transaction or business relationship that may otherwise be a kickback.

E. Compliance a Precondition of Payment

Grantee acknowledges and agrees that Grantee's compliance with the provisions of this Agreement and all applicable statutes and regulations is a precondition on the State's entry into this Agreement as well as the State's payment to Grantee of any and all monies under this Agreement or in connection with the Grant Program irrespective of any action or inaction by the State to verify or confirm compliance.

F. Affirmative Obligation to Return Funds

Grantee acknowledges and agrees that Grantee is obligated to, within fourteen (14) days of receipt, return to the State any monies received in connection with the Grant Program to which Grantee is not entitled pursuant to the terms of this Agreement and/or applicable laws and regulations. Grantee further acknowledges and agrees that this obligation to return funds applies in perpetuity to all funds Grantee receives in connection with the Grant Program, irrespective of the deadlines set out in this Agreement, receipt of a Project Closeout Letter (as detailed in Exhibit A), or any amendment or cancellation of this Agreement.

G. Timely Completion

Grantee agrees that it shall use best efforts to complete its Work pursuant to this Agreement in a timely and expeditious manner. Grantee certifies that it enters into this Agreement without reservation as to its ability to complete Work pursuant to this Agreement in a timely and expeditious manner.

H. Imposition of Sanctions for Fraud or Misconduct

Grantee acknowledges and agrees that if Grantee submits claims, obtains an excess payment or benefit, and/or fails to pay or underpays an obligation to the State, willfully by means of false statement, representation, concealment of any material fact, or other fraudulent scheme or device with or without specific intent to defraud, civil liability, monetary penalties, debarment, and/or criminal penalties shall be imposed pursuant to applicable state and/or federal law including, but not limited to, the Colorado False Claims Act.

**17. GENERAL PROVISIONS**

A. Assignment

Grantee's rights and obligations under this Agreement are personal and may not be transferred or assigned without the prior, written consent of the State. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of Grantee's rights and obligations approved by the State shall be subject to the provisions of this Agreement.

B. Subcontractors

Grantee shall not enter into any subgrant or subcontract in connection with its obligations under this Agreement without providing notice to the State. The State may reject any such Subcontractor, and Grantee shall terminate any subcontract that is rejected by the State and shall not allow any Subcontractor to perform work after that Subcontractor's subcontract has been rejected by the State. Grantee shall submit to the State a copy of each such subgrant or subcontract upon request by the State. All subgrants and subcontracts entered into by Grantee in connection with this Agreement shall comply with all applicable federal and state laws and regulations, shall provide that they are governed by the laws of the State of Colorado, and shall be subject to all provisions of this Agreement. If the entity with whom Grantee enters into a subcontract or subgrant would also be considered a Subrecipient, then the subcontract or subgrant entered into by Grantee shall also contain provisions permitting both Grantee and the State to perform all monitoring of that subcontract in accordance with the Uniform Guidance.

C. Binding Effect

Except as otherwise provided in **§16.A**, all provisions of this Agreement, including the benefits and burdens, shall extend to and be binding upon the Parties' respective successors and assigns.

D. Authority

Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's obligations have been duly authorized.

E. Captions and References

The captions and headings in this Agreement are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions. All references in this Agreement to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

F. Counterparts

This Agreement may be executed in multiple, identical, original counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

G. Entire Understanding

This Agreement represents the complete integration of all understandings between the Parties related to the Work, and all prior representations and understandings related to the Work, oral or written, are merged into this Agreement. Prior or contemporaneous additions, deletions, or other changes to this Agreement shall not have any force or effect whatsoever, unless embodied herein.

H. Digital Signatures

If any signatory signs this Agreement using a digital signature in accordance with the Colorado State Controller Contract, Grant and Purchase Order Policies regarding the use of digital signatures issued under the State Fiscal Rules, then any agreement or consent to use digital signatures within the electronic system through which that signatory signed shall be incorporated into this Agreement by reference.

I. Modification

Except as otherwise provided in this Agreement, any modification to this Agreement shall only be effective if agreed to in a formal amendment to this Agreement, properly executed and approved in accordance with applicable Colorado State law and State Fiscal Rules. Modifications permitted under this Agreement, other than Agreement amendments, shall conform to the policies issued by the Colorado State Controller.

J. Statutes, Regulations, State Fiscal Rules, and Other Authority

Any reference in this Agreement to a statute, regulation, State Fiscal Rule, fiscal policy or other authority shall be interpreted to refer to such authority then current, as may have been changed or amended since the Effective Date of this Agreement. Nothing in this Agreement shall restrict in any way the State's right to promulgate, amend, rescind, or supplement any State statute, regulation, State Fiscal Rule, fiscal or administrative policy, or other authority. In addition, nothing in this Agreement shall restrict in any way the State's right to seek changes to existing laws.

K. External Terms and Conditions

Notwithstanding anything to the contrary herein, the State shall not be subject to any provision included in any terms, conditions, or agreements appearing on Grantee's or a Subcontractor's website or any provision incorporated into any click-through or online agreements related to the Work unless that provision is specifically referenced in this Agreement.

L. Severability

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect, provided that the Parties can continue to perform their obligations under this Agreement in accordance with the intent of this Agreement.

M. Survival of Certain Agreement Terms

Any provision of this Agreement that imposes an obligation on a Party after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and shall be enforceable by the other Party.

N. Taxes

The State is exempt from federal excise taxes under I.R.C. Chapter 32 (26 U.S.C., Subtitle D, Ch. 32) (Federal Excise Tax Exemption Certificate of Registry No. 84-730123K) and from State and local government sales and use taxes under §§39-26-704(1), *et seq.,* C.R.S. (Colorado Sales Tax Exemption Identification Number 98-02565). The State shall not be liable for the payment of any excise, sales, or use taxes, regardless of whether any political subdivision of the State imposes such taxes on Grantee. Grantee shall be solely responsible for any exemptions from the collection of excise, sales or use taxes that Grantee may wish to have in place in connection with this Agreement.

O. Third Party Beneficiaries

Except for the Parties' respective successors and assigns described in **§17.A,** this Agreement does not and is not intended to confer any rights or remedies upon any person or entity other than the Parties. Enforcement of this Agreement and all rights and obligations hereunder are reserved solely to the Parties. Any services or benefits which third parties receive as a result of this Agreement are incidental to this Agreement, and do not create any rights for such third parties.

P. Waiver

A Party's failure or delay in exercising any right, power, or privilege under this Agreement, whether explicit or by lack of enforcement, shall not operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise of such right, power, or privilege. The express terms of this Agreement shall control and no terms can be modified or waived by the Parties' course of performance or course of dealing.

Q. CORA Disclosure

To the extent not prohibited by federal law, this Agreement and the performance measures and standards required under §24-106-107, C.R.S., if any, are subject to public release through the CORA.

R. Standard and Manner of Performance

Grantee shall perform its obligations under this Agreement in accordance with the highest standards of care, skill and diligence in Grantee's industry, trade, or profession.

S. Licenses, Certifications, Permits, and Other Authorizations

Grantee shall secure, and maintain at all times during the Term of this Agreement, at its sole expense, all easements, rights of way, licenses, certifications, permits, and other authorizations ("Authorizations") required to perform its obligations under this Agreement, and shall ensure that all employees, agents, and Subcontractors secure and maintain at all times during the term of their employment, agency, or Subcontractor status, all Authorizations required to perform their obligations under this Agreement. The State shall not be obligated to pay any Reimbursable Expenditures (as defined in Exhibit A) until Grantee provides documentation satisfactory to the State that Grantee has obtained all Authorizations required to perform its obligations under this Agreement. The State may choose, at its sole discretion, to accept documentation indicating that such Authorizations are preliminarily approved, but are still subject to final approval and/or payment.

T. Indemnification

i. General Indemnification

Grantee shall indemnify, save, and hold harmless the State, its employees, agents and assignees (the "Indemnified Parties"), against any and all costs, expenses, claims, direct damages, liabilities, court awards and other amounts (including reasonable attorneys' fees and related costs) incurred by any of the Indemnified Parties in relation to any act or omission by Grantee, or its employees, agents, Subcontractors, or assignees in connection with the performance of this Agreement.

ii. Confidential Information Indemnification

Disclosure or use of State Confidential Information by Grantee in violation of **§8** may be cause for legal action by third parties against Grantee, the State, or their respective agents. Grantee shall indemnify, save, and hold harmless the Indemnified Parties, against any and all claims, damages, liabilities, losses, costs, expenses (including attorneys' fees and costs) incurred by the State in relation to any act or omission by Grantee, or its employees, agents, assigns, or Subcontractors in violation of **§8**.

iii. Intellectual Property Indemnification

Grantee shall indemnify, save, and hold harmless the Indemnified Parties, against any and all costs, expenses, claims, damages, liabilities, and other amounts (including attorneys' fees and costs) incurred by the Indemnified Parties in relation to any claim that any Work infringes a patent, copyright, trademark, trade secret, or any other intellectual property right.

U. Compliance with State and Federal Law, Regulations, and Executive Orders

Grantee shall comply with all State and Federal laws, rules, regulations, executive orders, State and Federal Awarding Agency policies, procedures, directives, and reporting requirements at all times during the Term of this Agreement.

V. Accessibility

i. Grantee shall comply with and the Work Product provided under this Agreement shall be in compliance with all applicable provisions of §§24-85-101, *et seq*., C.R.S., and the Accessibility Standards for Individuals with a Disability, as established by the Governor's Office of Information Technology (OIT), pursuant to §24-85-103 (2.5), C.R.S. Grantee shall also comply with all State of Colorado technology standards related to technology accessibility and with Level AA of the most current version of the Web Content Accessibility Guidelines (WCAG), incorporated in the State of Colorado technology standards.

ii. Grantee shall indemnify, save, and hold harmless the Indemnified Parties against any and all costs, expenses, claims, damages, liabilities, court awards and other amounts (including attorneys' fees and related costs) incurred by any of the Indemnified Parties in relation to Grantee's failure to comply with §§24-85-101, *et seq*., C.R.S., or the Accessibility Standards for Individuals with a Disability as established by OIT pursuant to §24-85-103 (2.5), C.R.S.

iii. The State may require Grantee's compliance to the State's Accessibility Standards to be determined by a third party selected by the State to attest to Grantee's Work Product and software is in compliance with §§24-85-101, *et seq*., C.R.S., and the Accessibility Standards for Individuals with a Disability as established by OIT pursuant to §24-85-103 (2.5), C.R.S.

**18. COLORADO SPECIAL PROVISIONS (COLORADO FISCAL RULE 3-3)**

These Special Provisions apply to all agreements except where noted in italics.

A. **STATUTORY APPROVAL. §24-30-202(1), C.R.S.**

This Agreement shall not be valid until it has been approved by the Colorado State Controller or designee. If this Agreement is for a Major Information Technology Project, as defined in §24-37.5-102(2.6), C.R.S., then this Agreement shall not be valid until it has been approved by the State's Chief Information Officer or designee.

B. **FUND AVAILABILITY. §24-30-202(5.5), C.R.S.**

Financial obligations of the State payable after the current State Fiscal Year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.

C. **GOVERNMENTAL IMMUNITY.**

Liability for claims for injuries to persons or property arising from the negligence of the State, its departments, boards, commissions committees, bureaus, offices, employees and officials shall be controlled and limited by the provisions of the Colorado Governmental Immunity Act, §24-10-101, *et seq*., C.R.S.; the Federal Tort Claims Act, 28 U.S.C. Pt. VI, Ch. 171 and 28 U.S.C. § 1346(b), and the State's risk management statutes, §§24-30-1501, *et seq*. C.R.S. No term or condition of this Agreement shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protections, or other provisions, contained in these statutes.

D. **INDEPENDENT CONTRACTOR.**

Grantee shall perform its duties hereunder as an independent contractor, and not as an employee. Neither Grantee nor any agent or employee of Grantee shall be deemed to be an agent or employee of the State. Grantee shall not have authorization, express or implied, to bind the State to any agreement, liability or understanding, except as expressly set forth herein. **Grantee and its employees and agents are not entitled to unemployment insurance or workers compensation benefits through the State and the State shall not pay for or otherwise provide such coverage for Grantee or any of its agents or employees. Grantee shall pay when due all applicable employment taxes and income taxes and local head taxes incurred pursuant to this Agreement. Grantee shall (i) provide and keep in force workers' compensation and unemployment compensation insurance in the amounts required by law, (ii) provide proof thereof when requested by the State, and (iii) be solely responsible for its acts and those of its employees and agents.**

E. **COMPLIANCE WITH LAW.**

Grantee shall comply with all applicable federal and State laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

F. **CHOICE OF LAW, JURISDICTION, AND VENUE.**

Colorado law, and rules and regulations issued pursuant thereto, shall be applied in the interpretation, execution, and enforcement of this Agreement. Any provision included or incorporated herein by reference which conflicts with said laws, rules, and regulations shall be null and void. All suits or actions related to this Agreement shall be filed and proceedings held in the State of Colorado and exclusive venue shall be in the City and County of Denver.

G. **PROHIBITED TERMS.**

Any term included in this Agreement that requires the State to indemnify or hold Grantee harmless; requires the State to agree to binding arbitration; limits Grantee's liability for damages resulting from death, bodily injury, or damage to tangible property; or that conflicts with this provision in any way shall be *void ab* initio. Nothing in this Agreement shall be construed as a waiver of any provision of §24-106-109, C.R.S.

H. **SOFTWARE PIRACY PROHIBITION.**

State or other public funds payable under this Agreement shall not be used for the acquisition, operation, or maintenance of computer software in violation of federal copyright laws or applicable licensing restrictions. Grantee hereby certifies and warrants that, during the term of this Agreement and any extensions, Grantee has and shall maintain in place appropriate systems and controls to prevent such improper use of public funds. If the State determines that Grantee is in violation of this provision, the State may exercise any remedy available at law or in equity or under this Agreement, including, without limitation, immediate termination of this Agreement and any remedy consistent with federal copyright laws or applicable licensing restrictions.

I. **EMPLOYEE FINANCIAL INTEREST/CONFLICT OF INTEREST. §§24-18-201 and 24-50-507, C.R.S.**

The signatories aver that to their knowledge, no employee of the State has any personal or beneficial interest whatsoever in the service or property described in this Agreement. Grantee has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of Grantee's services and Grantee shall not employ any person having such known interests.

J. **VENDOR OFFSET AND ERRONEOUS PAYMENTS. §§24-30-202(1) and 24-30-202.4, C.R.S.**

**[*Not applicable to intergovernmental agreements*]** Subject to §24-30-202.4(3.5), C.R.S., the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: **(i)** unpaid child support debts or child support arrearages; **(ii)** unpaid balances of tax, accrued interest, or other charges specified in §§39-21-101, *et seq.*, C.R.S.; **(iii)** unpaid loans due to the Student Loan Division of the Department of Higher Education; **(iv)** amounts required to be paid to the Unemployment Compensation Fund; and **(v)** other unpaid debts owing to the State as a result of final agency determination or judicial action. The State may also recover, at the State's discretion, payments made to Grantee in error for any reason, including, but not limited to, overpayments or improper payments, and unexpended or excess funds received by Grantee by deduction from subsequent payments under this Agreement, deduction from any payment due under any other contracts, grants or agreements between the State and Grantee, or by any other appropriate method for collecting debts owed to the State.

# EXHIBIT A
# STATEMENT OF WORK

## 1. INTRODUCTION

1.1. By this Agreement, Grantee is agreeing to deliver and maintain broadband to the Service Area (defined below) in accordance with applicable law and the State and federal conditions applicable to the Award and this Agreement.

## 2. DEFINITIONS

2.1. "CBO" means the Colorado Broadband Office.

2.2. "Cost Savings" means the Project Budget amount less the amount expended to complete the Work. Cost Savings are determined at the time the Work is completed and the final payment request is submitted by Grantee to the State. State shall provide written notice to Grantee verifying any Cost Savings.

2.3. "Closeout Deadline" means the date on which Grantee must have completed all of the Work, including having completely constructed the Project in conformance with all requirements herein.

2.4. "Equipment" means the cable, fiber, materials, components, and supplies used to construct, maintain, or operate a broadband network.

2.5. "Grant Application" means the completed application form promulgated by the CBO and all attachments, documentation and communications provided in support of the application by Grantee.

2.6. "Facilities" means a place or building used to construct, maintain, or operate a broadband network.

2.7. "Infrastructure" means the Facilities or Equipment used in the deployment of broadband service.

2.8. "Lien Waiver" means a legally binding document confirming receipt of payment for Work and waives a Subcontractor's or supplier's right to file a mechanic's lien on the property. For the purpose of this Agreement, Lien Waiver includes conditional and unconditional waivers.

2.9. "Project" means the broadband infrastructure project to be completed by Grantee pursuant to this Agreement, as further described in the "Project Description" and "Work Description" subsections below.

2.10. "Project Closeout" means the final confirmation from the State that the Project meets all Project Completion Standards, Section 3.1.3, and that Grantee otherwise met the Project Closeout conditions detailed in Section 4.6.

2.11. "Project Phase" means a project phase as indicated in Exhibit A, Appendix 3.

2.12. "Reimbursable Expenditures" comprise those expenditures specified in Section 3 below that qualify for reimbursement under applicable federal and State laws, rules, regulations, and guidance in effect or hereafter established.

2.13. "Service Area" means the area designated by Grantee in which Grantee will construct a broadband network to provide reliable broadband to residents and businesses. For purposes of this Agreement, the Service Area is depicted in the map contained at Appendix 1 of this Exhibit A.

## 3. DESCRIPTION OF THE PROJECT AND WORK

3.1. **Project Description**.

3.1.1. Grantee must, within two (2) years from the Effective Date, create a fully-functioning, commercially-serviceable broadband network within the Service Area that meets all of the Project Completion Standards.

3.1.2. Grantee is charged with installing and deploying a broadband network. Creation of the broadband network will require that Grantee do each of the following:

3.1.2.1. Acquire such Equipment as is necessary to install, create, and maintain the broadband network, and to construct and install its related Facilities.

3.1.2.2. Design, install, construct, test, maintain, and operate its broadband network; and

3.1.2.3. Acquire all necessary real property interests or access rights to real property for the purpose of installing its transmission lines.

3.1.3. **Project Completion Standards.** Grantee agrees and warrants that, upon completion, the broadband network will have all of the following characteristics:

3.1.3.1. **Service Area:** The broadband network will provide broadband to the entirety of the area depicted in Appendix 1 of Exhibit A.

3.1.3.2. **Addresses Served:** The network will service each of the residential and business addresses attached hereto as Appendix 2 of Exhibit A. Grantee agrees that, upon completion, the network will serve no less than 276 distinct addresses (whether residential or business) located within the Service Area at the service speeds specified below.

3.1.3.3. **Service Speeds:** Each of the addresses served (see immediately above) will be able to purchase reliable broadband internet at speeds that at least: (i) reliably meet or exceed symmetrical 100 Mbps download speeds and upload speeds; or (ii) in cases where that is not practicable, because of the excessive cost of the Project or geography or topography of the area to be served by the Project, (a) reliably meet or exceed 100 Mbps download speed and between at least 20 Mbps and 100 Mbps upload speed, and (b) is scalable to a minimum of 100 Mbps download speed and 100 Mbps upload speed.

3.1.3.4. **Low Income:** Grantee agrees to provide discounted broadband service to low-income households by participating in the Federal Communications Commission's Affordable Connectivity Program (ACP) through the lifetime of the broadband infrastructure Project, or until the ACP or its successor program(s) are no longer operating, whichever is earlier.

3.1.4. **Outcome**

3.1.4.1. Grantee shall ensure that the final outcome of this Project will be increased access to high-speed broadband service which will result in improved broadband infrastructure.

3.2. **Work Description**

3.2.1. The Maverix Broadband, LLC will build the Kiowa FTTH through a Fiber to the Premise Last Mile NG-PON2 and XGS-PON via a 1:30 or 1:64 split ratio. In accordance with the Project Plan, the Project will serve a total of 276 addresses (6unserved, 270 Underserved) in unincorporated Elbert County. Additionally, in accordance with the project plan, the Maverix Broadband, LLC will build approximately 34 miles of buried fiber for 34 total route miles of fiber. Grantee owns the existing middle mile infrastructure related to this project.

This project contains an Enterprise Zone and will serve 8 Community Anchor Institutions (CAIs), 2 school district buildings, a library, sheriff's department, 2 government buildings, and 2 health services. The Grantee will also provide affordable services as listed in the Application, questions 11-13.

3.3. **Reimbursable Expenditures**

3.3.1. Grant Funds may only be used for Reimbursable Expenditures. Grantee agrees:

3.3.1.1. To qualify as a "Reimbursable Expenditure" an expenditure must be: (i) an Infrastructure expenditure; (ii) an expense that is actually incurred to complete the Work and for the Project Service Area; and (iii) an allowable expense under the Federal Award. Examples of "Reimbursable Expenditures" include, but are not necessarily limited to, costs to: (a) design a system; (b) test a system; (c) purchase materials or equipment used in a system; (d) obtain permits; (e) pay wages to employees or Subcontractors for their work in installing and constructing the Infrastructure in the Project Service Area; and (f) connect with other lines. "Reimbursable Expenditures" does not include operational expenditures, such as, by way of

example and not limitation, employee salary and wages, insurance expenditures, real property acquisition expenditures, attorney, accounting, bookkeeping, actuarial, tax report / compliance, network design or planning work, or any other professional services fees that are not utilized exclusively in the deployment of Infrastructure to the Service Area.

3.3.2. Grantee agrees and warrants that it will not seek reimbursement for any expenditure which does not qualify as a "Reimbursable Expenditure."

3.3.3. In the event the State and Grantee disagree as to whether an expenditure should qualify as a "Reimbursable Expenditure" and this Agreement does not resolve the dispute, then the Parties agree to first look to the laws and guidance surrounding the Federal Award and, if needed, the Uniform Guidance. If the dispute persists, the Parties agree that the State may consult with staff to ascertain whether the expenditure is eligible under federal law and regulation for reimbursement. The Parties agree the decision of staff of the Federal Awarding Agency and, if applicable, the Federal Communications Commission shall constitute the final resolution as to whether the expenses qualify as a "Reimbursable Expenditure."

3.3.4. Funding for the Project is strictly limited to areas which have an identified need for broadband. Grantee understands and agrees that Grant Funds cannot be used for costs that will be reimbursed by other federal or state funding streams. The Grant Funds are only eligible for reimbursement if they address additional broadband investment that is not met by existing federal or State funding commitments. Unless other sources of funding are disclosed herein, Grantee represents that, as of the Effective Date, it has no knowledge of any other federal, State, or local funding commitments for the Project or the Service Area, and that it has not applied for – or, if applied for, will immediately withdraw – funding from any other federal, State, or local government body for the Project or the Service Area.

3.3.5. Cost reimbursement requests shall be submitted in a timely manner, in a form acceptable to the State, and shall be associated with completed Work. Lien Waivers shall be submitted with each cost reimbursement request.

3.3.6. Grantee agrees that, in addition to the record-keeping requirements found in the main body and exhibits of this Agreement, Grantee has a specific obligation to preserve all records evidencing any Reimbursable Expenditure, including any receipts, invoices, and Lien Waivers concerning a Reimbursable Expenditure, and any records showing the ultimate uses for any Equipment or Facilities purchased with a Reimbursable Expenditure. Grantee agrees to promptly furnish any such records to the State upon the State's written request. Grantee agrees that Grantee's compliance with the terms of this Agreement is critical to the State's ability to monitor Grantee's performance, oversee Grantee's use of the Agreement Funds, and, generally, ensure that the State is serving as a good steward of taxpayer money. Accordingly, Grantee agrees that any failure to preserve or destruction of records evidencing the uses of Reimbursable Expenditures shall constitute a material Breach of Agreement.

3.3.7. Grantee shall obtain approval from the State for all budgets prior to beginning work. The approval of any budget is not confirmation by the State that specific expenditures by Grantee qualify as "Reimbursable Expenditures." The State reserves the right to examine or refuse to remit payment on expenditures which do not qualify as "Reimbursable Expenditures."

3.3.8. Budget Modifications:

3.3.8.1. For all Budget modifications under 10% (ten percent) of the Budget, Grantee may request modification of previously approved budgets to meet Project needs, by providing notice of the modified budget to the State for approval. Notice shall be in written format, which may include email. Grantee shall not move forward with any modification to the Project or Budget until it has been reviewed and approved in writing by the State.

3.3.8.2. For all Budget modifications 10% (ten percent) or greater of the Budget, Grantee shall submit a completed State-approved budget modification form, to document all budget modifications

and request approval from the State. Grantee shall not move forward with any modification to the Project or Budget until it has been reviewed and approved in writing by the State.

3.3.8.3. In the event that any budget modification changes the Work described in Exhibit A, Statement of Work, Grantee shall not move forward with any modification to the Project or Budget until a formal amendment to this Agreement has been executed and/or an Option Letter has been issued by the State.

3.3.9. Grantee agrees that the State's acceptance and remission of Reimbursable Expenditures constitutes the State's acceptance of the form of submission, only – and, even then, only to the extent such acceptance is not reversed by the Federal Communications Commission, Federal Awarding Agency, the State of Colorado Office of the State Auditor, or any other governmental entity with authority to review, approve, or overrule expenditures. Grantee agrees to provide the State with access to sites and records needed to evaluate Grantee's Work, but also agrees that the State's ultimate acceptance of the Work occurs only upon Project Completion, as confirmed by the State's issuance of a Project Closeout Letter (***see* §4)**.

3.3.10. Grantee acknowledges that all requests to the State for payment of Reimbursable Expenditures under this Agreement are subject to the Colorado False Claims Act, §§24-31-1204, *et seq*., C.R.S.

3.4. **Contingency Reserve.** The grant Award identified on the Cover Page may include budgeted funds that are designed to be used as a contingency reserve. The amount of these funds is $118,186.00**.** In the event Grantee needs or desires to make use of this contingency reserve, Grantee shall submit a State-approved budget modification form, prior to executing any budget related modifications. Grantee understands and agrees that use of this contingency reserve is still limited to Reimbursable Expenditures.

3.5. **Notification of Performance Issues**

3.5.1. Grantee shall notify, in writing, the CBO, as early as Grantee should reasonably know, that the Project may not be completed in accordance with the requirements listed in this Agreement by the end of the agreed Term.

3.5.2. Grantee's failure to complete the Project by the end of the agreed Term may affect Grantee's ability to gain additional funding/contracts in the future in addition to all other remedies set forth in this Agreement.

3.6. **Grantee Responsibilities.**

3.6.1. Grantee shall be responsible for the completion of the Work and to provide required documentation to the State as specified in this Exhibit A, Statement of Work. Grantee's completion of all Work in accordance with the deadlines set forth herein is a condition of Grantee's continued ability to keep those portions of the Grant Funds which have been distributed to Grantee.

3.6.2. Grantee warrants and agrees that it will provide discounted broadband service to low-income households in accordance with the Project Completion Standards. Grantee agrees that this obligation entails participating in the Federal Communications Commission's ACP through the lifetime of the broadband infrastructure Project, or until the ACP or its successor program(s) are no longer operating, whichever is earlier. Grantee agrees that this obligation "runs with the infrastructure," and, to the greatest extent allowed by law, no assignment, merger, divestiture, bankruptcy, sale, transfer or conveyance of the infrastructure or any portion of Grantee's business shall impact this obligation.

3.6.3. Grantee hereby consents and agrees to the terms contained in Exhibit F, Grant Federal Provisions. **Grantee acknowledges that adherence to the Exhibit F terms is of critical importance to the State, as the failure to adhere to the Exhibit F terms can result in a revocation or withholding of federal grant funds**. Grantee accepts all performance and reporting responsibilities contained in this Agreement. Grantee agrees to work in good faith with the State to resolve any deficiencies identified by the State or any federal agency in Grantee's adherence to applicable federal laws, regulations and guidance –

including, specifically, the Uniform Guidance so as that the State can minimize the risk of having federal funding revoked or withheld.

3.6.4. Grantee understands and agrees that, because the Award arises out of federal funding, Grantee must adhere to federal reporting requirements, including, but not limited to, reporting on: (i) its download and upload speeds; (ii) the pricing it offers to end-users; and (iii) any data allowances or limitations (both plan-specific and generally). Grantee agrees to respond in writing with such information if and when it is requested by the State or any federal agency.

3.7. **Strict Funding Deadline.**

This Agreement contains a unique Term and unique deadlines by which the Project must be completed and funds must be expended. Without limiting those deadlines, and for avoidance of doubt, Grantee agrees that all Grant Funds <u>must</u> be both expended by Grantee and distributed by the State on or by December 31, 2026. Grantee understands that this is required by regulation. Accordingly, Grantee agrees that, in the event this Agreement is extended, whether by a validly executed amendment or pursuant to other lawful means, such as the issuance by the State of an Option Letter, under no circumstances will Grantee be reimbursed for any Reimbursable Expenditures beyond this date. Grantee agrees it has no right to any of the Grant Funds that are not reimbursed to Grantee by December 31, 2026. It is Grantee's obligation to construct the Project and pursue reimbursement in an expedient manner to ensure this hard deadline does not preclude distribution of any portion of the Grant Funds.

## 4. PROJECT PHASES, MILESTONES AND DELIVERABLES

4.1. **Project Plan**

4.1.1. Grantee shall create a Project plan that includes, but is not limited to, the following:

4.1.1.1. A Project timeline, including major milestones to be achieved during the Project and performance milestones; and

4.1.1.2. Milestones that capture significant moments in the Project timeline, include completion percentages based on the overall Project, and that are designed to demonstrate Grantee's reasonable and timely progress on the Project to the CBO.

4.1.2. Grantee shall submit the initial Project plan to the State for review and approval within ten (10) Business Days after the Effective Date of this Agreement.

4.1.2.1. Grantee and the State shall work collaboratively to finalize the initial Project plan within ten (10) Business Days after submission.

4.1.3. Grantee shall submit an updated Project plan to the State as part of its Quarterly Report.

4.1.3.1. Grantee and the State shall work collaboratively to finalize the updated Project plan within ten (10) Business Days after submission.

4.1.4. The Project plan shall require that Grantee satisfy all Project Completion Standards within two (2) years of the Effective Date of this Agreement.

4.2. **Quarterly Report and Reimbursement Request**

4.2.1. Grantee shall submit a Quarterly Report to the State in a form specified by the State. This report shall include, but not be limited to, the following:

4.2.1.1. The percentage of the overall Project that has been completed to date.

4.2.1.2. A spending summary that details how Grantee's spending during the quarter aligned with its expected expenditures.

4.2.1.3. Any challenges that Grantee encountered during the quarter or that Grantee anticipates encountering in the next quarter.

4.2.1.4. The number of households to be served, if this has changed during the last quarter.

4.2.2. Grantee shall submit reimbursement requests in a form specified by the State.

4.2.2.1. Grantee shall retain all receipts supporting its reimbursement request. The sum of all receipts shall equal the amount being requested on the reimbursement request.

4.2.2.2. The State may periodically review backup documentation contemporaneously or retroactively. The State may reject or adjust any current or previously-submitted reimbursement request not supported by receipts and no payment will be made until all required documentation is submitted and approved by the State.

4.2.3. With the prior written approval of the State, Grantee may elect to submit reimbursement requests to the State within fifteen (15) days following the completion of a Project Phase, as identified in Appendix 3. Otherwise, Grantee shall submit its Quarterly Report and reimbursement request to the State within fifteen (15) days following the end of each calendar quarter.

4.3. **Annual Report**

4.3.1. Grantee shall submit, on an annual basis, during the lifetime of the Project, the following:

4.3.1.1. The number of homes and businesses that Grantee's grant-supported broadband network serves.

4.3.1.2. The number of additional homes and businesses that Grantee expects to serve through the grant-supported broadband network within the following year.

4.3.1.3. The speed tiers, advertised rates, and services that Grantee offers to customers through the grant-supported broadband network, including speed tiers, rates, and other services that Grantee offers to low-income households.

4.3.1.4. Other performance metrics as requested, in writing, by the State.

4.3.2. Grantee shall submit the Annual Report no later than June 30th of each year.

4.4. **Final Reimbursement Request and Final Quarterly Report**

4.4.1. Within forty-five (45) days after the completion of the Project, Grantee shall submit the final reimbursement request and final Quarterly Report to the State in the form specified by the State.

4.4.2. In addition, Grantee shall submit the following to the State:

4.4.2.1. A comprehensive Project summary in a form specified by the State.

4.4.2.2. Testimonials from subscribers impacted by the Project to further demonstrate the success of the Project.

4.4.2.3. Photos of the Project site and all completed work.

4.4.3. At the completion of the Project, Grantee shall schedule an onsite or remote monitoring visit with the State, and with the third-party performance-testing certifier. The State will make reports available for public view after their completion and review by CBO staff and counsel.

4.4.4. If the State finds that the Project was not completed in accordance with this Agreement by determining that (a) Grantee is not serving, or cannot serve, the addresses listed in this Agreement, (b) has not demonstrated significant progress in their final Quarterly Report and monitoring visit, or (c) it was determined by the third-party performance-testing certifier that the Project does not meet the original design of, or does not provide the measurable speeds, rates, and services set forth in, Grantee's Grant Application, then Grantee shall be found to be non-compliant, in addition to the other remedies afforded to the State under this Agreement.

4.5. **Final Testing Certification Report**

4.5.1. Prior to release of final payment, Grantee shall provide third-party performance-testing certification, based on FCC-approved performance-testing protocols, that the Project meets the original design of, and provides the measurable speeds, rates, and services set forth in, Grantee's Grant Application. These requirements are further detailed in Exhibit D. Grantee agrees to provide the State with a complete, unredacted copy of the testing results provided by the third-party. Grantee agrees that such testing shall include a sufficient number of addresses, with sufficient geographic diversity in the Project area, and over sufficient time-periods, to establish that the Addresses Served meet the Service Speed requirements (as detailed above and in Exhibit D). Grantee agrees that the State may discuss and otherwise seek additional information from the third-party concerning or relating to the Project and the testing results. Grantee is encouraged to seek prior approval from the State about the method and nature of testing, including the number of addresses to be tested and the locations of those addresses so as to ensure the Parties agree as to the number and geographic distribution of testing.

4.6. **Project Closeout – Project Closeout Letter**

4.6.1. Upon Grantee's submission of its final reimbursement request and final Quarterly Report, submission of its Final Testing Certification Report, and Grantee's proof, to the satisfaction of the State, that Grantee has met all Project Completion Standards, including the requirements contained in Exhibit D, the State will issue to Grantee a Project Closeout Letter. The Project Closeout Letter will appear in writing, on Colorado Broadband Office letterhead, and with date affixed thereto. Unless this Agreement is terminated earlier pursuant to the provisions herein or by law or order of a court, the issuance of the Project Closeout Letter shall terminate Grantee's obligations under this Agreement except for those obligations which by their terms or by their nature continue in force and effect following termination.

**5. BUDGET ADJUSTMENTS**

5.1. All changes to the overall Budget shall require prior written notice of the State. Grantee shall submit a written request for changes pursuant to this Section to the State. Such request shall include the amount of such request, the reason for the request, and any necessary documentation. Grantee shall request Budget changes pursuant to this Section, in writing, in a form specified by the State. Grantee is not authorized to perform additional Work until Grantee receives written approval accepting such change.

5.1.1. Signature Authority. All Grantee notices and requests submitted to the State pursuant to this **§5.1** must be signed and dated by a person authorized to bind Grantee to such Budget adjustments.

**6. PERSONNEL**

6.1. Key Personnel. Grantee's personnel, as listed below, are considered essential to the completion of the Work described in this Exhibit A.

6.1.1. Responsible Administrator. Grantee's performance hereunder shall be under the direct supervision of CEO, currently David Lindauer, or agent of Grantee, who is hereby designated as the responsible administrator of this Project. Such administrator shall be updated by Grantee throughout the lifetime of the Project. If the administrator is an agent of Grantee, such person must have signature authority to bind Grantee and must provide evidence of such authority.

6.2. Replacement. Grantee shall immediately notify the State if any key personnel specified above cease to provide services under this Agreement. Grantee may replace key personnel only after obtaining the State's prior written approval, which shall be at the State 's sole discretion, as the State executed this Agreement in part reliance on Grantee's representations regarding key personnel. Grantee's request for such approval shall specify, in writing, why the change is necessary, who the proposed replacement is, what their qualifications are, and when the change will take effect. Any time key personnel cease to provide services under this Agreement, the State, in its sole discretion, may direct Grantee to suspend Work until such time as replacements are approved. All notices sent under this subsection shall be sent in accordance with **§14** of the main body of this Agreement.

**7. FUNDING**

7.1. The State-provided funds shall be limited to the amount specified on the Cover Page.

7.1.1. Matching Funds. During the Term of this Agreement, Grantee shall provide Matching Funds, as listed in the "Matching Funds Amount" area of the Cover Page of this Agreement.

**8. PAYMENT**

8.1. Payments shall be made in accordance with provisions set forth in **§5** of the main body of this Agreement, in this Exhibit A, and in Exhibit C. Grantee shall return excess funds to the State.

8.2. In addition to other remedies set forth in this Agreement, and for avoidance of doubt, the State may withhold payment(s) if the State determines such payments are not an Reimbursable Expenditure, if any reports, described in **§4,** are not submitted timely, or if Grantee does not provide record evidencing the incurrence of expenditures or the uses of funds arising out of expenditures.

8.3. **Cost Savings.** In the event that Grantee realizes Cost Savings or determines that not all funds will be expended, Grantee shall notify the State in writing. Cost Savings do not result in payment by the State to Grantee above actual expenditures, but unexpended Grant Funds remain obligated. Cost Savings may be used to provide service to additional Service Areas subject to issuance by the State of an Option Letter, after consultation with Grantee.

8.4. **Subcontracted/Subgranted Work Payment Schedule**. If Work is subcontracted or subgranted and such Subcontractors and/or Subgrantees are not previously paid, Grantee shall disburse Grant Funds received from the State to such Subcontractor or Subgrantee within fifteen (15) days after receipt.

8.5. **Remittance Address.** If mailed, payments shall be remitted to the following address unless changed in accordance with **§14** of the main body of this Agreement:

10940 S Parker Rd, Suite 418, Parker, Colorado 80134 United States

**9. ADMINISTRATIVE REQUIREMENTS**

9.1. **Monitoring**

9.1.1. The State may monitor the Work as the State determines is necessary or prudent.

9.1.2. Grantee agrees that an important part of the State's ability to monitor Grantee's progress resides in the reports Grantee must file with the State and/or federal authorities. Grantee hereby agrees and warrants that all of its reports will: (i) be made in good faith; (ii) not include materially false or misleading information; and (iii) not omit information which would cause any statements in the reports to be materially false or misleading.

9.2. **Record Review.**

9.2.1. Grantee shall maintain a complete file of all records, documents, communications, notes and other written materials or electronic media, files or communications, which pertain in any manner to the operation of activities undertaken pursuant to this Agreement. Such books and records shall contain documentation of Grantee's pertinent activity under this Agreement in accordance with Generally Accepted Accounting Principles. During the Term of this Agreement and for a period of five (5) years following the Project Closeout Letter, Grantee must allow the State or federal government access to inspect Project locations and equipment upon request. The State shall provide Grantee reasonable notice of inspections. In addition, at any time during the Term, the State may demand that Grantee provide written documents, whether in hard copy or electronic form, in Grantee's possession which relate to or concern the Project. These documents may include, but are not necessarily limited to, documents pertaining to billing, invoices, expenditures, phases, design, Equipment, Facilities, and communications, invoices or other records relating to any Subcontractor's work on the Project. This right is in addition to, and not in lieu of, any of the State's other rights to obtain documentation under this Agreement (*see, e.g.*, **§7** of the main body of this Agreement).

9.2.2. For avoidance of doubt, and in addition to the record-retention requirements contained in the main body of this Agreement, Grantee acknowledges that the record-retention obligations contained at **§7.A** of the main body of this Agreement require that Grantee maintain all records, regardless of their form, which

concern or relate to the Project. Grantee agrees the maintenance and preservation of these records for the entire Record Retention Period is a material obligation of Grantee under this Agreement. Grantee agrees to undertake such actions as are needed to preserve all Project records, including, by way of example and not limitation, modifying its record-retention policies and systems to avoid automatic deletion of Project records, and developing independent systems for saving records. Grantee further specifically agrees that this obligation to retain records pertains to all Project financial records, including invoices, bills, and records of payments for the Project.

9.2.3. The State may choose to monitor or audit the financial records relevant to this Agreement. Audits may occur through the Office of the State Auditor or any other governmental entity with authority to conduct an audit of the Project, this Agreement, the grant Award, or the use of Agreement Funds.

**10. CONSTRUCTION/RENOVATION**

10.1. The following subsections shall apply to construction and/or renovation related projects/activities:

10.1.1. **Plans and Specifications**

10.1.1.1. Construction plans and specifications shall be drawn up by a qualified engineer, or pre-engineered in accordance with Colorado law.

10.1.2. **Standards**

10.1.2.1. Grantee, Subgrantees and Subcontractors shall comply with all applicable statutory design and construction standards and procedures that may be required and shall provide the State with documentation of such compliance.

10.1.2.2. All Work on the Project must comply with all applicable federal, state, and local law.

10.1.2.3. All Work must be undertaken and completed in a manner that is technically sound, meaning that it must meet design and construction methods and use materials that are approved, codified, recognized, and fall under standard or acceptable levels of practice, or are otherwise generally acceptable by the design and construction industry.

10.1.2.4. Grantee shall monitor its Subgrantees and/or Subcontractors, if any, during the Term of this Agreement. Results of such monitoring shall be documented by Grantee and maintained on file.

10.1.2.5. Grantee must comply with the Contract Work Hours and Safety Standards Act, 40 U.S.C. § 3702 and 3704, as supplemented by Department of Labor regulations (29 C.F.R. Part 5).

10.2. **Performance and Payment Bonds**

10.2.1. Grantee shall furnish a Performance Bond and a Labor and Material Payment Bond on Exhibits D and E, executed by a corporate Surety authorized to do business in the State of Colorado and in the full amount of the Agreement Funds Maximum Amount. The expense of these bonds shall be borne by Grantee and the bonds shall be filed with Colorado Broadband Office.

10.2.2. If, at any time, a Surety on such a bond is found to be, or ceases to be in strict compliance with any qualification requirements of the Agreement documents, or loses its right to do business in the State of Colorado, another Surety will be required, which Grantee shall furnish to the State within ten (10) days after receipt of Notice from the State or after Grantee otherwise becomes aware of such conditions.

10.3. **Retainage Withheld**

10.3.1. An amount equivalent to five percent (5%) of the amount shown to be due on each payment request shall be withheld until the Work required by this Agreement has been performed. The withheld percentage of the price of any such Work, improvement, or construction shall be retained until the Work or discrete portions of the Work, have been completed satisfactorily and finally or partially accepted by the State in writing.

10.4. **Release of Retainage**

10.4.1. Grantee may, for satisfactory and substantial reasons shown to the State's satisfaction, make a written request to the State for release of part or all of the withheld percentage applicable to the Work of a Subcontractor which has completed the subcontracted Work in a manner finally acceptable to Grantee, and the State. Any such request shall be supported by a written approval from the Surety furnishing

Grantee's bonds and any surety that has provided a bond for the Subcontractor. The release of any such withheld percentage shall be further supported by such other evidence as the State may require, including but not limited to, evidence of prior payments made to the Subcontractor, copies of the Subcontractor's contract with Grantee, any applicable warranties, as-built information, maintenance manuals and other customary closeout documentation. The State shall not be obligated to review such documentation nor shall they be deemed to assume any obligations to third parties by any review undertaken.

10.4.2. Any rights of the State which might be terminated by or from the date of any final acceptance of the Work, whether at common law or by the terms of this Agreement, shall not be affected by such partial release of retainage prior to any final acceptance of the entire Project.

10.4.3. Grantee remains fully responsible for the Subcontractor's Work and assumes any risk that might arise by virtue of the partial release to the Subcontractor of the withheld percentage, including the risk that the Subcontractor may not have fully paid for all materials, labor and equipment furnished to the Project.

10.4.4. If the State considers Grantee's request for such release satisfactory and supported by substantial reasons, the State shall make a "final inspection" of the applicable portion of the Project to determine whether the Subcontractor's Work has been completed in accordance with this Agreement. A final punch list shall be made for the Subcontractor's Work and closeout procedures shall be followed for that portion of the Work.

**11. WARRANTY**

11.1. Notwithstanding the acceptance of any Work, or the payment of any invoice for such Work, Grantee warrants that any Work provided by Grantee under this Agreement shall be free from material defects and shall function in material accordance with the applicable specifications. Grantee's warranties under this section shall apply to any defects or material nonconformities discovered within 180 days following delivery of any Work.

11.2. Upon notice during the warranty term of any defect or material nonconformity, Grantee shall submit to the State in writing within ten (10) Business Days of the notice one or more recommendations for corrective action with sufficient documentation for the State to ascertain the feasibility, risks, and impacts of each recommendation. The State's remedy for such defect or material non-conformity shall be:

11.2.1. Grantee shall re-perform, repair, or replace such Work in accordance with any recommendation chosen by the State. Grantee shall deliver, at no additional cost to the State, all documentation required under this Agreement as applicable to the corrected Work; or

11.2.2. Grantee shall refund to the State all amounts paid for such Work, as well as pay to the State any additional amounts reasonably necessary for the State to procure alternative goods or services or substantially equivalent capability, function, and performance.

11.3. Any Work delivered to the State as a remedy under this section shall be subject to the same quality assurance, acceptance, and warranty requirements as the original Work. The duration of the warranty for any replacement or corrected Work shall run from the date of the corrected or replacement Work.

**APPENDIX 1**
**SERVICE AREA MAP**




*App-000160 (449676 - Maverix Broadband, Inc. - Kiowa FTTH)*

**APPENDIX 2**
**ADDRESSES SERVED**

| Location Name | Eligibility |
|---|---|
| 941160 - 13399 MACKENZIE DR BLDG 3 | Eligible - Underserved |
| 941161 - 12529 COUNTY ROAD 134 | Eligible - Underserved |
| 941247 - 6139 BOW MEADOWS DR | Eligible - Underserved |
| 941248 - 6035 BOW MEADOWS DR | Eligible - Underserved |
| 941249 - 33636 BOW MEADOWS CIR | Eligible - Underserved |
| 941250 - 32172 COUNTY ROAD 27 | Eligible - Underserved |
| 941251 - 33656 BOW MEADOWS CIR | Eligible - Underserved |
| 941252 - 6785 ARROWHEAD CIR | Eligible - Underserved |
| 941253 - 32768 PRIVATE ROAD 29 RD | Eligible - Underserved |
| 941254 - 32074 PRIVATE ROAD 29 RD | Eligible - Underserved |
| 941255 - 32099 COUNTY ROAD 27 | Eligible - Underserved |
| 941256 - 6757 COUNTY ROAD 132 | Eligible - Underserved |
| 941257 - 33500 MEADOW HILL LN | Eligible - Underserved |
| 941258 - 33450 MEADOW HILL LN | Eligible - Underserved |
| 941259 - 33455 MEADOW HILL LN | Eligible - Underserved |
| 941260 - 33568 QUILL LN | Eligible - Underserved |
| 941261 - 34729 WOLF CREEK TRL | Eligible - Underserved |
| 941262 - 34183 WOLF CREEK TRL | Eligible - Underserved |
| 941324 - 33574 QUILL LN | Eligible - Underserved |
| 941325 - 33575 BOW MEADOWS CIR | Eligible - Underserved |
| 941327 - 33400 MEADOW HILL LN | Eligible - Underserved |
| 941329 - 33642 BOW MEADOWS CIR | Eligible - Underserved |
| 941330 - 33582 QUILL LN | Eligible - Underserved |
| 941331 - 33591 BOW MEADOWS CIR | Eligible - Underserved |
| 941332 - 6729 COUNTY ROAD 132 | Eligible - Underserved |
| 941333 - 6423 ARROWHEAD TRL | Eligible - Underserved |
| 941334 - 6435 ARROWHEAD TRL | Eligible - Underserved |
| 941335 - 6655 ARROWHEAD TRL | Eligible - Underserved |
| 941336 - 6597 ARROWHEAD TRL | Eligible - Underserved |
| 941337 - 6031 ARROWHEAD TRL | Eligible - Underserved |
| 941338 - 32247 PRIVATE ROAD 29 | Eligible - Underserved |
| 941339 - 6723 COUNTY ROAD 132 | Eligible - Underserved |
| 941340 - 32305 REMUDA TRL | Eligible - Underserved |
| 941341 - 6361 ARROWHEAD TRL | Eligible - Underserved |
| 941342 - 6451 ARROWHEAD TRL | Eligible - Underserved |
| 941343 - 6089 ARROWHEAD TRL | Eligible - Underserved |
| 941344 - 6507 ARROWHEAD TRL | Eligible - Underserved |
| 941345 - 6541 ARROWHEAD TRL | Eligible - Underserved |
| 941346 - 6711 ARROWHEAD TRL | Eligible - Underserved |
| 941347 - 6395 ARROWHEAD TRL | Eligible - Underserved |
| 941411 - 6327 ARROWHEAD TRL | Eligible - Underserved |
| 941412 - 6233 ARROWHEAD TRL | Eligible - Underserved |
| 941413 - 6281 ARROWHEAD TRL | Eligible - Underserved |
| 941414 - 6185 ARROWHEAD TRL | Eligible - Underserved |
| 941415 - 6345 ARROWHEAD TRL | Eligible - Underserved |
| 941416 - 6063 ARROWHEAD TRL | Eligible - Underserved |
| 941417 - 6137 ARROWHEAD TRL | Eligible - Underserved |
| 942409 - 6526 ARROWHEAD TRL | Eligible - Underserved |
| 942455 - 6414 ARROWHEAD TRL | Eligible - Underserved |
| 942456 - 6568 ARROWHEAD TRL | Eligible - Underserved |
| 942457 - 6580 ARROWHEAD TRL | Eligible - Underserved |
| 942458 - 6634 ARROWHEAD TRL | Eligible - Underserved |
| 942459 - 6612 ARROWHEAD TRL | Eligible - Underserved |
| 942460 - 6188 ARROWHEAD TRL | Eligible - Underserved |
| 942461 - 6342 ARROWHEAD TRL | Eligible - Underserved |
| 942462 - 6028 ARROWHEAD TRL | Eligible - Underserved |
| 942463 - 6102 ARROWHEAD TRL | Eligible - Underserved |
| 942465 - 6676 ARROWHEAD TRL | Eligible - Underserved |
| 942466 - 6156 ARROWHEAD TRL | Eligible - Underserved |
| 942467 - 6040 ARROWHEAD TRL | Eligible - Underserved |
| 942468 - 6134 ARROWHEAD TRL | Eligible - Underserved |
| 942469 - 6480 ARROWHEAD TRL | Eligible - Underserved |
| 942470 - 6728 ARROWHEAD TRL | Eligible - Underserved |

| | |
|---|---|
| 942628 - 33631 QUILL LN | Eligible - Underserved |
| 942629 - 6200 BOW MEADOWS DR | Eligible - Underserved |
| 942630 - 6528 BOW MEADOWS DR | Eligible - Underserved |
| 942631 - 33568 BOW MEADOWS CIR | Eligible - Underserved |
| 942632 - 33664 BOW MEADOWS CIR | Eligible - Underserved |
| 942633 - 33625 BOW MEADOWS CIR | Eligible - Underserved |
| 942634 - 33554 BOW MEADOWS CIR | Eligible - Underserved |
| 942635 - 33612 BOW MEADOWS CIR | Eligible - Underserved |
| 942636 - 33543 QUILL LN | Eligible - Underserved |
| 942637 - 33591 QUILL LN | Eligible - Underserved |
| 943646 - 31820 PVT RD 57 | Eligible - Underserved |
| 943647 - 31200 PVT RD 57 | Eligible - Underserved |
| 943756 - 31250 COUNTY ROAD 45 | Eligible - Underserved |
| 943757 - 31450 COUNTY ROAD 45 | Eligible - Underserved |
| 943780 - 13510 HIGHWAY 86 | Eligible - Underserved |
| 943781 - 13124 HIGHWAY 86 | Eligible - Underserved |
| 943788 - 13130 HIGHWAY 86 | Eligible - Underserved |
| 943799 - 11700 HIGHWAY 86 | Eligible - Underserved |
| 943859 - 10900 COUNTY ROAD 126 | Eligible - Underserved |
| 943896 - 10997 COUNTY ROAD 126 | Eligible - Underserved |
| 943903 - 10413 COUNTY ROAD 126 | Eligible - Underserved |
| 943959 - 31305 COUNTY ROAD 45 | Eligible - Underserved |
| 943961 - 31505 COUNTY ROAD 45 | Eligible - Underserved |
| 943963 - 31951 COUNTY ROAD 45 | Eligible - Underserved |
| 943964 - 31033 COUNTY ROAD 45 | Eligible - Underserved |
| 945165 - 12405 COUNTY ROAD 134 | Eligible - Underserved |
| 945166 - 12777 HIGHWAY 86 | Eligible - Underserved |
| 945167 - 12729 COUNTY ROAD 134 | Eligible - Underserved |
| 945168 - 12885 HIGHWAY 86 | Eligible - Underserved |
| 945169 - 12891 COUNTY ROAD 134 | Eligible - Underserved |
| 945170 - 12901 HIGHWAY 86 | Eligible - Underserved |
| 945171 - 13000 MACKENZIE DR | Eligible - Underserved |
| 945177 - 11555 COUNTY ROAD 134 | Eligible - Underserved |
| 945178 - 12450 COUNTY ROAD 134 | Eligible - Underserved |
| 945179 - 12567 COUNTY ROAD 134 | Eligible - Underserved |
| 945180 - 12600 COUNTY ROAD 134 | Eligible - Underserved |
| 945182 - 11985 COUNTY ROAD 134 | Eligible - Underserved |
| 945187 - 13200 COUNTY ROAD 134 | Eligible - Underserved |
| 945188 - 13267 COUNTY ROAD 134 | Eligible - Underserved |
| 945189 - 13695 COUNTY ROAD 134 | Eligible - Underserved |
| 945190 - 13805 HIGHWAY 86 | Eligible - Underserved |
| 945193 - 14255 HIGHWAY 86 | Eligible - Underserved |
| 945195 - 13771 HIGHWAY 86 | Eligible - Underserved |
| 945196 - 31995 PVT RD 55 | Eligible - Underserved |
| 945198 - 32160 PRIVATE ROAD 055 | Eligible - Underserved |
| 945199 - 32500 PVT RD 55 | Eligible - Underserved |
| 945200 - 32617 PRIVATE ROAD 055 | Eligible - Underserved |
| 945201 - 33182 WOLF CREEK TRL | Eligible - Underserved |
| 945202 - 33546 WOLF CREEK TRL | Eligible - Underserved |
| 945203 - 32100 PVT RD 55 | Eligible - Underserved |
| 945215 - 33728 WOLF CREEK TRL | Eligible - Underserved |
| 945221 - 33991 WOLF CREEK TRL | Eligible - Underserved |
| 945222 - 33910 WOLF CREEK TRL | Eligible - Underserved |
| 945223 - 34274 WOLF CREEK TRL | Eligible - Underserved |
| 945225 - 34456 WOLF CREEK TRL | Eligible - Underserved |
| 945226 - 34638 WOLF CREEK TRL | Eligible - Underserved |
| 945227 - 34992 WOLF CREEK TRL | Eligible - Underserved |
| 945229 - 12509 COUNTY ROAD 134 | Eligible - Underserved |
| 945230 - 13399 MACKENZIE DR | Eligible - Underserved |
| 945258 - 8557 HIGHWAY 86 | Eligible - Underserved |
| 945263 - 10161 HIGHWAY 86 | Eligible - Underserved |
| 945265 - 10058 STATE HIGHWAY 86 | Eligible - Underserved |
| 945378 - 13399 MACKENZIE DR BLDG 2 | Eligible - Underserved |
| 945406 - 7781 HIGHWAY 86 | Eligible - Underserved |
| 945408 - 7895 HIGHWAY 86 | Eligible - Underserved |
| 945593 - 9660 COUNTY ROAD 134 | Eligible - Underserved |
| 945594 - 9220 COUNTY ROAD 134 | Eligible - Underserved |
| 945595 - 9550 COUNTY ROAD 134 | Eligible - Underserved |

| | |
|---|---|
| 945605 - 9770 COUNTY ROAD 134 | Eligible - Underserved |
| 945606 - 8768 COUNTY ROAD 134 | Eligible - Underserved |
| 945607 - 8785 COUNTY ROAD 134 | Eligible - Underserved |
| 945608 - 8991 COUNTY ROAD 134 | Eligible - Underserved |
| 945609 - 9000 HIGHWAY 86 | Eligible - Underserved |
| 945610 - 9006 HIGHWAY 86 | Eligible - Underserved |
| 945611 - 8778 COUNTY ROAD 134 | Eligible - Underserved |
| 945612 - 8781 COUNTY ROAD 134 | Eligible - Underserved |
| 945613 - 9448 COUNTY ROAD 134 | Eligible - Underserved |
| 945615 - 8761 COUNTY ROAD 134 | Eligible - Underserved |
| 945616 - 33350 COUNTY ROAD 33 | Eligible - Underserved |
| 945617 - 9279 COUNTY ROAD 134 | Eligible - Underserved |
| 945618 - 8520 ALAN RIDGE RD | Eligible - Underserved |
| 945619 - 8760 COUNTY ROAD 134 | Eligible - Underserved |
| 945620 - 9570 COUNTY ROAD 134 | Eligible - Underserved |
| 945621 - 9491 COUNTY ROAD 134 | Eligible - Underserved |
| 945622 - 9747 COUNTY ROAD 134 | Eligible - Underserved |
| 945623 - 9652 HIGHWAY 86 | Eligible - Underserved |
| 945624 - 9133 COUNTY ROAD 134 | Eligible - Underserved |
| 945625 - 8769 COUNTY ROAD 134 | Eligible - Underserved |
| 945626 - 33294 EXPERTISE TRL | Eligible - Underserved |
| 945627 - 32500 COUNTY ROAD 33 | Eligible - Underserved |
| 945628 - 32780 COUNTY ROAD 33 | Eligible - Underserved |
| 945629 - 32800 COUNTY ROAD 33 | Eligible - Underserved |
| 945630 - 33782 COUNTY ROAD 33 | Eligible - Underserved |
| 945631 - 9409 COUNTY ROAD 134 | Eligible - Underserved |
| 945632 - 9391 COUNTY ROAD 134 | Eligible - Underserved |
| 945633 - 7625 SUMMER CIR | Eligible - Underserved |
| 945635 - 7667 SUMMER CIR | Eligible - Underserved |
| 945636 - 7271 PINE CREST DR | Eligible - Underserved |
| 945638 - 33390 SUMMER VIEW CIR | Eligible - Underserved |
| 945639 - 7655 SUMMER CIR | Eligible - Underserved |
| 945640 - 32312 PINE CREST CT | Eligible - Underserved |
| 945641 - 32356 PINE CREST CT | Eligible - Underserved |
| 945642 - 32345 PINE VIEW DR | Eligible - Underserved |
| 945643 - 32341 PINE VIEW DR | Eligible - Underserved |
| 945646 - 7458 PINE CREST DR | Eligible - Underserved |
| 945647 - 7324 PINE CREST DR | Eligible - Underserved |
| 945648 - 7673 SUMMER CIR | Eligible - Underserved |
| 945649 - 7700 PINE CREST DR | Eligible - Underserved |
| 945650 - 7562 PINE CREST DR | Eligible - Underserved |
| 945651 - 7584 PINE CREST DR | Eligible - Underserved |
| 945652 - 7638 PINE CREST DR | Eligible - Underserved |
| 945653 - 7500 PINE CREST DR | Eligible - Underserved |
| 945654 - 32767 COUNTY ROAD 33 | Eligible - Underserved |
| 945655 - 32625 COUNTY ROAD 33 | Eligible - Underserved |
| 945656 - 32517 COUNTY ROAD 33 | Eligible - Underserved |
| 945657 - 6799 ARROWHEAD CIR | Eligible - Underserved |
| 945658 - 32068 COUNTY ROAD 130 | Eligible - Underserved |
| 945659 - 32414 PINE CREST CT | Eligible - Underserved |
| 945660 - 32417 PINE CREST CT | Eligible - Underserved |
| 945661 - 32333 PINE VIEW DR | Eligible - Underserved |
| 945662 - 32363 PINE VIEW DR | Eligible - Underserved |
| 945663 - 32875 COUNTY ROAD 33 | Eligible - Underserved |
| 945664 - 33393 SUMMER VIEW CIR | Eligible - Underserved |
| 945665 - 33395 SUMMER VIEW CIR | Eligible - Underserved |
| 945666 - 33398 SUMMER VIEW CIR | Eligible - Underserved |
| 945667 - 33519 COUNTY ROAD 33 | Eligible - Underserved |
| 945668 - 32307 PINE VIEW DR | Eligible - Underserved |
| 945669 - 32223 PINE VIEW DR | Eligible - Underserved |
| 945670 - 31856 COUNTY ROAD 31 | Eligible - Underserved |
| 945671 - 32101 PINE VIEW DR | Eligible - Underserved |
| 945672 - 32315 PINE CREST CT | Eligible - Underserved |
| 945673 - 32374 PINE VIEW DR | Eligible - Underserved |
| 945674 - 32358 PINE VIEW DR | Eligible - Underserved |
| 945675 - 32400 PINE VIEW DR | Eligible - Underserved |
| 945676 - 7479 PINE CREST DR | Eligible - Underserved |
| 945677 - 7595 PINE CREST DR | Eligible - Underserved |

| | |
|---|---|
| 945678 - 7573 PINE CREST DR | Eligible - Underserved |
| 945679 - 32298 PINE VIEW DR | Eligible - Underserved |
| 945680 - 32220 PINE VIEW DR | Eligible - Underserved |
| 945681 - 7647 PINE CREST DR | Eligible - Underserved |
| 945685 - 7531 PINE CREST DR | Eligible - Underserved |
| 945686 - 7385 PINE CREST DR | Eligible - Underserved |
| 945687 - 7397 PINE CREST DR | Eligible - Underserved |
| 945688 - 32072 PINE VIEW DR | Eligible - Underserved |
| 945689 - 32144 PINE VIEW DR | Eligible - Underserved |
| 945690 - 32314 PINE VIEW DR | Eligible - Underserved |
| 945691 - 32330 PINE VIEW DR | Eligible - Underserved |
| 945699 - 6685 CIRCLE HILL CIR | Eligible - Underserved |
| 945721 - 6690 CIRCLE HILL CIR | Eligible - Underserved |
| 945722 - 6695 CIRCLE HILL CIR | Eligible - Underserved |
| 945724 - 6680 CIRCLE HILL CIR | Eligible - Underserved |
| 945738 - 6546 COUNTY ROAD 132 | Eligible - Underserved |
| 945739 - 6480 SUNFLOWER CIR | Eligible - Underserved |
| 945741 - 6350 SUNFLOWER CIR | Eligible - Underserved |
| 945742 - 6377 BOW MEADOWS DR | Eligible - Underserved |
| 945743 - 6733 PVT RD | Eligible - Underserved |
| 945744 - 6701 BOW MEADOWS DR | Eligible - Underserved |
| 945745 - 6707 BOW MEADOWS DR | Eligible - Underserved |
| 945746 - 6990 BOW MEADOWS DR | Eligible - Underserved |
| 945747 - 6992 BOW MEADOWS DR | Eligible - Underserved |
| 945748 - 6790 SUNFLOWER CIR | Eligible - Underserved |
| 945749 - 6629 BOW MEADOWS DR | Eligible - Underserved |
| 945750 - 6583 BOW MEADOWS DR | Eligible - Underserved |
| 945754 - 6531 BOW MEADOWS DR | Eligible - Underserved |
| 945755 - 6481 BOW MEADOWS DR | Eligible - Underserved |
| 945756 - 6087 BOW MEADOWS DR | Eligible - Underserved |
| 945757 - 6044 BOW MEADOWS DR | Eligible - Underserved |
| 945758 - 6165 BOW MEADOWS DR | Eligible - Underserved |
| 945759 - 6217 BOW MEADOWS DR | Eligible - Underserved |
| 945760 - 6292 BOW MEADOWS DR | Eligible - Underserved |
| 945761 - 6429 BOW MEADOWS DR | Eligible - Underserved |
| 945762 - 6680 SUNFLOWER CIR | Eligible - Underserved |
| 945763 - 6362 BOW MEADOWS DR | Eligible - Underserved |
| 945764 - 33622 QUILL LN | Eligible - Underserved |
| 945765 - 33527 MEADOW HILL LN | Eligible - Underserved |
| 945766 - 33583 BOW MEADOWS CIR | Eligible - Underserved |
| 945767 - 33614 QUILL LN | Eligible - Underserved |
| 945768 - 33598 QUILL LN | Eligible - Underserved |
| 945769 - 33530 MEADOW HILL LN | Eligible - Underserved |
| 945770 - 33335 MEADOW HILL LN | Eligible - Underserved |
| 945771 - 33070 PRIVATE ROAD 29 | Eligible - Underserved |
| 945772 - 33011 PRIVATE ROAD 29 | Eligible - Underserved |
| 945773 - 32971 PRIVATE ROAD 29 | Eligible - Underserved |
| 945774 - 32400 COUNTY ROAD 27 | Eligible - Underserved |
| 994678 - 11896 HIGHWAY 86 | Eligible - Underserved |
| 994682 - 731 COMANCHE ST | Eligible - Underserved |
| 994926 - 31701 PVT RD 57 | Eligible - Underserved |
| 994927 - 708 COMANCHE ST | Eligible - Underserved |
| 994928 - 620 COMANCHE ST | Eligible - Underserved |
| 995157 - 12938 COUNTY ROAD 134 | Eligible - Underserved |
| 995161 - 34820 WOLF CREEK TRL | Eligible - Underserved |
| 995171 - 8561 HIGHWAY 86 | Eligible - Underserved |
| 995201 - 8200 CHERRYWOOD CIR | Eligible - Underserved |
| 995202 - 8175 CHERRYWOOD CIR | Eligible - Underserved |
| 995203 - 8570 ALAN RIDGE RD | Eligible - Underserved |
| 995204 - 8124 HIGHWAY 86 | Eligible - Underserved |
| 995205 - 7918 CHERRYWOOD LOOP | Eligible - Underserved |
| 995206 - 7990 CHERRYWOOD LOOP | Eligible - Underserved |
| 995207 - 7971 CHERRYWOOD LOOP | Eligible - Underserved |
| 995208 - 7963 CHERRYWOOD LOOP | Eligible - Underserved |
| 995209 - 7911 CHERRYWOOD LOOP | Eligible - Underserved |
| 995210 - 7959 CHERRYWOOD LOOP | Eligible - Underserved |
| 995211 - 7935 CHERRYWOOD LOOP | Eligible - Underserved |
| 995212 - 7929 CHERRYWOOD LOOP | Eligible - Underserved |

| | |
|---|---|
| 995213 - 31795 COUNTY ROAD 31 | Eligible - Underserved |
| 998694 - 33170 PRIVATE RD | Eligible - Underserved |
| 998756 - 7921 CHERRYWOOD LOOP | Eligible - Underserved |
| 947737 - 34264 WOLF CREEK TRL | Eligible - Unserved |
| 1922748 - 34446 WOLF CREEK TRL | Eligible - Unserved |
| 1923046 - 13182 MACKENZIE DR | Eligible - Unserved |
| 1923053 - 34719 WOLF CREEK TRL | Eligible - Unserved |
| 1923054 - 34901 WOLF CREEK TRL | Eligible - Unserved |
| 1942160 - 34628 WOLF CREEK TRL | Eligible - Unserved |

**APPENDIX 3**
**PROJECT PHASES EXAMPLE**

| Phases | Expected Completion Date | Authorization to Proceed | Reimbursement |
|---|---|---|---|
| **Phase 1 – Planning** | | | |
| Community Need | | | |
| Approved Project | | | |
| Funding | | | |
| Bidding/Contracting | | | |
| **Phase 2 – Design** | | | |
| ROW, Permits | | | |
| Cable Plant | | | |
| Structures and Hardware | | | |
| Components | | | |
| Documentation | | | |
| **Phase 3 – Installation** | | | |
| Procurement | | | |
| Construction | | | |
| Cable Installation | | | |
| Splicing | | | |
| Testing | | | |
| Documentation/As Built | | | |
| **Phase 4 – Acceptance** | | | |
| Handoff to Operations | | | |
| Project Closeout | | | |

**EXHIBIT B**
**SAMPLE OPTION LETTER**

| | |
|---|---|
| **State Agency**<br>Insert Department's or IHE's Full Legal Name | **Option Letter Number**<br>Insert the Option Number (e.g. "1" for the first option) |
| **Grantee**<br>Insert Grantee's Full Legal Name, including "Inc.", "LLC", etc... | **Original Agreement Number**<br>Insert CMS number or Other Agreement Number of the Original Agreement |
| **Current Agreement Maximum Amount**<br>Initial Term<br>State Fiscal Year 20xx $0.00<br>Extension Terms<br>State Fiscal Year 20xx $0.00<br>State Fiscal Year 20xx $0.00<br>State Fiscal Year 20xx $0.00<br>State Fiscal Year 20xx $0.00<br>Total for All State Fiscal Years $0.00 | **Option Agreement Number**<br>Insert CMS number or Other Agreement Number of this Option<br>**Agreement Performance Beginning Date**<br>Month Day, Year<br>**Current Agreement Expiration Date**<br>Month Day, Year |

1. **OPTIONS:**
   A. Option to extend for an Extension Term
   B. Option to change the quantity of Goods under the Agreement
   C. Option to change the quantity of Services and/or Service Area under the Agreement
   D. Option to modify Agreement rates
   E. Option to initiate next phase of the Agreement
2. **REQUIRED PROVISIONS:**

A. **For use with Option 1(A):** In accordance with Section(s) Number of the Original Agreement referenced above, the State hereby exercises its option for an additional term, beginning Insert start date and ending on the Current Agreement Expiration Date shown above, at the rates stated in the Original Agreement, as amended.

B. **For use with Options 1(B and C):** In accordance with Section(s) Number of the Original Agreement referenced above, the State hereby exercises its option to Increase/Decrease the quantity of the Goods/Services/Service Area at the rates stated in the Original Agreement, as amended.

C. **For use with Option 1(D):** In accordance with Section(s) Number of the Original Agreement referenced above, the State hereby exercises its option to modify the Agreement rates specified in Exhibit/Section Number/Letter. The Agreement rates attached to this Option Letter replace the rates in the Original Agreement as of the Option Effective Date of this Option Letter.

D. **For use with Option 1(E):** In accordance with Section(s) Number of the Original Agreement referenced above, the State hereby exercises its option to initiate Phase indicate which Phase: 2, 3, 4, etc., which shall begin on Insert start date and end on Insert ending date at the cost/price specified in Section Number.

E. **For use with all Options that modify the Agreement Maximum Amount:** The Agreement Maximum Amount table on the Agreement's Cover Page is hereby deleted and replaced with the Current Agreement Maximum Amount table shown above.

3. **OPTION EFFECTIVE DATE:**

A. The effective date of this Option Letter is upon approval of the State Controller or , whichever is later.

| | |
|---|---|
| **STATE OF COLORADO**<br>Jared S. Polis, Governor<br>INSERT-Name of Agency or IHE<br>INSERT-Name & Title of Head of Agency or IHE<br><br>______________________________<br>By: Name & Title of Person Signing for Agency or IHE<br><br>Date: _________________ | In accordance with §24-30-202, C.R.S., this Option is not valid until signed and dated below by the State Controller or an authorized delegate.<br>**STATE CONTROLLER**<br>**Robert Jaros, CPA, MBA, JD**<br><br>By:______________________________<br>Name of Agency or IHE Delegate-Please delete if Agreement will be routed to OSC for approval<br><br>Option Effective Date:_______________ |

# EXHIBIT C
## BUDGET

| Budget Category | Amount |
|---|---|
| Engineering | $82,400.00 |
| Permitting, Easements and Encroachment Acquisition | $45,478.00 |
| Fiber Optic and Coaxial Cable | $177,160.00 |
| Other Materials--Underground | $231,751.12 |
| Underground Construction Labor | $1,414,880.50 |
| Customer Premise Installation Labor | $220,500.00 |
| Customer Premise Installation Materials | $36,726.75 |
| Customer Premise Equipment (CPE) | $41,492.25 |
| Equipment shelter, land, site preparation, and site restoration costs | $19,800.00 |
| Headend/Central Office/Remote Cabinet Equipment and Installation | $47,185.66 |
| Project and Construction Management | $46,347.00 |
| Contingency | $118,186.00 |
| **Agreement Funds (Total Project Amount)** | **$2,481,907.00** |

| Summary | Amount |
|---|---|
| Grant Funds Maximum Amount | $1,861,407.00 |
| Matching Funds Amount | $620,500.00 |
| Agreement Funds (Total Project Amount) | $2,481,907.00 |
| | |
| Contingency Reserve Funds | $118,186.00 |

**EXHIBIT D**
**PERFORMANCE BOND**

Institution/Agency:

Project No./Name: ______________________________________________

**BONDING COMPANY: DO NOT MAKE ANY CHANGES TO THE LANGUAGE IN THIS BOND.**

**KNOW ALL PERSONS BY THESE PRESENTS:**

That Grantee

as Principal and hereinafter called "Principal,"

and

as Surety and hereinafter called "Surety," a corporation organized and existing under the laws of ________________ ______________________ are held and firmly bound unto **the STATE OF COLORADO** acting by and through___ ____________________________________________

(AGENCY OR INSTITUTION)

hereinafter called the "State Representative", in the sum of ________________________________________________ Dollars ($_____________________________)

for the payment whereof the Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly, by these presents.

**WHEREAS,** the Principal and the State of Colorado acting by and through the State Representative have entered into a certain Agreement, hereinafter called "Agreement" dated __________________________, 20____, for the construction of a Project described as

which Agreement is hereby by reference made a part hereof.

**EXHIBIT D**
**PERFORMANCE BOND**

**NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION,** is such that, if the Principal shall promptly, fully and faithfully perform all the undertakings, covenants, terms, conditions and agreements of said Agreement during the Term of said Agreement, any extensions thereof may be granted by an amendment or through the issuance of an Option Letter, with or without notice to the Surety, and during the life of any guaranty required under the Agreement, and shall also well and truly perform and fulfill all undertakings, covenants, terms, conditions and agreements of any and all duly authorized modifications of said Agreement that may hereafter be made, notice of which modifications to the Surety being hereby waived, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

**AND THE SAID SURETY**, for value received hereby stipulates and agrees that whenever the Principal shall be, and declared by the State Representative to be in default under said Agreement, the State of Colorado having performed its obligations thereunder, the Surety may promptly remedy the default or shall promptly (1) Complete the Agreement in accordance with its terms and conditions, or (2) Obtain a bid or bids for submittal to the State Representative for completing the Agreement in accordance with its terms and conditions, and upon determination by the State Representative and Surety of the lowest responsible bidder, arrange for an agreement between such bidder and the State of Colorado acting by and through the State Representative and make available as Work progresses (even though there should be a default or a succession of defaults under the agreement or agreements of completion arranged under this paragraph) sufficient funds to pay the cost of completion, less the balance of the Agreement price but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount hereinbefore set forth. The term "balance of the Agreement price" as herein used shall mean the total amount payable to the Principal under the Agreement and any amendments thereto, less the amount properly paid by the State of Colorado to Grantee.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the State of Colorado.

**IN WITNESS WHEREOF** said Principal and Surety have executed this Bond, this ____________ day of _______, A.D., ______________________________ 20_____.

(Corporate Seal)

**THE PRINCIPAL**

______________________________________________

**ATTEST:**

By: ______________________________________

Title: ______________________________________

______________________________________________
Secretary

(Corporate Seal)

**SURETY**

______________________________________________

By: ______________________________________
Attorney-in-fact

**THIS BOND MUST BE ACCOMPANIED BY POWER OF ATTORNEY, EFFECTIVELY DATED**

Note: This bond is issued simultaneously with another bond conditioned for the full and faithful payment for all labor and material of the Agreement.

# EXHIBIT E
## LABOR AND MATERIAL PAYMENT BOND

Institution/Agency: ______________________________

Project No./Name: ______________________________

**BONDING COMPANY: DO NOT MAKE ANY CHANGES TO THE LANGUAGE IN THIS BOND.**

KNOW ALL PERSONS BY THESE PRESENTS:

That Grantee

as Principal and hereinafter called "Principal,"

and

as Surety and hereinafter called "Surety," a corporation organized and existing under the laws of ____________________________________ are held and firmly bound unto the STATE OF COLORADO acting by and through ___________________________________________________

(agency or institution)

hereinafter called "State Representative," and to all Subcontractors and any others who have supplied or furnished or shall supply or furnish materials, rental machinery, tools, or equipment actually used in the performance of the hereinafter identified Agreement, or who have performed or shall perform labor in the performance of or in connection with said Agreement, hereinafter called "Obligees" in the sum of __________________________________________ Dollars ($____________________)

together with interest at the rate of eight percent (8%) per annum on all payments becoming due in accordance with said Agreement, from the time such payments shall become due until such payment shall be made, for the payment of which, well and truly made to the Obligees, the Principal and the Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly, by these presents.

**WHEREAS**, the Principal and the State of Colorado, acting by and through the State Representative, have entered into a certain Agreement, hereinafter called "Agreement," dated ________, 20__ for the construction of a Project described as

which Agreement is hereby by reference made a part hereof.

**EXHIBIT E**
**LABOR AND MATERIAL PAYMENT BOND**

**NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION** is such that if the Principal and the Surety shall fully indemnify and save harmless the State of Colorado and the State Representative from and against any and all costs and damages, including patent infringements, which either may suffer by reason of any failure or failures of the Principal promptly and faithfully to perform all terms and conditions of said Agreement and shall fully reimburse and repay the State of Colorado and the State Representative all outlay and expense which the State of Colorado and the State Representative may incur in making good any such failure or failures, and further, if the Principal and its Subcontractors shall duly and promptly pay for any and all labor, materials, team hire, sustenance, provisions, provender, rental machinery, tools, or equipment and other supplies which have been or shall be used or consumed by said Principal or its Subcontractors in the performance of the work of said Agreement, and if said Principal shall duly and promptly pay all its Subcontractors the sums due them for any and all materials, rental machinery, tools, or equipment and labor that have been or shall be furnished, supplied, performed or used in connection with performance of said Agreement, and shall also fully indemnify and save harmless the State of Colorado and the State Representative to the extent of any and all expenditures which either or both of them may be required to make by reason of any failures or defaults by the Principal or any Subcontractor in connection with such payments; then this obligation shall be null and void, otherwise it shall remain in full force and effect.

It is expressly understood and agreed that any alterations which may be made in the terms of said Agreement or in the Work to be done under said Agreement, or any extension(s) of time for the performance of the Agreement, or any forbearance on the part of either the State of Colorado or the Principal to any of the others, shall not in any way release the Principal and the Surety, or either of them, their heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety of any such alteration, extension or forbearance being hereby waived.

**IN WITNESS WHEREOF,** the Principal and the Surety have executed this Bond, this _________ day of ______, A.D., 20__.

(Corporate Seal)

**THE PRINCIPAL**

_______________________________________

**ATTEST:**

By: _______________________________________

_______________________________________
Secretary

Title: _______________________________________

(Corporate Seal)

**SURETY**

_______________________________________

By
: _______________________________________
Attorney-in-fact

- THIS BOND MUST BE ACCOMPANIED BY POWER OF ATTORNEY, EFFECTIVELY DATED

Note: This bond is issued simultaneously with another bond conditioned for the full and faithful performance of the Agreement.

**EXHIBIT F**
**GRANT FEDERAL PROVISIONS**

**1. APPLICABILITY OF PROVISIONS.**

1.1. The Grant to which these Grant Federal Provisions are attached has been funded, in whole or in part, with an Award of Federal funds. In the event of a conflict between the provisions of these Grant Federal Provisions, the Special Provisions, the body of the Grant, or any attachments or exhibits incorporated into and made a part of the Grant, the provisions of these Grant Federal Provisions shall control.

1.2. The State of Colorado is accountable to the Federal Awarding Agency for oversight of their Subrecipients, including ensuring their Subrecipients comply with Federal statutes, Federal Award terms and conditions, and reporting requirements, as applicable.

1.3. Additionally, any Subrecipient that issues a subaward to another entity (2nd tier Subrecipient), must hold the 2nd tier Subrecipient accountable to these provisions and adhere to all reporting requirements.

1.4. These Grant Federal Provisions are subject to the Award as defined in §2 of these Grant Federal Provisions, as may be revised pursuant to ongoing guidance from the relevant Federal or State of Colorado agency or institutions of higher education.

**2. DEFINITIONS.**

2.1. For the purposes of these Grant Federal Provisions, the following terms shall have the meanings ascribed to them below.

2.1.1. "Award" means an award of Federal financial assistance, and the Grant setting forth the terms and conditions of that financial assistance, that an Entity receives or administers.

2.1.2. "Entity" means:

2.1.2.1. a Non-Federal Entity;

2.1.2.2. a foreign public entity;

2.1.2.3. a foreign organization;

2.1.2.4. a non-profit organization;

2.1.2.5. a domestic for-profit organization (for 2 C.F.R. Parts 25 and 170 only);

2.1.2.6. a foreign non-profit organization (for 2 C.F.R. Part 170 only);

2.1.2.7. a Federal agency, but only as a Subrecipient under an Award or Subaward to a non-Federal entity (or 2 C.F.R. § 200.1); or

2.1.2.8. a foreign for-profit organization (for 2 C.F.R. Part 170 only).

2.1.3. "Executive" means an officer, managing partner or any other employee in a management position.

2.1.4. "Federal Awarding Agency" means a Federal agency providing a Federal Award to a Recipient as described in 2 C.F.R. § 200.1.

2.1.5. "Grant" means the Grant to which these Grant Federal Provisions are attached.

2.1.6. "Grantee" means the party or parties identified as such in the Grant to which these Grant Federal Provisions are attached. For the purposes of this Agreement, Grantee is a Subrecipient.

2.1.7. "Non-Federal Entity" means a State, local government, Indian tribe, institution of higher education, or nonprofit organization that carries out a Federal Award as a Recipient or a Subrecipient. Notwithstanding the definition of "non-Federal entity" in 2 C.F.R. § 200.1, for the purposes of this Agreement, the definition of Non-Federal Entity includes for-profit entities.

2.1.8. "Nonprofit Organization" means any corporation, trust, association, cooperative, or other organization, not including IHEs, that:

2.1.8.1. Is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest;

2.1.8.2. Is not organized primarily for profit; and

2.1.8.3. Uses net proceeds to maintain, improve, or expand the operations of the organization.

2.1.9. "OMB" means the Executive Office of the President, Office of Management and Budget.

2.1.10. "Pass-through Entity" means a non-Federal entity that provides a Subaward to a Subrecipient to carry out part of a Federal program.

2.1.11. "Recipient" means the Colorado State agency or institution of higher education identified as the Grantor in the Grant to which these Grant Federal Provisions are attached.

2.1.12. "Subaward" means an award by a Recipient to a Subrecipient or a contractor funded in whole or in part by a Federal Award. The terms and conditions of the Federal Award flow down to the Subaward unless the terms and conditions of the Federal Award specifically indicate otherwise in accordance with 2 C.F.R. § 200.101. The term does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program.

2.1.13. "Subrecipient" or "Subgrantee" means an Entity receiving Federal funds through a Recipient to support the performance of the Federal project or program for which the Federal funds were awarded. A Subrecipient is subject to the terms and conditions of the Federal Award to the Recipient, including program compliance requirements. The term does not include an individual who is a beneficiary of a federal program. For the purposes of this Agreement, Grantee is a Subrecipient.

2.1.14. "System for Award Management (SAM)" means the Federal repository into which an Entity must enter the information required under the Transparency Act, which may be found at http://www.sam.gov.

2.1.15. "Total Compensation" means the cash and noncash dollar value earned by an Executive during the Subrecipient's preceding fiscal year (see 48 C.F.R. § 52.204-10, as prescribed in 48 C.F.R. § 4.1403(a)) and includes the following:

2.1.15.1. Salary and bonus;

2.1.15.2. Awards of stock, stock options, and stock appreciation rights, using the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2005) (FAS 123R), Shared Based Payments;

2.1.15.3. Earnings for services under non-equity incentive plans, not including group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of Executives and are available generally to all salaried employees;

2.1.15.4. Change in present value of defined benefit and actuarial pension plans;

2.1.15.5. Above-market earnings on deferred compensation which is not tax-qualified;

2.1.15.6. Other compensation, if the aggregate value of all such other compensation (e.g., severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the Executive exceeds $10,000.

2.1.16. "Transparency Act" or "FFATA" means the Federal Funding Accountability and Transparency Act of 2006 (Public Law 109-282), as amended by §6202 of Public Law 110-252.

2.1.17. "Uniform Guidance" means the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. The terms and conditions of the Uniform Guidance flow down to Awards to Subrecipients unless the Uniform Guidance or the terms and conditions of the Federal Award specifically indicate otherwise.

2.1.18. "Unique Entity ID" means the Unique Entity ID established by the federal government for a Grantee or Subrecipient at https://sam.gov/content/home.

## 3. COMPLIANCE.

3.1. Grantee shall comply with all applicable provisions of the Transparency Act and the regulations issued pursuant thereto, all applicable provisions of the Uniform Guidance, and all applicable Federal Laws and regulations required by this Federal Award. Any revisions to such provisions or regulations shall automatically become a part of these Grant Federal Provisions, without the necessity of either party executing any further instrument. The State of Colorado, at its discretion, may provide written notification to Grantee of such revisions, but such notice shall not be a condition precedent to the effectiveness of such revisions.

**4. SYSTEM FOR AWARD MANAGEMENT (SAM) AND UNIQUE ENTITY ID REQUIREMENTS.**

4.1. SAM. Grantee shall maintain the currency of its information in SAM until Grantee submits the final financial report required under the Award or receives final payment, whichever is later. Grantee shall review and update SAM information at least annually.

4.2. Unique Entity ID. Grantee shall provide its Unique Entity ID to its Recipient, and shall update Grantee's information at http://www.sam.gov at least annually after the initial registration, and more frequently if required by changes in Grantee's information.

**5. TOTAL COMPENSATION.**

5.1. Grantee shall include Total Compensation in SAM for each of its five most highly compensated Executives for the preceding fiscal year if:

5.1.1. The total Federal funding authorized to date under the Award is $30,000 or more; and

5.1.2. In the preceding fiscal year, Grantee received:

5.1.2.1. 80% or more of its annual gross revenues from Federal procurement Agreements and Subcontractors and/or Federal financial assistance Awards or Subawards subject to the Transparency Act; and

5.1.2.2. $30,000,000 or more in annual gross revenues from Federal procurement Agreements and Subcontractors and/or Federal financial assistance Awards or Subawards subject to the Transparency Act; and

5.1.2.3. The public does not have access to information about the compensation of such Executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78m(a), 78o(d) or § 6104 of the Internal Revenue Code of 1986.

**6. REPORTING.**

6.1. Pursuant to the Transparency Act, Grantee shall report data elements to SAM and to the Recipient as required in this Exhibit. No direct payment shall be made to Grantee for providing any reports required under these Grant Federal Provisions. The reporting requirements in this Exhibit are based on guidance from the OMB, and as such are subject to change at any time by OMB. Any such changes shall be automatically incorporated into this Grant and shall become part of Grantee's obligations under this Grant.

**7. EFFECTIVE DATE AND DOLLAR THRESHOLD FOR FEDERAL REPORTING.**

7.1. Reporting requirements in §8 below apply to new Awards as of October 1, 2010, if the initial award is $30,000 or more. If the initial Award is below $30,000 but subsequent Award modifications result in a total Award of $30,000 or more, the Award is subject to the reporting requirements as of the date the Award exceeds $30,000. If the initial Award is $30,000 or more, but funding is subsequently de-obligated such that the total award amount falls below $30,000, the Award shall continue to be subject to the reporting requirements. If the total award is below $30,000 no reporting required; if more than $30,000 then FFATA reporting is required.

7.2. The standards set forth in §11 below are applicable to audits of fiscal years beginning on or after December 26, 2014.

**8. SUBRECIPIENT REPORTING REQUIREMENTS.**

8.1. Grantee shall report as set forth below.

8.1.1. Grantee shall report to the State within fifteen (15) days after the end of each calendar quarter ending in September, December, March, and June.

8.1.2. A Subrecipient shall report the following data elements to Recipient no later than five days after the end of the month following the month in which the Subaward was made.

8.1.2.1. Subrecipient UEI Number;

8.1.2.2. Subrecipient UEI Number if more than one electronic funds transfer (EFT) account;

8.1.2.3. Subrecipient parent's organization UEI Number;

8.1.2.4. Subrecipient's address, including: Street Address, City, State, Country, Zip + 4, and Congressional District;

8.1.2.5. Subrecipient's top 5 most highly compensated Executives if the criteria in §4 above are met; and

8.1.2.6. Subrecipient's Total Compensation of top 5 most highly compensated Executives if the criteria in §4 above met.

8.1.3. To Recipient, a Subrecipient shall report, the following data elements:

8.1.3.1. Subrecipient's UEI Number as registered in SAM.

8.1.3.2. Primary Place of Performance Information, including: Street Address, City, State, Country, Zip code + 4, and Congressional District.

8.1.3.3. For infrastructure projects or capital expenditures, narrative identifying the projected construction start date (month/year), projected initiation of operations date (month/year), and location (for broadband, geospatial location data).

8.1.3.3.1. For projects of $5 million or more (based on expected total cost):

8.1.3.3.1.1. Certification that all laborers and mechanics employed by contractors and Subcontractors in the performance of such project are paid wages at rates not less than those prevailing, as determined by the U.S. Secretary of Labor in accordance with subchapter IV of chapter 31 of title 40, United States Code (commonly known as the "Davis-Bacon Act"), for the corresponding classes of laborers and mechanics employed on projects of a character similar to the Agreement work in the civil subdivision of the State (or the District of Columbia) in which the work is to be performed, or by the appropriate State entity pursuant to a corollary State prevailing-wage-in-construction law (commonly known as "baby Davis-Bacon Acts"). If such certification is not provided, a recipient must provide a project employment and local impact report detailing: (1) the number of employees of contractors and Subcontractors working on the project; (2) the number of employees on the project hired directly and hired through a third party; (3) the wages and benefits of workers on the project by classification; and (4) whether those wages are at rates less than those prevailing. Recipients must maintain sufficient records to substantiate this information upon request.

8.1.3.3.1.2. A Subrecipient may provide a certification that a project includes a project labor agreement, meaning a pre-hire collective bargaining agreement consistent with section 8(f) of the National Labor Relations Act (29 U.S.C. § 158(f)). If the recipient does not provide such certification, the recipient must provide a project workforce continuity plan, detailing: (i) how the Subrecipient will ensure the project has ready access to a sufficient supply of appropriately skilled and unskilled labor to ensure high-quality construction throughout the life of the project; (ii) how the Subrecipient will minimize risks of labor disputes and disruptions that would jeopardize timeliness and cost-effectiveness of the project; and (iii) how the Subrecipient will provide a safe and healthy workplace that avoids delays and costs associated with workplace illnesses, injuries, and fatalities; (4) whether workers on the project will receive wages and benefits that will secure an appropriately skilled workforce in the context of the local or regional labor market; and (5) whether the project has completed a project labor agreement.

8.1.3.3.1.3. Whether the project prioritizes local hires.

8.1.3.3.1.4. Whether the project has a Community Benefit Agreement, with a description of any such agreement.

8.1.4. Subrecipient also agrees to comply with any reporting requirements established by the Federal Awarding Agency, Governor's Office and Office of the State Controller. The State of Colorado may need additional reporting requirements after this Agreement is executed. If there are additional reporting requirements, the State will provide notice in writing of such additional reporting requirements.

## 9. PROCUREMENT STANDARDS.

9.1. Procurement Procedures. A Subrecipient shall use its own documented procurement procedures which reflect applicable State, local, and Tribal laws and applicable regulations, provided that the procurements conform to applicable Federal law.

9.2. Never contract with the enemy (2 C.F.R. § 200.215). Federal awarding agencies and recipients are subject to the regulations implementing "Never contract with the enemy" in 2 C.F.R. Part 183. The regulations in 2 C.F.R. Part 183 affect covered contracts, grants and cooperative agreements that are expected to exceed $50,000 within the period of performance, are performed outside the United States and its territories, and are in support of a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

9.3. Prohibition on certain telecommunications and video surveillance services or equipment (2 C.F.R. § 200.216). Subrecipient is prohibited from obligating or expending loan or grant funds on certain telecommunications and video surveillance services or equipment pursuant to 2 C.F.R. § 200.216.

**10. ACCESS TO RECORDS.**

10.1. A Subrecipient shall permit Recipient and its auditors to have access to Subrecipient's records and financial statements as necessary for Recipient to meet the requirements of 2 C.F.R. § 200.332 (Requirements for pass-through entities), 2 C.F.R. § 200.300 (Statutory and national policy requirements) through 2 C.F.R. § 200.309 (Period of performance), and Subpart F-Audit Requirements of the Uniform Guidance.

**11. SINGLE AUDIT REQUIREMENTS.**

11.1. If a Subrecipient, other than a for-profit entity, expends $750,000 or more in Federal Awards during the Subrecipient's fiscal year, the Subrecipient shall procure or arrange for a single or program-specific audit conducted for that year in accordance with the provisions of Subpart F-Audit Requirements of the Uniform Guidance, issued pursuant to the Single Audit Act Amendments of 1996, (31 U.S.C. § 7501-7507). 2 C.F.R. § 200.501.

11.1.1. Election. A Subrecipient shall have a single audit conducted in accordance with Uniform Guidance 2 C.F.R. § 200.514 (Scope of audit), except when it elects to have a program-specific audit conducted in accordance with 2 C.F.R. § 200.507 (Program-specific audits). The Subrecipient may elect to have a program-specific audit if Subrecipient expends Federal Awards under only one Federal program (excluding research and development) and the Federal program's statutes, regulations, or the terms and conditions of the Federal Award do not require a financial statement audit of Recipient. A program-specific audit may not be elected for research and development unless all of the Federal Awards expended were received from Recipient and Recipient approves in advance a program-specific audit.

11.1.2. Exemption. If a Subrecipient expends less than $750,000 in Federal Awards during its fiscal year, the Subrecipient shall be exempt from Federal audit requirements for that year, except as noted in 2 C.F.R. § 200.503 (Relation to other audit requirements), but records shall be available for review or audit by appropriate officials of the Federal agency, the State, and the Government Accountability Office.

11.1.3. Subrecipient Compliance Responsibility. A Subrecipient shall procure or otherwise arrange for the audit required by Subpart F of the Uniform Guidance and ensure it is properly performed and submitted when due in accordance with the Uniform Guidance. Subrecipient shall prepare appropriate financial statements, including the schedule of expenditures of Federal Awards in accordance with 2 C.F.R. § 200.510 (Financial statements) and provide the auditor with access to personnel, accounts, books, records, supporting documentation, and other information as needed for the auditor to perform the audit required by Uniform Guidance Subpart F-Audit Requirements.

**12. REQUIRED PROVISIONS FOR SUBRECIPIENT WITH SUBCONTRACTORS.**

12.1. In addition to other provisions required by the Federal Awarding Agency or the Recipient, Grantee shall include all of the following applicable provisions in all subcontracts entered into by it pursuant to this Grant:

12.1.1. For grant agreements with Subrecipients, include the terms in the Grant Federal Provisions Exhibit located at https://osc.colorado.gov/spco/central-contracts-unit/contract-grant-forms under "Special Attachments to Contracts & Grants."

12.1.2. For contracts with Subcontractors, include the terms in the Contract Federal Provisions Exhibit located at https://osc.colorado.gov/spco/central-contracts-unit/contract-grant-forms under "Special Attachments to Contracts & Grants," excluding section 4.11. Contracts with small and minority businesses, women's business enterprises, and labor surplus area firms. (2 C.F.R. §200.321); section 4.12. Domestic preferences for procurements. (2 C.F.R. §200.322); and section 4.13 Procurement of recovered materials. (2 C.F.R. §200.323).

**13. CERTIFICATIONS.**

13.1. Unless prohibited by Federal statutes or regulations, Recipient may require Subrecipient to submit certifications and representations required by Federal statutes or regulations on an annual basis. 2 C.F.R. § 200.208. Submission may be required more frequently if Subrecipient fails to meet a requirement of the Federal Award. Subrecipient shall certify in writing to the State at the end of the Award that the project or activity was completed or the level of effort was expended. 2 C.F.R. § 200.201(3). If the required level of activity or effort was not carried out, the amount of the Award must be adjusted.

**14. EXEMPTIONS.**

[RESERVED].

**15. EVENT OF DEFAULT AND TERMINATION.**

15.1. Failure to comply with these Grant Federal Provisions shall constitute an event of default under the Grant and the State of Colorado may terminate the Grant upon thirty (30) days prior written notice if the default remains uncured five (5) days following the termination of the thirty-day (30-day) notice period. This remedy will be in addition to any other remedy available to the State of Colorado under the Grant, at law or in equity.

15.2. Termination (2 C.F.R. § 200.340). The Federal Award may be terminated in whole or in part as follows:

15.2.1. By the Federal Awarding Agency or Pass-through Entity, if a Subrecipient fails to comply with the terms and conditions of a Federal Award;

15.2.2. By the Federal Awarding Agency or Pass-through Entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

15.2.3. By the Federal Awarding Agency or Pass-through Entity with the consent of the Subrecipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated;

15.2.4. By the Subrecipient upon sending to the Federal Awarding Agency or Pass-through Entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal Awarding Agency or Pass-through Entity determines in the case of partial termination that the reduced or modified portion of the Federal Award or Subaward will not accomplish the purposes for which the Federal Award was made, the Federal Awarding Agency or Pass-through Entity may terminate the Federal Award in its entirety; or

15.2.5. By the Federal Awarding Agency or Pass-through Entity pursuant to termination provisions included in the Federal Award.

**EXHIBIT G**
**AGREEMENT WITH SUBRECIPIENT**
**OF FEDERAL RECOVERY FUNDS and TERMS AND CONDITIONS**

Section 604(b) of the Social Security Act (the Act), as added by section 9901 of the American Rescue Plan Act (ARPA), Pub. L. No. 117-2 (March 11, 2021), authorizes the U.S. Department of the Treasury (Treasury) to make payments to certain recipients from the Coronavirus Capital Projects Fund (CPF). As a condition of your organization receiving federal recovery funds from the State, the authorized representative below hereby (i) certifies that your organization will carry out the relevant activities listed in section 604 of the Act and (ii) agrees to the terms attached hereto. Your organization also agrees to use the federal recovery funds as specified by the State of Colorado.

The funds disbursed under this Award will be subject to the requirements of the CPF program and all applicable federal statutes, regulations, executive orders, the Guidance for the Coronavirus Capital Projects Funds for States, Territories and Freely Associated States issued by Treasury on September 20, 2021, as it may be amended from time to time, and any other guidance issued by Treasury regarding the CPF, including the "SLFRF and CPF Supplementary Broadband Guidance" issued by the U.S. Department of the Treasury on May 17, 2023 (collectively, "Guidance").

1. Use of Funds.
    a. Subrecipient understands and agrees that the funds disbursed under this Award may only be used in compliance with §604 of the Social Security Act (the Act) and Treasury's regulations implementing that section and Guidance.
    b. Costs are subject to the requirements of the cost principles provided in 2 C.F.R. § 200 subpart E and any other restrictions Treasury or the State of Colorado may impose as a condition of approving this Agreement.
    c. Subrecipient will determine prior to engaging in any project using this assistance that it has the institutional, managerial, and financial capability to ensure proper planning, management, and completion of such project.
2. Period of Performance. The period of performance for this subaward is shown on page one of this Agreement. Subrecipient may use funds to cover eligible costs incurred, as set forth in Treasury's implementing regulations, and Guidance, during this period of performance.
3. Reporting. Subrecipient agrees to comply with any reporting obligations established by Treasury as they relate to Subrecipient performance under this Agreement, including, without limitation the submission of quarterly project and expenditure reports, annual performance reports and the submission of information on Subrecipient's workforce plans and practices related to the Award and subcontracted entities. Subrecipient also agrees to comply with any reporting requirements established by the Governor's Office, and the Office of the State Controller, and the Governor's Office of Information Technology. The State will provide notice of such reporting requirements in writing. Subrecipient acknowledges that any such information required to be reported pursuant to this section may be publicly disclosed.
4. Maintenance of and Access to Records
    a. Subrecipient shall maintain records and financial documents sufficient to evidence compliance with §604 Treasury's regulations implementing that section, and guidance issued by Treasury regarding the foregoing.
    b. The Treasury Office of Inspector General and the Government Accountability Office, or their authorized representatives, shall have the right of access to records (electronic and otherwise) of Subrecipient in order to conduct audits or other investigations.
    c. Records shall be maintained by Subrecipient for a period of five (5) years after all funds have been expended or returned to Treasury, whichever is later.
5. Pre-award Costs. [RESERVED].
6. Administrative Costs. Subrecipient may not use funds provided under this Award to cover either direct or indirect administrative costs.

7. Cost Sharing. [RESERVED].

8. Conflicts of Interest. Subrecipient and Subcontractors must disclose in writing to the State, as appropriate, any potential conflict of interest affecting the awarded funds in accordance with 2 C.F.R. § 200.112.

9. Compliance with Applicable Law and Regulations.

   a. Subrecipient agrees to comply with the requirements of section 602 of the Act, regulations adopted by Treasury pursuant to section 602(f) of the Act, and guidance issued by Treasury regarding the foregoing. Subrecipient also agrees to comply with all other applicable federal statutes, regulations, and executive orders, and Subrecipient shall provide for such compliance by other parties in any agreements it enters into with other parties relating to this award.

   b. Federal regulations applicable to this Award include, without limitation, the following:

      i. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, **other than such provisions as the U.S. Department of the Treasury may determine are inapplicable to this Agreement and subject to such exceptions as may be otherwise provided by Treasury, as updated from time to time.** Subpart F – Audit Requirements of the Uniform Guidance, implementing the Single Audit Act, shall apply to this Agreement.

      ii. Universal Identifier and System for Award Management (SAM), 2 C.F.R. Part 25, pursuant to which the award term set forth in Appendix A to 2 C.F.R. Part 25 is hereby incorporated by reference.

      iii. Reporting Subaward and Executive Compensation Information, 2 C.F.R. Part 170, pursuant to which the award term set forth in Appendix A to 2 C.F.R. Part 170 is hereby incorporated by reference.

      iv. OMB Guidelines to Agencies on Government wide Debarment and Suspension (Nonprocurement), 2 C.F.R. Part 180, including the requirement to include a term or condition in all lower tier covered transactions (Agreements and Subcontractors described in 2 C.F.R. Part 180, subpart B) that the award is subject to 2 C.F.R. Part 180 and Treasury's implementing regulation at 31 C.F.R. Part 19.

      v. Subrecipient Integrity and Performance Matters, pursuant to which the award term set forth in 2 C.F.R. Part 200, Appendix XII to Part 200 is hereby incorporated by reference.

      vi. Government wide Requirements for Drug-Free Workplace, 31 C.F.R. Part 20.

      vii. New Restrictions on Lobbying, 31 C.F.R. Part 21.

      viii. Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (42 U.S.C. §§ 4601-4655) and implementing regulations.

      ix. Generally applicable federal environmental laws and regulations.

   c. Statutes and regulations prohibiting discrimination applicable to this award include, without limitation, the following:

      i. Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq.*) and Treasury's implementing regulations at 31 C.F.R. Part 22, which prohibit discrimination on the basis of race, color, or national origin under programs or activities receiving federal financial assistance;

      ii. The Fair Housing Act, Title VIII of the Civil Rights Act of 1968 (42 U.S.C. §§ 3601 *et seq.*), which prohibits discrimination in housing on the basis of race, color, religion, national origin, sex, familial status, or disability;

      iii. Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794), which prohibits discrimination on the basis of disability under any program or activity receiving federal financial assistance;

      iv. The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101 *et seq.*), and Treasury's implementing regulations at 31 C.F.R. Part 23, which prohibit discrimination on the basis of age in programs or activities receiving federal financial assistance; and

      v. Title II of the Americans with Disabilities Act of 1990, as amended (42 U.S.C. §§ 12101 *et seq.*), which prohibits discrimination on the basis of disability under programs, activities, and services provided or made available by state and local governments or instrumentalities or agencies thereto.

10. Remedial Actions. In the event of Subrecipient's noncompliance with section 602 of the Act, other applicable laws, Treasury's implementing regulations, guidance, or any reporting or other program requirements, Treasury may impose additional conditions on the receipt of a subsequent tranche of future award funds, if any, or take other available remedies as set forth in 2 C.F.R. § 200.339. In the case of a violation of section 604 of the Act regarding the use of funds, previous payments shall be subject to recoupment as provided in section 604 of the Act and any additional payments may be subject to withholding as provided in sections 604 of the Act, as applicable.

11. Hatch Act. Subrecipient agrees to comply, as applicable, with requirements of the Hatch Act (5 U.S.C.§§ 1501-1508 and 7324-7328), which limit certain political activities of State or local government employees whose principal employment is in connection with an activity financed in whole or in part by this federal assistance.

12. False Statements. Subrecipient understands that making false statements or claims in connection with this award is a violation of federal law and may result in criminal, civil, or administrative sanctions, including fines, imprisonment, civil damages and penalties, debarment from participating in federal awards or agreements, and/or any other remedy available by law.

13. Publications. Any publications produced with funds from this award must display the following language: "This project [is being] [was] supported, in whole or in part, by federal award number CPFFN0142 awarded to the State of Colorado by the U.S. Department of the Treasury."

14. Debts Owed the Federal Government.

    a. Any funds paid to the Subrecipient (1) in excess of the amount to which the Subrecipient is finally determined to be authorized to retain under the terms of this Agreement; (2) that are determined by the Office of Inspector General to have been misused; or (3) that are determined to be subject to a repayment obligation and have not been repaid by the Subrecipient shall constitute a debt to the federal government.

    b. Any debts determined to be owed to the federal government must be paid promptly by Subrecipient. A debt is delinquent if it has not been paid by the date specified in Treasury's initial written demand for payment, unless other satisfactory arrangements have been made or if the Subrecipient knowingly or improperly retains funds that are a debt as defined in paragraph 14(a). Treasury will take any actions available to it to collect such a debt.

15. Disclaimer.

    a. The United States expressly disclaims any and all responsibility or liability to Subrecipient or third persons for the actions of Subrecipient or third persons resulting in death, bodily injury, property damages, or any other losses resulting in any way from the performance of this Award or any other losses resulting in any way from the performance of this Award or any agreement, or subcontract under this Award.

    b. The acceptance of this Award by Subrecipient does not in any way establish an agency relationship between the United States and Subrecipient.

16. Protections for Whistleblowers.

    a. In accordance with 41 U.S.C. § 4712, Subrecipient may not discharge, demote, or otherwise discriminate against an employee in reprisal for disclosing to any of the list of persons or entities provided below, information that the employee reasonably believes is evidence of gross mismanagement of a federal agreement or grant, a gross waste of federal funds, an abuse of authority relating to a federal agreement or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal agreement (including the competition for or negotiation of an agreement) or grant.

    b. The list of persons and entities referenced in the paragraph above includes the following:

        i. A member of Congress or a representative of a committee of Congress;

        ii. An Inspector General;

        iii. The Government Accountability Office;

        iv. A Treasury employee responsible for agreement or grant oversight or management;

        v. An authorized official of the Department of Justice or other law enforcement agency;

        vi. A court or grand jury; or

        vii. A management official or other employee of Subrecipient, contractor, or Subcontractor who has the responsibility to investigate, discover, or address misconduct.

c. Subrecipient shall inform its employees in writing of the rights and remedies provided under this section, in the predominant native language of the workforce.

17. Increasing Seat Belt Use in the United States. Pursuant to Executive Order 13043, 62 FR 19217 (Apr. 18, 1997), Subrecipient should encourage its contractors to adopt and enforce on-the-job seat belt policies and programs for their employees when operating company-owned, rented or personally owned vehicles.

18. Reducing Text Messaging While Driving. Pursuant to Executive Order 13513, 74 FR 51225 (Oct. 6, 2009), Subrecipient should encourage its employees, Subrecipients, and contractors to adopt and enforce policies that ban text messaging while driving, and Subrecipient should establish workplace safety policies to decrease accidents caused by distracted drivers.

19. Federal Interest and Insurance. Subrecipient agrees that any equipment, supplies or real property purchased, or in the case of real property, improved, using Award funds will be used for the purpose and in the manner described in the Agreement, subject to the Guidance, the requirements of 2 C.F.R. § 200.310 Insurance, 2 C.F.R. § 200.311 Real Property, 2 C.F.R. § 200.313 Equipment, 2 C.F.R. § 200.314 Supplies, 2 C.F.R. § 200.315 Intangible Property, as applicable, and any other restriction Treasury may impose as a condition of the originating award.

20. Use of Buildings. Subrecipient agrees that any building constructed or improved using Award funds to jointly and directly enable work, education and health monitoring will be used for all three of these purposes for a period of at least five years after completion of the construction of or improvement to such a building.

21. Broadband Infrastructure Projects. Subrecipient agrees that with respect to any completed broadband infrastructure Project:

a. The Project will be designed to deliver, upon completion, service that reliably meets or exceeds symmetrical download and upload speeds of 100 Mbps. If it would be impracticable to do so, any such broadband infrastructure Project will be designed so that it reliability meets or exceeds 100 Mbps download speeds and between 20 Mbps and 100 Mbps upload speeds and is scalable to a minimum of 100 Mbps symmetrical for download and upload speeds.

b. Subrecipient will provide pricing data to the State as part of program performance and monitoring for such broadband infrastructure Project.

c. Subrecipient will require (or in the case that the Subrecipient is a service provider, affirm) that any service provider for a completed broadband infrastructure Project participate in federal programs that provide low-income consumers with subsidies on broadband internet access services. Subrecipient agrees that it will require completed service offering funded by the Award to allow subscribers in the Service Area to utilize the Federal Communications Commission's Emergency Broadband Benefit program (if available) or the Affordable Connectivity Program (ACP). Subrecipient further agrees that it will require that any service provider for a completed broadband infrastructure Project will participate in ACP for the duration of the ACP or until the date the broadband infrastructure Project funded by this Award is no longer in use.

## ASSURANCES OF COMPLIANCE WITH CIVIL RIGHTS REQUIREMENTS

ASSURANCES OF COMPLIANCE WITH TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

As a condition of receipt of federal financial assistance from the U.S. Department of the Treasury (Treasury), the Subrecipient provides the assurances stated herein. The federal financial assistance may include federal grants, loans and agreements to provide assistance to the Subrecipient's beneficiaries, the use or rent of Federal land or property at below market value, Federal training, a loan of Federal personnel, subsidies, and other arrangements with the intention of providing assistance. Federal financial assistance does not encompass agreements of guarantee or insurance, regulated programs, licenses, procurement agreements by the Federal government at market value, or programs that provide direct benefits.

The assurances apply to all federal financial assistance from or funds made available through the Department of the Treasury, including any assistance that the Subrecipient may request in the future.

The Civil Rights Restoration Act of 1987 provides that the provisions of the assurances apply to all of the operations of the Subrecipient's program(s) and activity(ies), so long as any portion of the Subrecipient's program(s) or activity(ies) is federally assisted in the manner prescribed above.

1. Subrecipient ensures its current and future compliance with Title VI of the Civil Rights Act of 1964, as amended, which prohibits exclusion from participation, denial of the benefits of, or subjection to discrimination under programs and activities receiving federal financial assistance, of any person in the United States on the ground of race, color, or national origin (42 U.S.C. § 2000d *et seq.*), as implemented by the Department of the Treasury Title VI regulations at 31 C.F.R Part 22 and other pertinent executive orders such as Executive Order 13166, directives, circulars, policies, memoranda, and/or guidance documents.
2. Subrecipient acknowledges that Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," seeks to improve access to federally assisted programs and activities for individuals who, because of national origin, have Limited English proficiency (LEP). Subrecipient understands that denying a person access to its programs, services, and activities because of LEP is a form of national origin discrimination prohibited under Title VI of the Civil Rights Act of 1964 and the Department of the Treasury's implementing regulations. Accordingly, Subrecipient shall initiate reasonable steps, or comply with the Department of the Treasury's directives, to ensure that LEP persons have meaningful access to its programs, services, and activities. Subrecipient understands and agrees that meaningful access may entail providing language assistance services, including oral interpretation and written translation where necessary, to ensure effective communication in the Subrecipient's programs, services, and activities.
3. Subrecipient agrees to consider the need for language services for LEP persons when Subrecipient develops applicable budgets and conducts programs, services, and activities. As a resource, the Department of the Treasury has published its LEP guidance at 70 FR 6067. For more information on taking reasonable steps to provide meaningful access for LEP persons, please visit http://www.lep.gov.
4. Subrecipient acknowledges and agrees that compliance with the assurances constitutes a condition of continued receipt of federal financial assistance and is binding upon Subrecipient and Subrecipient's successors, transferees, and assignees for the period in which such assistance is provided.
5. Subrecipient acknowledges and agrees that it must require any Subgrantees, contractors, Subcontractors, successors, transferees, and assignees to comply with assurances 1-4 above, and agrees to incorporate the following language in every agreement subject to Title VI and its regulations between the Subrecipient and the Subrecipient's Subgrantees, contractors, Subcontractors, successors, transferees, and assignees:

   *The Subgrantee, contractor, Subcontractor, successor, transferee, and assignee shall comply with Title VI of the Civil Rights Act of 1964, which prohibits Subrecipients of federal financial assistance from excluding from a program or activity, denying benefits of, or otherwise discriminating against a person on the basis of race, color, or national origin (42 U.S.C. § 2000d et seq.), as implemented by the Department of the Treasury's Title VI regulations, 31 C.F.R. Part 22, which are herein incorporated by reference and made a part of this Agreement. Title VI also includes protection to persons with "Limited English Proficiency" in any program or activity receiving federal financial assistance, 42 U.S.C. § 2000d et seq., as implemented by the Department of the Treasury's Title VI regulations, 31 C.F.R. Part 22, and herein incorporated by reference and made a part of this Agreement.*

6. Subrecipient understands and agrees that if any real property or structure is provided or improved with the aid of federal financial assistance by the Department of the Treasury, this assurance obligates the Subrecipient, or in the case of a subsequent transfer, the transferee, for the period during which the real property or structure is used for a purpose for which the federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. If any personal property is provided, this assurance obligates the Subrecipient for the period during which it retains ownership or possession of the property.
7. Subrecipient shall cooperate in any enforcement or compliance review activities by the Department of the Treasury of the aforementioned obligations. Enforcement may include investigation, arbitration, mediation, litigation, and monitoring of any settlement agreements that may result from these actions. The Subrecipient shall comply with information requests, on-site compliance reviews and reporting requirements.
8. Subrecipient shall maintain a complaint log and inform the Department of the Treasury of any complaints of discrimination on the grounds of race, color, or national origin, and limited English proficiency covered by Title VI of the Civil Rights Act of 1964 and implementing regulations and provide, upon request, a list of all such reviews or proceedings based on the complaint, pending or completed, including outcome. Subrecipient also must inform the Department of the Treasury if Subrecipient has received no complaints under Title VI.
9. Subrecipient must provide documentation of an administrative agency's or court's findings of non-compliance of Title VI and efforts to address the non-compliance, including any voluntary compliance or other agreements between the Subrecipient and the administrative agency that made the finding. If the Subrecipient settles a case or matter alleging such discrimination, the Subrecipient must provide documentation of the settlement. If Subrecipient has not been the subject of any court or administrative agency finding of discrimination, please so state.
10. If the Subrecipient makes subawards to other agencies or other entities, the Subrecipient is responsible for ensuring that sub-Subrecipients also comply with Title VI and other applicable authorities covered in this document State agencies that make subawards must have in place standard grant assurances and review procedures to demonstrate that that they are effectively monitoring the civil rights compliance of sub-Subrecipients.

The United States of America has the right to seek judicial enforcement of the terms of this assurances document and nothing in this document alters or limits the federal enforcement measures that the United States may take in order to address violations of this document or applicable federal law.

**EXHIBIT H**
**PII CERTIFICATION**

**STATE OF COLORADO**
**THIRD PARTY ENTITY / ORGANIZATION CERTIFICATION FOR ACCESS TO PII THROUGH A DATABASE OR AUTOMATED NETWORK**

Pursuant to §24-74-105, C.R.S., I, David Lindauer, on behalf of Maverix Broadband, Inc. (the "Organization"), hereby certify under the penalty of perjury that the Organization has not and will not use or disclose any Personal Identifying Information, as defined by §24-74-102(1), C.R.S., for the purpose of investigating for, participating in, cooperating with, or assisting Federal Immigration Enforcement, including the enforcement of civil immigration laws, and the Illegal Immigration and Immigrant Responsibility Act, which is codified at 8 U.S.C. §§ 1325 and 1326, unless required to do so to comply with Federal or State law, or to comply with a court-issued subpoena, warrant or order.

I hereby represent and certify that I have full legal authority to execute this certification on behalf of the Organization.

Signature: DocuSigned by: David Lindauer 5A71151C09CC45C...
Printed Name: David Lindauer
Title: CEO
Date: 5/30/2024

**EXHIBIT I**
**[RESERVED]**

**EXHIBIT J**
**CERTIFICATION OF BROADBAND SPEEDS**

The U.S. Department of the Treasury states "eligible projects are expected to be designed to deliver, upon project completion, service that reliably meets or exceeds symmetrical upload and download speeds of 100 Mbps. There may be instances in which it would not be practicable for a project to deliver such service speeds because of the geography, topography, or excessive costs associated with such a project. In these instances, the affected project would be expected to be designed to deliver, upon project completion, service that reliably meets or exceeds 100 Mbps download and between at least 20 Mbps and 100 Mbps upload speeds and be scalable to a minimum of 100 Mbps symmetrical for download and upload speeds."

The U.S. Department of the Treasury states "Recipients will be required to report speed, pricing, and any data allowance information as part of mandatory reporting to the Treasury."

By signing this form, Grantee agrees to and acknowledges that all funds shall be used for systems that meet or exceed symmetrical upload and download speeds of 100 Mbps, and that Grantee will provide third party testing or certification of the speed at no additional cost to the State, pricing and data allowance details.

DocuSigned by:
David Lindauer
5A71151C09CC45C...

5/30/2024
Date

DocuSigned by:
544C1CF265CA418...
ency Grant Manager

5/30/2024
Date

# EXHIBIT K
## ASSURANCES OF COMPLIANCE WITH 2 C.F.R. § 200.216 PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT

As a condition of receipt of federal financial assistance from the Federal Government, any Subrecipient provides the assurances stated herein.

As required by 2 C.F.R. § 200.216, recipients and Subrecipients of federal funds, including borrowers, are prohibited from obligating or expending loan or grant funds to procure or obtain; extend or renew a contract to procure or obtain; or enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities). Recipients, Subrecipients, and borrowers also may not use federal funds to purchase:

a. For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).
b. Telecommunications or video surveillance services provided by such entities or using such equipment.
c. Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country. Consistent with 2 C.F.R. § 200.471, costs incurred for telecommunications and video surveillance services or equipment such as phones, internet, video surveillance, and cloud servers are allowable except for the following circumstances:

1. Obligating or expending federal funds for covered telecommunications and video surveillance services or equipment or services as described in 2 C.F.R. § 200.216 to:
   a. Procure or obtain, extend or renew a contract to procure or obtain;
   b. Enter into a contract (or extend or renew a contract) to procure; or
   c. Obtain the equipment, services, or systems. Certain prohibited equipment, systems, or services, including equipment, systems, or services produced or provided by entities identified in section 889, are recorded in the System for Award Management exclusion list.

Federal funds may not be used for purchases of equipment from vendors listed in Public Law 115-232. Any equipment purchased from a proscribed vendor using federal funds shall be removed and replaced by Grantee at Grantee's expense. Ineligible costs may be disallowed or recaptured by the State or Federal Government.

DocuSigned by:
David Lindauer
5A71151C09CC45C... ______________________ 5/30/2024
Date

DocuSigned by:
544C1CF265CA418... ______________________ 5/30/2024
State Agency Grant Manager Date

**EXHIBIT L**
**CERTIFICATION OF LAST MILE**

Colorado Advance Broadband programs must "focus on projects that will achieve last-mile connections, whether by focusing directly on funding last-mile projects or by ensuring that funded middle-mile projects have commitments in place to support new and/or improved last-mile service".

By signing this form, Grantee certifies that all funds used will be used to achieve last mile connection. Grantees shall submit documentation to the State's satisfaction certifying that funded middle mile projects have partnered with a last mile network provider.

DocuSigned by:
David Lindauer
5A71151C09CC45C... e

5/30/2024
Date

DocuSigned by:
544C1CF265CA418... y Grant Manager

5/30/2024
Date

**EXHIBIT M**
**ACKNOWLEDGMENT OF REPORTING REQUIREMENTS**

The Federal Awarding Agencies periodically update compliance and reporting requirements. The State will provide updated reporting requirements and guidance to Grantee based on Federal Awarding Agency guidelines.

By signing this form, Grantee agrees to and acknowledges that they must submit additional required programmatic data upon the release of any new federal or state requirements.

DocuSigned by:
David Lindauer
5A71151C09CC45C...

5/30/2024
Date

**EXHIBIT N**
**NOTICE TO PROCEED**

COLORADO

STATE OF COLORADO
COLORADO BROADBAND OFFICE

NOTICE TO PROCEED TO PHASE __ OF THE PROJECT

Date of Notice: ______________________
Date to be inserted by the State

Notice No./Date: ______________________

Phase No./Description: ______________________

Grantee: ______________________

Project No./Name: ______________________

To:

This is to advise Grantee that Grantee's Performance Bond, Labor and Material Payment Bond, Insurance Policies (upon request) and Certificates of Insurance have been received by the State. The State's issuance of this Notice to Proceed does not relieve Grantee of responsibility to assure that the bond and insurance requirements of the Agreement are met for the duration of the Agreement. This Notice to Proceed for the above-described Work has been fully executed.

Grantee is hereby authorized and directed to proceed to Phase __ within ten (10) days from the date of this Notice to Proceed, as indicated in Exhibit A of this Agreement.

By: ______________________________________________
Colorado Broadband Office Authorized Representative Date

When issued by the State, this Notice to Proceed is to be delivered to the Principal Representative of Grantee.

**EXHIBIT O**
**CERTIFICATION OF NEED**

Federal Award requirements state "eligible areas for investment are projects designed to provide service to households and businesses with an identified need for additional broadband infrastructure investment, which would include but not be limited to a lack of broadband service reliably delivering certain speeds". Federal Awards also state that "Recipients have flexibility to identify a need for additional broadband infrastructure investment: examples of need include lack of access to a connection that reliably meets or exceeds symmetrical 100 Mbps download and upload speeds, lack of affordable access to broadband service, or lack of reliable broadband service."

By signing this form, Grantee agrees to and acknowledges that all funds shall be used for projects that invest in an identified need including but not limited to, lack of access to a reliable high-speed broadband connection, lack of affordable broadband, and lack of reliable service and that Grantee will provide documentation of identified need as required by the State at no additional cost to the State.

DocuSigned by:
David Lindauer
5A71151C09CC45C... antee

5/30/2024
Date

**EXHIBIT P**
**CERTIFICATION OF AFFORDABILITY**

The Federal Award requires that service providers for a completed broadband infrastructure investment project that provides service to households to participate in the Federal Communications Commission's (FCC) Affordable Connectivity Program (ACP) through the lifetime of the broadband infrastructure Project, or until the ACP or its successor program(s) are no longer operating, whichever is earlier.

Additionally, a recipient is encouraged to require that services provided by a broadband infrastructure Project include at least one low-cost option offered without data usage caps at speeds that are sufficient for a household with multiple users to simultaneously telework and engage in remote learning. The State will require recipients to report speed, pricing, and any data allowance information as part of their mandatory reporting.

By signing this form, Grantee agrees to and acknowledges that the service provider who provides service to a household will participate in the ACP, and that Grantee will provide documentation certifying this requirement.

DocuSigned by:
David Lindauer
5A71151C09CC45C...

5/30/2024
Date

# State of Colorado Capital Projects Fund (CPF)

## Grant Agreement Amendment 1

**COVER PAGE**

**State Agency**
Governor's Office of Information Technology
**Grantee**
Maverix Broadband, Inc.
**Project Name**
Kiowa FTTH
**Grantee UEI**
X3G2NJ6QE223
**Agreement Number**
191465
**CORE Encumbrance Number**
CTGG1 EGBA 2024*4106
**Amendment Agreement Number**
203803
**Agreement Performance Beginning Date**
June 3, 2024
**Grant Funds Maximum Amount**
$1,861,407.00
**Matching Funds Amount**
$620,500.00
**Matching Funds Percentage Required:** 25%

**Agreement Expiration Date**
December 31, 2026
**Fund Expenditure End Date**
December 31, 2026
**Current Agreement Maximum Amount**
$1,861,407.00
**Initial Term**
State Fiscal Year 2024: $1,861,407.00
State Fiscal Year 2025: Any funds not used in previous State Fiscal Year
State Fiscal Year 2026: Any funds not used in previous State Fiscal Year(s)
State Fiscal Year 2027: Any funds not used in previous State Fiscal Year(s)
**Extension Terms**
State Fiscal Year 20__: Any funds not used in previous State Fiscal Year(s)

**Total for all State Fiscal Years $1,861,407.00**
**Agreement Authority**
Authority to enter into this grant Agreement exists in section 604 of the Social Security Act (the CPF Statute), as added by section 9901 of the American Rescue Plan Act of 2021. This grant Agreement is issued as a Fixed Amount Subaward per 2 C.F.R. § 200.201 pursuant to the "SLFRF and CPF Supplementary Broadband Guidance.

**Agreement Purpose**
The purpose of this Agreement is to facilitate timely completion by Grantee of the broadband Project described in Exhibit A while complying with all requirements found in the laws, regulations, and official guidance implementing the broadband awards made from the Capital Projects Fund (CPF). This grant Agreement is issued as a Fixed Amount Subaward per 2 C.F.R. § 200.201 subject to additional State rules, regulations, and requirements.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

**Exhibits and Order of Precedence**

The following Exhibits and attachments are included with this Agreement:

1. Exhibit A, Statement of Work.
2. Exhibit B, Sample Option Letter.
3. Exhibit C, Budget.
4. Exhibit D, Performance Bond.
5. Exhibit E, Labor and Material Payment Bond.
6. Exhibit F, Grant Federal Provisions.
7. Exhibit G, Agreement with Subrecipient of Federal Recovery Funds and Terms and Conditions.
8. Exhibit H, PII Certification.
9. Exhibit I, [RESERVED].
10. Exhibit J, Certification of Broadband Speeds.
11. Exhibit K, Assurances of Compliance with 2 C.F.R. § 200.216 Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.
12. Exhibit L, Certification of Last Mile.
13. Exhibit M, Acknowledgement of Reporting Requirements.
14. Exhibit N, Notice to Proceed.
15. Exhibit O, Certification of Need.
16. Exhibit P, Certification of Affordability.

In the event of a conflict of inconsistency between this Agreement and any Exhibit or attachment, such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

1. Exhibit F, Grant Federal Provisions.
2. Exhibit G, Agreement with Subrecipient of Federal Recovery Funds and Terms and Conditions.
3. Colorado Special Provisions in §18 of the main body of this Agreement.
4. The provisions of the other sections of the main body of this Agreement.
5. Exhibit A, Statement of Work.
6. Exhibit H, PII Certification.
7. Exhibit B, Sample Option Letter.
8. Exhibit N, Notice to Proceed.
9. Exhibit C, Budget.
10. Exhibit J, Certification of Broadband Speeds.
11. Exhibit K, Assurances of Compliance with 2 C.F.R. § 200.216 Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.
12. Exhibit L, Certification of Last Mile.
13. Exhibit M, Acknowledgement of Reporting Requirements.
14. Exhibit O, Certification of Need.
15. Exhibit P, Certification of Affordability.
16. Exhibit E, Labor and Material Payment Bond.
17. Exhibit D, Performance Bond.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

# SIGNATURE PAGE

**The Parties hereto have executed this agreement**

**Each person signing this Amendment represents and warrants that the signer is duly authorized to execute this Amendment and to bind the Party authorizing such signature.**

**GRANTEE**
Maverix Broadband, Inc.

Signed by:
David Lindauer
E95E41525981453...
By: David Lindauer

Date: 2/20/2026

**STATE OF COLORADO**
Jared S. Polis, Governor
Governor's Office of Information Technology
David Edinger, Chief Information Officer and Executive Director

DocuSigned by:
Alex Monts
4235987998F1488...
By: Alex Monts

Date: 2/20/2026

**STATE CONTROLLER**
Robert Jaros, CPA, MBA, JD

DocuSigned by:
Amanda Carroll
2A9C40DF49BF4D5...
By: Amanda Carroll

Amendment Effective Date: 2/23/2026

In accordance with §24-30-202, C.R.S., this Agreement is not valid until signed and dated above by the State Controller or an authorized delegate.

**1. Parties**

This Amendment (the "Amendment") to the Original Agreement shown on the Signature and Cover Page for this Amendment (the "Agreement") is entered into by and between Grantee, and the State.

**2. Terminology**

Except as specifically modified by the Amendment, all terms used in this Amendment that are defined in the Agreement shall be construed and interpreted in accordance with the Agreement.

**3. Amendment Effective Date and Term**

A. Amendment Effective Date

This Amendment shall not be valid or enforceable until the Amendment Effective Date shown on the Signature and Cover Page for this Amendment. The State shall not be bound by any provision of this Amendment before that Amendment Effective Date, and shall have no obligation to pay Grantee for any Work performed or expense incurred under this Amendment either before or after the Amendment Term shown in **§3.B** of this Amendment.

B. Amendment Term

The Parties' respective performances under this Amendment and the changes to the Agreement contained herein shall commence on the Amendment Effective Date shown on the Signature and Cover Page for this Amendment and shall terminate on the termination of the Agreement.

**4. Purpose**

The purpose of this Amendment is to add language to the Agreement regarding pre-assignment allowable costs.

**5. Modification**

The Agreement and all prior amendments thereto, if any, are modified as follows:

A. Section 17.A. of the Agreement is deleted and replaced with the following:

Assignment

Grantee's rights and obligations under this Agreement are personal and may not be transferred or assigned without the prior, written consent of the State. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of Grantee's rights and obligations approved by the State shall be subject to the provisions of this Agreement.

In the event the State approves an assignment, the assignor, the assignee, and the State shall cooperate in good faith to determine any accounting adjustments to accommodate for the continuation of the Work and the Project.

In the event of an assignment, and if approved in writing by the State, and allowable under the applicable federal grant program, assignee may request reimbursement for allowable pre-assignment costs incurred by the assignee prior to the effective date of the assignment.

**6. Limits of Effect and Order of Precedence**

This Amendment is incorporated by reference into the Agreement, and the Agreement and all prior amendments or other modifications to the Agreement, if any, remain in full force and effect except as specifically modified in this Amendment. Except for the Special Provisions contained in the Agreement, in the event of any conflict, inconsistency, variance, or contradiction between the provisions of this Amendment and any of the provisions of the Agreement or any prior modification to the Agreement, the provisions of this Amendment shall in all respects supersede, govern, and control. The provisions of this Amendment shall only supersede, govern, and control over the Special Provisions contained in the Agreement to the extent that this Amendment specifically modifies those Special Provisions.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**